**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 18-545** |
| **JOHN JOSEPH KRASLEY** | : | |

### UNITED STATES' SENTENCING MEMORANDUM

For more than five years, defendant John Joseph Krasley distributed, transported, received and accessed images and videos of minors being sexually exploited.  His acts of sharing, receiving and accessing these images and videos victimized each of the child victims shown in those depictions.  Because Krasley's viewing and sharing of these child exploitation videos victimized these children anew, and because he has not acknowledged or accepted any responsibility for his actions and poses a danger to the community, this Court should impose a significant custody sentence.  As explained below, the government recommends that the Court impose a custody sentence within the Sentencing Guideline range of 262-327 months in custody. The government also recommends that the Court impose a fine, the special assessments, and order restitution to two victims.  This Court has scheduled sentencing in this matter for Tuesday, February 16, 2021, at 10:00 AM at the Easton courthouse.

### I.     THE JURY CONVICTED KRASLEY OF ALL COUNTS AT TRIAL

On October 31, 2019, the trial jury convicted Krasley of all 14 counts of child exploitation offenses that the grand jury had charged.   These convictions confirmed Krasley's

involvement with child pornography spanning more than five years – from March of 2013 to June of 2018.   The chart below summarizes the counts on which the jury convicted Krasley:

| COUNTS OF CONVICTION | | | |
|---|---|---|---|
| Ct | Date | Charge | Description |
| 1 | March 4, 2013 | Distribution | Gigatribe exchange with UC HSI agent |
| 2 | August 24, 2014 | Distribution | Gigatribe exchange with UC HSI agent |
| 3 | April 3, 2015 | Distribution | Gigatribe exchange with UC HSI agent |
| 4 | Dec 31, 2016 | Transportation | Uploaded file to Chatstep |
| 5 | Feb 6, 2017 | Distribution | Gigatribe exchange with UC Swiss LE agent |
| 6 | Oct 13, 2017 | Distribution | Gigatribe exchange with UC FBI TFO |
| 7 | Nov 24, 2017 | Access w/ intent to view | Clicked on link at funkyimg.com |
| 8 | Nov 24, 2017 | Receipt | 2 links on PutVid.net |
| 9 | Dec 2, 2017 | Access w/ intent to view | Accessed links at #boypicpaste |
| 10 | Dec 7, 2017 | Access w/ intent to view | Accessed links at funkyimg.com |
| 11 | Dec 12, 2017 | Transportation | Uploaded image to picpaste.com |
| 12 | Dec 12, 2017 | Access w/ intent to view | Accessed the uploaded image at picpaste.com |
| 13 | March 14, 2018 | Receipt | 2 links on PutVid.net |
| 14 | June 27, 2018 | Distribution | Gigatribe exchange with UC FBI TFO |

These offenses are in violation of 18 U.S.C. § 2252(a)(1) (transportation), § 2252(a)(2) (distribution and receipt), and § 2252(a)(4)(B) (access with intent to view).

II.   OFFENSE CONDUCT

Evidence at trial showed that Krasley connected to the internet from his home to receive, share, distribute and view child pornography between March of 2013 and June of 2018.  Some of

2

the time Krasley shared child pornography on a file sharing site on the internet called Gigatribe (gigatribe.com).  He shared folders and files that he possessed by granting access to them to others with whom he chatted on Gigatribe.  The shared folders contained child exploitation images, and Krasley shared these images of child exploitation with undercover law enforcement agents.  At other times Krasley downloaded videos of child exploitation from an internet site called PutVid.  During a wiretap on Krasley's internet account in December 2017, agents saw that Krasley also clicked on links that took him to images of child pornography for his personal viewing.  The images and videos that Krasley accessed in this way included images of prepubescent children, and images of bondage, sadistic conduct and conduct that would necessarily be painful to the young child victim such as the penetration of prepubescent minors. There were 245 images and 6 videos involved in the charged counts, and an additional 145 images that Krasley viewed as recorded on the Title III interception.  A review of the facts for the counts of conviction is presented below.[1]

A.   Count 1 (Distribution – March 4, 2013)

On March 4, 2013, HSI SA Patrick McCall, while using an undercover account, signed on to a website called gigatribe.com.  This site was known for having users who shared child pornography.  Krasley was also signed on to gigatribe.com at that time using the name "looking2allu2day."  SA McCall began a chat session with Krasley.  Within the chat session, Krasley told SA McCall the password for the folders that Krasley was sharing was "boysrgreat." SA McCall accessed the password-protected folders that Krasley had posted and saw that they contained images of child pornography.  SA McCall downloaded 47 image files of child

---

1 These facts for the counts of conviction are taken from the testimony and other evidence presented and admitted at trial, including the images and videos themselves.  The Presentence Report also describes the offense conduct by count.  PSR ¶¶ 7-21.

pornography from Krasley's folders.  These were the basis for the conviction of distributing

child pornography in Count 1.  Two of these images were admitted at trial (Gvt. Exhibits 1A and

1B).  Exhibit 1A depicts a naked early pubescent boy sitting in a chair with his legs spread apart

and his erect penis exposed to the camera. The child appears to be bound with rope at the wrists

and upper arms.  Exhibit 1B depicts a baby boy who is seen naked from the waist-down lying on

his back with his legs spread apart and his genitals exposed to the camera. An adult male's penis

is seen pressed against the child's anus.

   B. Count 2 (Distribution – August 24, 2014)

  On August 24, 2014, SA McCall was signed on to an undercover account at

gigatribe.com.  Krasley was also signed on to Gigatribe using the name "somethingnew."  SA

McCall began a chat session with Krasley who stated that his age preference was "12."  Krasley

told SA McCall the password for the folders that Krasley was then sharing on Gigatribe.  SA

McCall accessed Krasley's password-protected folders and saw that they contained child

pornography images.  SA McCall downloaded 51 of these child pornography image files, and

these are the basis for Krasley's conviction in Count 2.   Two of these 51 images were admitted

at trial (Gvt. Exhibits 2A and 2B).  Exhibit 2A depicts a baby boy who is seen naked from the

waist-down lying on his left side with his genitals exposed to the camera. An adult male's erect

penis is seen penetrating the child's anus.  Exhibit 2B depicts a naked toddler boy in a bathtub

performing oral copulation on the erect penis of an adult male.

   C. Count 3 (Distribution – April 3, 2015)

  On April 3, 2015, SA McCall was signed on to an undercover account at gigatribe.com.

Krasley was also signed onto Gigatribe using the name "anythingnew."  SA McCall began a chat

session with Krasley who stated that his interest was in "boys."  Krasley told SA McCall the

password for the folders that Krasley was then sharing on Gigatribe.   SA McCall accessed Krasley's Gigatribe folders and saw that they contained images of child pornography.  SA McCall downloaded 19 child pornography image files from Krasley's Gigatribe folders.  These are the basis for the conviction for distribution of child pornography in Count 3.  Two images from this download were admitted at trial (Gvt. Exhibits 3A and 3B).  Exhibit 3A depicts a close-up image of a baby boy being anally penetrated by the erect penis of an adult male.  Exhibit 3B depicts a close-up image of an adult male's erect penis lying against the anus of a baby boy, whose anus and genitals are fully visible to the camera.

D.     Count 4 (Transportation – December 31, 2016)

On December 31, 2016 at 04:11:25 UTC (11:11 PM on 12/30/16 EST) Krasley was logged onto the internet anonymous chat site Chatstep.com.  While chatting with another person, Krasley uploaded a file that was an image of child pornography.  This uploading is the basis for Krasley's conviction for transporting child pornography in Count 4.  The image was admitted at trial as Gvt. Exhibit 4.  This image depicts a prepubescent boy sitting on an orange fabric with his legs spread apart. He is pulling down his blue checked boxer shorts to reveal his erect penis.

E.     Count 5 (Distribution – February 6, 2017)

On February 6, 2017, Officer Gilles Zuercher of the Swiss Federal Police was signed on to an undercover account at gigatribe.com.  Krasley was also signed on to gigatribe.com using the name "Slick2you14" and was sharing files within several password-protected folders.  Officer Zuercher began a chat session with Krasley, and Krasley told the officer the password for his main Gigatribe folder.  Officer Zuercher opened the folder and downloaded twelve still images and two videos of child pornography from Krasley's folder.  These are the basis of the conviction in Count 5.  One image and a portion of one video were admitted at trial as Gvt.

5

Exhibits 5A and 5B.  Exhibit 5A depicts close-up image of a baby boy being anally penetrated by the erect penis of an adult male.  Exhibit 5B is an excerpt from the video that depicts a naked prepubescent girl spreading her legs apart and exposing her genitalia to the camera.  An adult male's hand is seen masturbating the child.

### F.    Count 6 (Distribution – October 13, 2017)

On October 13, 2017, FBI Task Force Officer Carlton Turner was signed on to an undercover account at gigatribe.com.  TFO Turner began a chat with Krasley who was signed onto gigatribe.com using the name "Slick2you10."  Krasley was sharing files within a password-protected folder.  Krasley told TFO Turner the password to the folder containing the files Krasley was sharing.  TFO Turner opened the folder and downloaded 99 images, 75 of which were child pornography.  This distribution was the basis for the conviction in Count 6.  One array and three of the child pornography images were admitted at trial (Gvt. Exhibits 6A through 6D).  Exhibit 6A depicts 51 thumbnail images of files that Krasley made available for download. The majority of the images depict child exploitation.  Exhibit 6B depicts a naked prepubescent boy lying on his back with his legs spread apart and his erect penis exposed to the camera. Exhibit 6C depicts a close-up image of a prepubescent boy's penis. The child's penis has a cord tied around it with a black device holding it tight against his penis. Exhibit 6D depicts a close-up image of a baby boy's penis.

### G.    Count 7 (Access with Intent to View – November 24, 2017)

On November 24, 2017, agents monitoring Krasley's internet activity pursuant to a court ordered wiretap saw Krasley use that internet account to access a child pornography image file through the known image-sharing website "funkyimg.com."   The image Krasley accessed depicted a naked prepubescent boy being anally penetrated by the erect penis of an adult male.

Gvt. Exhibit 7.  This was the basis for the conviction for accessing with intent to view child pornography in Count 7.

> H.    Count 8 (Receipt – November 24, 2017)

On November 24, 2017, agents monitoring Krasley's internet activity pursuant to a court ordered wiretap saw Krasley use that internet account to access two links that went to the website PutVid.net.  This is a website from which persons can access and download videos.  Each of these links, when Krasley accessed it, opened a video depicting child pornography.  The videos were admitted at trial as Gvt. Exhibits 8A and 8B.  This was the basis for the conviction for receipt of child pornography in Count 8.   Exhibit 8A depicts a pubescent boy in a bathroom masturbating his erect penis, with the child performing close-ups of his penis by holding up his green cell phone to the bathroom mirror.  Exhibit 8B depicts an early pubescent boy undressing and exposing his genitalia to the camera. The boy turns around and spreads his buttocks to expose his anus to the camera.

> I.    Count 9 (Access with Intent to View – December 2, 2017)

On December 2, 2017, agents monitoring Krasley's internet activity pursuant to a court ordered wiretap saw Krasley use that internet account to access undernet.org, which is an Internet Relay Chat (IRC) location on the internet.  IRC is a program that brings persons with similar interests together in chat rooms.  Krasley joined the IRC channels named #littleboysexchannel and #boypicpaste.  These chatrooms are known to be populated by individuals that actively trade child exploitation material.  While Krasley was in the #boypicpaste chat room, another user posted a link that went to a file on funkyimg.com.  This image-sharing website is frequently used by individuals chatting within IRC chat rooms, such as #littleboysex channel, to share image files. Within a minute of the posting, Krasley accessed that

link.  By accessing the link, Krasley went directly to an image of a prepubescent boy naked from the waist-down. The child is lying on a brown blanket with his left knee bent up. His erect penis is exposed to the camera.   Gvt. Exhibit 9.  This is the basis for the conviction for access with intent to view child exploitation in Count 9.

J.     Count 10 (Access with Intent to View – December 7, 2017)

On December 7, 2017, agents monitoring Krasley's internet activity pursuant to a court ordered wiretap saw Krasley use that internet account to access seven image files through "funkyimg.com."  Each of the seven image files that Krasley accessed depicted graphic child exploitation activity involving the same naked prepubescent boy and adult male.  This is the conduct that is the basis for the conviction for accessing child pornography with intent to view in Count 10.  One of the images Krasley accessed depicts a naked prepubescent boy being anally penetrated by an adult male's erect penis.  Gvt. Exhibit 10.

K.     Count 11 (Transportation – December 12, 2017)

On December 12, 2017, agents monitoring Krasley's internet activity pursuant to a court ordered wiretap saw Krasley use that internet account to upload an image of child pornography to the image-sharing website "picpaste.com."  This is the basis for the conviction for transportation of child pornography in Count 11.  The image Krasley uploaded depicts the erect penis of a prepubescent boy being held by the hand of an adult male.  Gvt. Exhibit 11.

L.     Count 12 (Access with Intent to View – December 12, 2017)

On December 12, 2017, agents monitoring Krasley's internet activity pursuant to a court ordered wiretap saw Krasley use that internet account to connect to the picpaste.com website where he had just uploaded a child exploitation image ten minutes earlier.  Krasley then accessed and viewed the same image he had just uploaded (as described in the previous paragraph above).

This is the basis of the conviction for accessing child pornography with intent to view in Count 12.

### M.    Count 13 (Receipt – March 14, 2018)

On March 14, 2018, Krasley downloaded two child pornography videos by clicking on two links that connected to the video storage website PutVid.net.   The first video depicts two naked prepubescent boys lying on the couch. One of the boys is seen masturbating the other. Gvt. Exhibit 13A.  The second video depicts a prepubescent boy being anally penetrated by the erect penis of an adult male.  Exhibit 13B.  These are the basis for the conviction for receipt of child pornography in Count 13.

### N.    Count 14 (Distribution – June 27, 2018)

On June 27, 2018, FBI TFO Turner was signed onto an undercover account at gigatribe.com.  Krasley was signed onto gigatribe.com at that time using the name "Thesunshines" and was sharing files within a password-protected folder.  TFO Turner began a chat session with Krasley who then told TFO Turner the password for his folder.  TFO Turner opened the folder and downloaded 35 images of child exploitation material.  This distribution is the basis for the conviction for distribution in Count 14.  Two of these images were admitted at trial (Gvt. Exhibits 14A and 14B).  Exhibit 14A depicts a naked prepubescent girl performing oral copulation on the erect penis of an adult male. Exhibit 14B depicts a naked prepubescent girl standing next to a naked prepubescent boy. The girl is touching the boy's genitals.

### O.    Additional Images

HSI agents who monitored the Court-ordered wiretap during November and December of 2017 on Krasley's internet connection saw Krasley view an additional 145 still images of child pornography.  PSR ¶ 23.  These are in addition to those images identified above in the

descriptions of the counts of conviction.   These images are relevant conduct for purposes of the Sentencing Guidelines.  PSR ¶ 38.[2]

The agents also saw Krasley view an additional 383 images of children that constituted "child erotica"[3] during the interception.  The images of child erotica that the agents saw that Krasley was viewing were images of mostly boys in the early pubescent age range. The boys were frequently depicted wearing only underwear, or standing nude.  Krasley viewed these during the operation of the Title III intercept in November and December of 2017 and these are in addition to the number of child pornography images and videos reported above in connection with individual counts of conviction or relevant conduct.  Although not meeting the definition of sexually explicit conduct under 18 U.S.C. § 2256(2), Krasley's viewing of child erotica shows his particular interest in sexually oriented images of minors, all of which exploit these children.

P.    Other Conduct

During the Title III interception, agents saw that Krasley conducted internet searches for "teen boys diapers," for "VinX HD Converter Deluxe 11 Year Old Luis Jerks And Dry Cums

---

2 The total number of images as noted in the Presentence Report's Note 1 at ¶ 38 probably should be 840, not 940.  (6x75)+245+145 = 450+245+145 = 450+390 = 840 images.  This is also referred to in the PSR Addendum.

3 "Child erotica" has been described in a Third Circuit opinion in this way:  "The government distinguishes child pornography from child erotica by defining the latter as material that depicts 'young girls as sexual objects or in a sexually suggestive way,' but is not 'sufficiently lascivious to meet the legal definition of sexually explicit conduct' under 18 U.S.C. § 2256. *See also United States v. Gourde,* 440 F.3d 1065, 1068 (9th Cir.2006) (en banc) (citing FBI affidavit describing child erotica as 'images that are not themselves child pornography but still fuel ... sexual fantasies involving children')."  *United States v. Vosburgh*, 602 F.3d 512, 520 (3d Cir. 2010).  Of course, the same applies equally to images of young boys as well as young girls.  The 145 images of child pornography and the child erotica images here were not offered at trial.

over," and for "Home cam Hidden Video Boys cover."  Evidence of these searches was admitted at trial as Gvt. Exhibits 42-44.

During the December 2018 search of Krasley's residence, agents found a Staples thumb drive that had two deleted files.  The forensic examiner was able to recover the file names but not the content.  The deleted filenames suggested that the deleted content was child pornography. The deleted filenames were:

    1. "Dad.Caught.Masturbating.Fucks.Son's.Friend.wmv" and

    2. "Three.Twinks.wmv."

"Twinks" is a term that refers to gay teen pornography.[4]  The forensic expert testified that based on log information on the thumb drive, the files were created in 2010 and last accessed in 2012. Evidence of the file names found on the thumb drive was admitted as Gvt. Exhibits 70-71.  Also, on an old Dell hard drive seized from Krasley's residence there was a log of an IRC chat that was indicative of attempts to trade child pornography.  The chat log was from 2010 and it had been deleted, but the forensic examiner was able to recover it.  This was admitted as Gvt. Exhibit 72.  This evidence of searches and these file titles indicates the breadth of Krasley's interest in child pornography, extending into various depraved areas of child exploitation images, as well as

---

4 *See United States v. Ramos*, 685 F.3d 120, 125 (2d Cir. 2012) ("The hard drive had been used to conduct a Google search using words such as "twink," which suggested a search for child pornography"); *United States v. Hunter*, No. MJ 16-00013-N, 2016 WL 917948, at *3, n. 2 (S.D. Ala. Mar. 10, 2016) ("Agent Hunter stated that the term ["twink"] refers to underage young teen boys engaging in sexual acts.")  In some contexts, the term "twink" can mean a youthful looking young adult appearing to be underage.  *See Free Speech Coalition, Inc. v. Holder*, 957 F.Supp.2d 564, 584 (E.D. Pa. 2013) ("Some of the most popular categories of commercial pornography, such as "teen porn," "college porn" and "twinks" (gay teen porn), are popular precisely because they depict women and men who appear to be 18, 19 or 20 years old, or younger.").

showing how his pursuit of this material extended over a long time period, going back to at least 2010.

Krasley continued to access Gigatribe and other sites on the internet that provided access to child pornography, and continued to share files of child exploitation even after law enforcement searched his residence in 2006, 2009, and 2013.  In those searches, the agents did not find child pornography images on any device that they found at his residence, and again in the search in 2018 law enforcement did not find Krasley's child pornography on any device they found and seized.  The government's expert at trial testified that Krasley could have used a small SD card or thumb drive to boot up his computer to access Gigatribe and leave no remnant on his actual computer, only on the card or thumb drive.  The expert testified that the card or thumb drive could be very small (see Gvt. Exhibit 76 – a photo of an SD card next to a quarter, showing the card to be only slightly larger than a quarter).  Such a device could be easily secreted in his residence.  Krasley himself testified that he had a lot of "junk" stored all over the house, including in the attic, basement and garage.  10/20/19 Transcript at 15-16.  This would have provided many locations for him to secret such a small device so that that the agents would not find it.

III.   SENTENCING CALCULATION

A.   Statutory Maximum Sentence.

The Court may impose the following statutory maximum sentence on the counts charging distribution, transportation and receipt (Counts 1-6, 8, 11, 13,14):  20 years imprisonment with a 5-year mandatory minimum, a $250,000 fine, a minimum of five years of supervised release up to a lifetime of supervised release, restitution, forfeiture, and special assessments of $100 and

$5,000 (JVTA)[5] (each count), except that the JVTA assessment is not applicable to the convictions in Counts 1, 2 and 3 as they were committed before the JVTA provisions took effect. PSR ¶ 81 at note 5.

The Court may impose the following statutory maximum sentence on the counts charging access with intent to view (Counts 7, 9, 10, 12):  20 years imprisonment,[6] a $250,000 fine, a minimum of five years of supervised release up to a lifetime of supervised release, restitution, forfeiture, and special assessments of $100 and $5,000 (JVTA).

The total maximum sentence is:  280 years imprisonment with a 5-year mandatory minimum, a $3,500,000 fine, a minimum of five years of supervised release up to a lifetime of supervised release, restitution, forfeiture, and special assessments of $1400 and $55,000 (JVTA).

B.    Sentencing Guidelines Calculation.

The Probation Office correctly calculated the defendant's advisory guideline offense level as follows:

| | | |
|---|---|---|
| 2G2.2(a)(2) | 22 | base offense level |
| 2G2.2(b)(2) | +2 | prepubescent minor |
| 2G2.2(b)(3)(F) | +2 | distribution |
| 2G2.2(b)(4) | +4 | portrayal of sadistic conduct or abuse of infant |
| 2G2.2(b)(6) | +2 | use of a computer |
| 2G2.2(b)(7)(D) | +5 | more than 600 images |
| 3C1.1 | +2 | obstruction of justice |
| Total | 39 | |

---

5  "JVTA" refers to the Justice for Victims of Trafficking Act of 2015 (JVTA).  The JVTA provided for a mandatory $5,000 special assessment applicable to convictions for certain child exploitation offenses, including the offenses of conviction here.  18 U.S.C. §3014(a).   Its application is limited to "non-indigent person[s]."   The Third Circuit has recently held that the statute requires the assessment to be applied on a per count basis, not on a per case basis.  *United States v. Johnman,* 948 F.3d 612, 620 (3d Cir. 2020).  This assessment is discussed further below.

6 The maximum is 20 years for these counts because for each count the jury specifically found that one or more visual depictions involved in the count involved a prepubescent minor or a minor under the age of 12.  18 U.S.C. § 2252(b)(2).

PSR ¶¶ 30-45.

The probation officer in the presentence report further correctly determined that the defendant has zero criminal history points.  PSR ¶ 48.  Krasley is therefore in criminal history category I.  PSR ¶ 48.

Krasley's Guideline sentencing range is therefore (39, I) = **262-327 months.**  PSR ¶ 73.

Krasley objected to the inclusion of three of these Specific Offense Characteristics in his counsel's December 28, 2020 letter to the Probation Officer in response to the draft presentence report.  *See* PSR Addendum.  Krasley objected to the application of these three enhancements: +4 for sadistic conduct,[7] +5 for more than 600 images, and +2 for obstruction of justice.  The application of each of these Guidelines Specific Offense Characteristics is well supported by the evidence admitted at trial, and the relevant conduct.  The Probation Officer was correct to include each of these in Krasley's Guidelines calculations.  Each of these is discussed below.

1. <u>Sadistic or Masochistic Conduct</u>

Guideline Section 2B2.2(b)(4) provides:

If the offense involved material that portrays (A) sadistic or masochistic conduct or other depictions of violence; or (B) sexual abuse or exploitation of an infant or toddler, increase by 4 levels.

U.S.S.G. § 2B2.2(b)(4).  Part B of this Guideline was effective on November 1, 2016.  U.S.S.G. Amendment 801.  Thus, part B applies only to Counts 4 through 14 here.

The Third Circuit, along with other circuits, has held that the "sadistic or masochistic conduct" Guideline enhancement applies "where an image depicts sexual activity involving a prepubescent minor that would have caused pain to the minor."  *United States v. Maurer*, 639

---

7 Although the PSR addendum refers to this as being a +2 level enhancement, it is actually a +4 level enhancement.  U.S.S.G. § 2G2.2(b)(4);  PSR ¶ 36.

F.3d 72, 79 (3d Cir. 2011).   The court in *Maurer* noted that the application was "not limited to circumstances where the pain that would result from the depicted conduct is the result of sexual penetration by an adult or bondage of a child." <u>Id.</u> at 80.  The court held that "in order to apply this enhancement, a sentencing court need only find, by a preponderance of the evidence, that an image depicts sexual activity involving a prepubescent minor and that the depicted activity would have caused pain to the minor." <u>Id.</u> at 79.  In *Maurer,* the depictions involved "a prepubescent . . . male . . . anally penetrated by an older male"; "a prepubescent . . . female with her wrist bound to her ankle with duct tape"; and an image of "a prepubescent . . . female, her legs bound above her head with white rope, with an object inserted between her legs." <u>Id.</u> at 81.  Further, there is no need to show that the defendant intended to possess such images.  "Section 2G2.2(b)(4) is applied on the basis of strict liability." <u>Id.</u> at 80.  In particular, this enhancement has uniformly been applied when a prepubescent minor is vaginally or anally penetrated. <u>E.g.</u> *United States v. Bender*, 290 F.3d 1279, 1285 -1286 (11th Cir. 2002)(the enhancement applies when it depicts the "subjection of a young child to a sexual act that would have to be painful. . . . This includes photographs of very young children being vaginally and anally penetrated by adult males.")

Several of the images admitted into evidence at trial depict penetration of young children, conduct that is necessarily painful.  Exhibit 2A depicts a baby boy who is seen naked from the waist-down lying on his left side with his genitals exposed to the camera. An adult male's erect penis is seen penetrating the child's anus.  Exhibit 3A depicts a close-up image of a baby boy being anally penetrated by the erect penis of an adult male.  Exhibit 5A depicts close-up image of a baby boy being anally penetrated by the erect penis of an adult male.  Exhibit 7 depicted a naked prepubescent boy being anally penetrated by the erect penis of an adult male image

depicting a naked early pubescent boy's body.   Exhibit 10 depicts a naked prepubescent boy being anally penetrated by an adult male's erect penis.  Exhibit 13B is a video that depicts a prepubescent boy being anally penetrated by the erect penis of an adult male.  Any one of these images would be sufficient to support the application of § 2G2.2(b)(4); together they are conclusive.

Additionally, two images satisfy the second prong of the Guideline – that an image involved "sexual abuse or exploitation of an infant or toddler" within the time when that Guideline enhancement is applicable.  Exhibit 5A is an image that depicts close-up image of a baby boy being anally penetrated by the erect penis of an adult male.  Exhibit 6D depicts a close-up image of a baby boy's penis.  Both were in offenses committed after November 1, 2016. Either of these images would cause the Guideline enhancement to be applied; together they are conclusive.

Finally, one of the images in Count 1 (Exhibit 1A) showed a naked early pubescent boy sitting in a chair with his legs spread apart and his erect penis exposed to the camera. The child appears to be bound with rope at the wrists and upper arms.  This binding indicates sadistic/masochistic conduct that independently invokes § 2G2.2(b)(4).  *United States v. Tyree*, 123 Fed. App. 508 (3d Cir. 2005)(conviction affirmed where the sole issue was whether the video underlying the conviction was sadistic and masochistic where the video "show[ed] the child victim standing in her underwear, hands bound, wearing a collar around her neck, and her buttocks red as if having just been beaten. The focus of the video [was] plainly on the child victim's bound body, which is in a submissive pose."  *See also United States v. Hotaling*, 634 F.3d 725 (2d Cir. 2011) (upholding sadistic and masochistic sentencing enhancement under

Sentencing Guidelines where image was morphed to make it appear that child was partially nude, restrained by handcuffs, bound by a dog collar, and tied to a dresser).

The images identified above were involved in the counts of conviction noted. Each image supports the application of the § 2B2.2(b)(4) Guideline enhancement of +4 levels. These images and videos will be available at the sentencing hearing for the Court's inspection. The Probation Officer correctly applied the § 2G2.2(b)(4) enhancement of +4 levels. PSR ¶ 36.

2. <u>Number of Images – 600 or More Images</u>

Guideline Section 2B2.2(b)(7) provides:

(7)     If the offense involved—
   (A)     at least 10 images, but fewer than 150, increase by 2 levels;
   (B)     at least 150 images, but fewer than 300, increase by 3 levels;
   (C)     at least 300 images, but fewer than 600, increase by 4 levels; and
   (D)     600 or more images, increase by 5 levels.

U.S.S.G.§ 2G2.2(b)(7).

Application Note 6 to Guideline 2G2.2 directs how to count images for § 2G2.2(b)(7):

6.     Application of Subsection (b)(7).—

(A)   <u>Definition of "Images."</u>—"Images" mean any visual depiction, as defined in 18 U.S.C. § 2256(5), that constitutes child pornography, as defined in 18 U.S.C. § 2256(8).

(B)   <u>Determining the Number of Images</u>.—For purposes of determining the number of images under subsection (b)(7):

(i)    Each photograph, picture, computer or computer-generated image, or any similar visual depiction shall be considered to be one image. If the number of images substantially underrepresents the number of minors depicted, an upward departure may be warranted.

(ii)   Each video, video-clip, movie, or similar visual depiction shall be considered to have 75 images. If the length of the visual depiction is substantially more than 5 minutes, an upward departure may be warranted.

U.S.S.C. § 2G2.2, Application Note 6.

Guideline 2G2.2(b)(7) directs that all images involved in the offenses of conviction are counted.  Courts have ruled that images involved in relevant conduct are also to be included. *United States v. Shrake*, 515 F.3d 743, 747-48 (7th Cir. 2008) (Easterbrook, J.)(defendant received +5 under § 2G2.2(b)(7)(D) "because his relevant conduct included 600 or more images").  Further, duplicate images are to be counted separately.  "The distribution of duplicate images increases the supply and availability of child pornography just as the distribution of unique images does." *United States v. Sampson*, 606 F.3d 505, 510 (8th Cir.2010).  *Accord United States v. McNerney,* 636 F.3d 772, 777 (6th Cir.2011) (holding "duplicate digital images, like duplicate hard copy images, should be counted separately for the purposes of calculating a sentence enhancement pursuant to § 2G2.2(b)(7)");  *United States v. Price*, 711 F.3d. 455, 458-60 (4th Cir. 2013)("when applying the number of images enhancement, each and every depiction of child pornography without regard to originality must be counted. We reject any uniqueness requirement that [the defendant] tries to read into Section 2G2.2(b)(7) and hold that any image without regard to its originality should be counted when applying this enhancement so long as that image depicts child pornography and is relevant to the underlying conviction.").  In addition, the application note directs that each video involved should be counted as 75 images.

Here, testimony at trial established that there were 245 images and 6 videos involved in the fourteen counts of conviction.  As set forth in the facts section above, these were images or videos that the undercover officers downloaded from the Gigatribe folders that Krasley shared with them, videos that Krasley downloaded from PutVid.net, images that he uploaded or downloaded, and images that he accessed.  The six videos involved each count as 75 images. Thus, the image count of the videos is 450 images.  This is added to the 245 still images that Krasley shared, distributed, received, transported or viewed.  This totals 695 images, well above

the 600 required to apply the +5 enhancement under § 2B2.2(b)(7)(D).  In addition, during the

period of the Title III interception, agents saw that Krasley viewed or accessed an additional 145

images of child exploitation.  These are also countable in determining the number of images

under this Guideline, although the maximum +5 is reached without even considering the relevant

conduct from the Title III interception.

For these reasons, the Probation Officer was correct in including a +5 enhancement under

§ 2G2.2(b)(7)(D) in Krasley's Guideline calculation.  PSR ¶ 38.

3.  Obstruction of Justice

Guideline section 3C1.1 provides as follows:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede,
> the administration of justice with respect to the investigation, prosecution, or sentencing
> of the instant offense of conviction, and (2) the obstructive conduct related to (A) the
> defendant's offense of conviction and any relevant conduct; or (B) a closely related
> offense, increase the offense level by 2 levels.

U.S.C.C. § 3C1.1.

The Third Circuit recently reaffirmed that when a defendant at trial falsely denies

committing the crime, that is perjury and the Obstruction of Justice Guideline enhancement

applies.  *United States v. Gray*, 942 F.3d 627, 633–34 (3d Cir. 2019).  In *Gray,* the defendant

testified at his felon-in-possession trial and "repeatedly testified that he did not possess a stolen

firearm."  Id.  at 633.  The jury convicted.  With respect to the Guideline enhancement, the Court

stated that "[i]t is undisputed that this enhancement is triggered where a defendant provides

perjured testimony during the course of his criminal proceedings."  Id.  The district court there

"expressly found that the elements for perjury were satisfied in light of the jury's verdict because

Gray had repeatedly testified that he did not possess a stolen firearm."  Id.

The *Gray* court explained that "[a] defendant qualifies for the perjury enhancement when he gives 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" Id., *citing United States v. Dunnigan*, 507 U.S. 87, 94 (1993). The district court should make a clear finding on each element of perjury, and is bound by the facts necessarily implicit in the jury's guilty verdict. Id.

Here, Krasley testified at trial and gave knowingly false testimony in denying that he was involved with child pornography. Krasley gave the following testimony at trial during his direct examination:

> Q    Have you ever, at any point in your life, used a computer to upload or download child pornography at any point?
>
> A    No, I have not. I never sent or received child pornography from any of my computers or over my internet.
>
> Q    Sitting here today, can you tell --
>
> A    I wish - I wish I knew who did because I wouldn't be sitting here today.
>
> Q    That was - that was my next question. Can you tell –
>
> A    I wouldn't be sitting here if I knew.
>
> Q    You can't tell the jury who did it?
>
> A    No, absolutely not. I wish I knew.

Transcript (10/30/19) at 12.

This testimony was clearly false. The jury found, beyond a reasonable doubt, that Kralsey used his computer and his internet connection to upload and download child pornography. In six of the counts (Counts 1, 2, 3, 5, 6, and 14), the jury convicted Krasley of distributing child exploitation images to undercover agents by sharing these images from folders

he possessed by allowing the agents to access his folders and upload the exploitation images to their computers.  He did this when connecting with the agents on Gigatribe.com through his internet connection.  In each case, Krasley intentionally gave the agent the password to his folder containing child pornography images.  His having allowed these uploads from his folders is directly contrary to his testimony that he never sent or received any child pornography from his computer or using his internet connection.  Similarly, the jury convicted Kralsey of receiving child pornography in Count 8 when he downloaded two video files containing child pornography from a site called PutVid.net on November 24, 2017.  In Count 13 the jury convicted Krasley of downloading two additional video files from PutVid.net containing child pornography on March 4, 2018.  These facts are directly contrary to Krasley's testimony that he never sent or received child pornography using his computer or internet connection.  In addition, in Count 11 the jury convicted Krasley of uploading a child pornography image to the website picpaste.com, and then convicted Krasley in Count 12 of accessing that image to view it.  This is contrary to Krasley's testimony that he never sent or received child pornography using his computer or internet connection.  As the trial evidence showed, all of these offenses occurred using the internet connection assigned to Krasley's residence.

The jury necessarily found that Kralsey sent or received child pornography on his internet connection in convicting on these counts.  For the Gigatribe connections, the jury found that Krasley distributed the images.  It found that the sharing of the images by providing the folder passwords to the agents was distribution, which is equivalent to sending them, as he knew when he provided the password to those folders, and that was the reason to provide the password and make the contents of those folders available.  For the PutVid videos, the jury found that he received them in order to convict on Counts 8 and 13.  The jury necessarily found that Krasley

sent child pornography when it convicted him of transportation of child pornography in Count 11, as his sending the image to picpaste was the transportation for which they jury convicted.

Finally, it is clear that Krasley gave "false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Gray* at 633.  By the time he testified, he had heard all of the detailed evidence showing how he had sent and received child pornography.  Krasley knew exactly what conduct was at issue.  The question was clear – "[h]ave you ever, at any point in your life, used a computer to upload or download child pornography at any point?"  There was no ambiguity or confusion about the question.  Krasley's answer was equally clear:  He told the jury "[n]o, I have not. I never sent or received child pornography from any of my computers or over my internet." This testimony and the context in which it was given shows conclusively that he had the willful intent to provide false testimony.  The subject was the question at the heart of the issues before the jury, so it was material.  There was no equivocation in the answer – no room to now argue that it was the result of confusion, mistake or faulty memory.

This Court should explicitly find that the elements of falsity, materiality and willfulness are met here.  Falsity and materiality of Krasley's testimony is implicit in the jury's verdicts.  It could not have convicted Krasley if it did not find that he distributed child pornography in the distribution counts, and that he uploaded and downloaded child pornography in the counts charging receipt and transportation.   This is sending and receiving child pornography.  The evidence of where this occurred was the evidence that it came from the IP address assigned to Krasley's residence, and it therefore was over Krasley's internet connection.  Thus, as in *Gray*, the relevant findings of falsity and materiality were made by the jury, and the Court here should make those findings based on the jury's verdicts. *United States v. Boggi*, 74 F.3d 470, 479 (3d

Cir. 1996) (concluding the defendant's trial testimony was false and "necessarily material" because the jury would not have convicted him if the jury had believed the testimony); *United States v. Fiorelli*, 133 F.3d 218, 224 (3d Cir. 1998) (affirming district court's finding that falsity was implicit in jury's verdict and, thus, sufficient to carry Government's burden).   The facts in the trial record support this finding of falsity and materiality, as explained above.  Finally, this Court should find that Krasley's false testimony was willfully given.  There is no evidence of confusion, and Krasley's denial was clear and unequivocal.  The false testimony was willful and intentional.

The Supreme Court has ruled that the application of the Obstruction of Justice Guideline enhancement to a defendant's perjury at trial does not undermine the defendant's right to testify. *United States v. Dunnigan*, 507 U.S. 87 (1993).  There, the Court stated that the defendant "cannot contend that increasing her sentence because of her perjury interferes with her right to testify, for we have held on a number of occasions that a defendant's right to testify does not include a right to commit perjury."  *Dunnigan,* 507 U.S. at 96.  The Court explained that this concern was "dispelled by our earlier explanation that if an accused challenges a sentence increase based on perjured testimony, the trial court must make findings to support all the elements of a perjury violation in the specific case." Id. at 96-97.  Thus, it has long been the case that applying this Guideline to a defendant's perjury at trial does not interfere with his right to testify.  The Court should make the findings of perjury and apply this enhancement.

    IV.   ANALYSIS.

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) is necessary for the Court to make an individualized determination of an appropriate sentence for this defendant.

The Supreme Court has declared:  "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007).  Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

A.  Section 3553(a) Factors

This Court must consider all of the sentencing considerations set forth in Section 3553(a). Those factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant;
>
> (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (5) the guidelines and policy statements issued by the Sentencing Commission;
>
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).[8]

---

[8]  Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why

B.  A Guidelines Sentence is Appropriate and Necessary

The defendant committed serious offenses that involved real victims.  The distribution, receipt, and transportation of these child exploitation images and videos, and accessing links to view them, perpetuated the victimization of the children depicted in those images and videos.  Further, by distributing these images and videos to undercover officers Krasley showed that he had no concern or hesitation about these depictions of child exploitation reaching out much further to any number of other persons who would view and further victimize these children.  Many of these images involved the victimization of very young children, those under 12 years of age, and some involved sadistic conduct.

The Third Circuit considered the impact and harm of child exploitation images in a case involving a defendant who pleaded guilty to possession of such images:

> Children are exploited, molested, and raped for the prurient pleasure of [defendant] and others who support suppliers of child pornography. . . . Their injuries and the taking of their innocence are all too real.  There is nothing "casual" or theoretical about the scars they will bear from being abused for [defendant's] advantage.
>
> *        *        *
>
> The simple fact that the images have been disseminated perpetuates the abuse initiated by the producer of the materials.  "The materials produced are a permanent record of the children's participation and the harm to the child is exacerbated by their circulation." [citation]  Consumers such as [defendant] who "merely" or "passively" receive or possess child pornography directly contribute to this continuing victimization.  Having paid others to "act out" for him, the victims are no less damaged for his having remained safely at home, and his voyeurism has actively contributed to a tide of depravity that Congress, expressing the will of our nation, has condemned in the strongest terms.

---

a sentence has been chosen, also explain why some lighter sentence is inadequate.'"  United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

*United States v. Goff*, 501 F.3d 250, 259 (3d Cir. 2007) (citations omitted).  *Accord New York v. Ferber*, 458 U.S. 747, 759 (1982);  *Osborne v. Ohio*, 495 U.S. 103 (1990) ("The pornography's continued existence causes the child victims continuing harm by haunting the children for years to come.");  *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007) ("The greater the customer demand for child pornography, the more that will be produced.")

As the Third Circuit noted in *Goff*, Congress also has condemned this conduct.  Cf. Child Pornography Prevention Act of 1996 ("CPPA"), Pub.L. 104-208, sec. 121, 110 Stat. 3009-26, reprinted in 18 U.S.C. § 2251 note at 611 ("Congress finds that ... where children are used in its production, child pornography permanently records the victim's abuse, and its continued existence causes the child victims of sexual abuse continuing harm by haunting those children in future years....").  *Goff*, 501 F.3d at 259.

Soon after, the Third Circuit reemphasized its message in *Goff* that possessing child exploitation images contributes to the very real injury of the victim children.  In *United States v. Lychock*, 578 F.3d 214 (3d Cir. 2009), the court singled out its discussion in *Goff* about the harm to children by possessors of child pornography:  "[in *Goff*] [w]e outlined the harm caused by the purportedly 'passive' possession of child pornography and the 'ample evidence of Congress's intent that offenses involving child pornography be treated severely.' [citing *Goff*]  We need not repeat that analysis here."  *Lychock*, 578 F. 3d. at 220.  The court in *Lychock* reversed a sentence of probation in a possession of child pornography case as procedurally and substantively unreasonable and remanded for resentencing.  Id. at 220-221.  *Accord, United States v. Grober*, 624 F.3d 592, 602 n.6 (3d Cir. 2010) ("We have previously described the unspeakable harm suffered by the children featured in these images and the perpetuation of this harm caused by the distribution of the permanent record of their abuse. [citing *Goff*]").  *Accord, United States v.*

*Yard*, 558 Fed. Appx. 231 (3d Cir. March 3, 2014) ("The pornography's continued existence causes the child victims continuing harm by haunting the children in years to come." *quoting Osborne v. Ohio*, 495 U.S. 103, 111 (1990));  *United States v. Hayes*, 383 Fed.Appx. 204 (3d Cir. 2010)(reversing sentence of six months of home confinement for conviction for possession of child pornography);  *United States v. Dagostino*, 520 Fed. Appx. 90, 92 (3d Cir. 2013) ("We have consistently held that receiving and possessing child pornography images causes direct harm to the victims depicted.")

In a recent memorandum decision, a Third Circuit panel reaffirmed "the seriousness of the offense, and the clarity with which Congress has expressed its view on the matter." *United States v. Ramey*, 721 Fed.Appx 135, 138 (3d Cir. 2018)(not precedential)(possession of child pornography).  In so doing, it referenced its discussions in *Goff* and *Lychock*.  Id.  The panel stated that "we reiterate that the possession of child pornography alone, even absent any physical contact between the offender and a minor, is an extremely serious crime that causes substantial harm," and reiterated its language from *Goff* that "the simple fact that the images have been disseminated perpetuates that abuse initiated by the producer of the materials."  Id.

The harm that Krasley's acts had on the victim children is made explicit by some of the victims themselves, as they express the horror of their victimization through victim impact letters.  Kralsey distributed two exploitative images of "Andy." (Count Six).  Andy writes in his victim impact letter:

> I THINK ABOUT THE CHILD PORNOGRAPHY EVERY DAY! There is not one day that goes by that I don't think, with hatred, about the sick and disgusting people who view, trade, save and "get off" on my abuse when I was just a little kid and couldn't defend myself. It is sickening. I feel that every single criminal that is found with mine or another child's images should be held accountable for the highest amount possible to help us victims repair our lives. Each pervert who finds pleasure in my childhood abuse should suffer the fullest consequences of the

law—be that prison, strict parole conditions, restitution, counseling, and, they should NEVER be allowed to be alone with little kids.

The impact of this victimization is echoed in the victim impact letter submitted by the adoptive mother of John Doe IV, whose exploitative image Krasley distributed (Counts Two and Three):

> People may think, that the only victim of child pornography is the child himself and that the viewing of the pornography is remote in time, distance, and proximity from the child rapes themselves. My entire family is a victim of this child pornography. Our children are certainly impacted by the knowledge that other people are enjoying themselves with pictures of our children's rape and torment. We are likewise stressed to no end with helpless fury at the thought of what these people are doing with these photographs of our kids. Every time our family learns of another case our hearts sink once more. Will the torment ever end?

Krasley's conduct here is particularly egregious. Not only did he victimize many child victims by his offenses involving 245 images and 6 videos in the conduct charged, he engaged in this exploitive activity over a period of more than five years. Further, the active engagement with law enforcement did not deter him from continuing to exploit children in this way. Law enforcement searched Krasley's home for evidence of child pornography <u>three</u> times <u>prior</u> to the distributions and other offenses that Krasley committed here:

- The Pennsylvania State Police searched his home for child pornography in 2006;

- The FBI searched his home for child pornography in 2009;

- Homeland Security Investigations (HSI) searched his home for child pornography in 2013.

In each case, the agents did not find where he was hiding his child exploitation material. This was also the case in the HSI search in December 2018. None of these pre-2018 searches by law enforcement deterred Krasley from continuing to distribute, receive, transport, and access child pornography. Krasley's persistent pursuit of child pornography even after he knew that law enforcement was investigating show that <u>three</u> law enforcement searches of his home had no deterrent effect on Krasley. The Court's sentence here should be severe enough to deter Krasley

28

from future similar conduct and to promote respect for the law.  18 U.S.C. § 3553(a)(2) and (a)(3).

The government recommends that the Court impose a custody sentence within the Sentencing Guideline range of 262-327 months.  Such a sentence will not only recognize the egregious nature and circumstances of these offenses, but will also offer a measure of deterrence – both to Krasley and to others who may consider committing similar offenses.  "The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so the more will be produced.'" *Goff*, 501 F.3d at 261 (*quoting United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007)). "[D]eterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing." Id.

Further, Krasley has not accepted responsibility here.  He committed perjury at trial in denying involvement, and he continues to deny his guilt here.  Acceptance of responsibility is important for any prospect of changing conduct in the future.  Its absence here is significant.  A substantial custody sentence within the Guideline range is appropriate.

There is no need in this case to adjust the sentence in order "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . ." § 3553(a)(2)(D).

C.  Restitution

Two victims of Kralsey's offenses have requested restitution.  This Court should order that Krasley pay restitution to these victims.  Restitution is mandatory under 18 U.S.C. § 2259.

Victim "John Doe IV" from the "8kids" series appeared in the same image in Counts 2 and 3 – this image was among those that Krasley allowed the undercover HSI agent to download.

29

Attorneys for John Doe IV have requested $15,000 in restitution and have submitted documentation of the psychological harm to John Doe IV from the initial exploitation and the continued availability of the graphic record of this exploitation from people like Krasley. The government provided this data to defense counsel and has submitted it *in camera* to the Court. The psychologist who examined John Doe IV estimated a lifetime cost of psychological care for John Doe IV to be $469,650.[9]

The second victim seeking restitution is "Andy" from the SpongeB series. Krasley distributed two images depicting sexual exploitation of Andy in the conduct underlying the conviction for distribution in Count 6. Attorneys for Andy seek restitution for: (1) $25,000 for the defendant's share of Andy's future psychological counsel costs and future lost income; (2) $33,415 for his expenses in preparing his report. The total of these requests is $58,415. Andy's attorneys have submitted documentation of the psychological harm to Andy from the initial exploitation and the continued availability of the exploitation images from people like Krasley. The government provided this data to defense counsel and has submitted it *in camera* to the Court. The psychologist who examined Andy estimated the lifetime treatment Andy will require will cost $267,038. An economist estimated lost income due to the offenses to be $1,854,925. This is a total loss of $2,121,963. The government's communication with an attorney for Andy indicates that, other than periodic necessary updates, the cost of the initial report has been covered by prior restitution payments. The government therefore submits that it would be appropriate to reduce the report portion of this request to $1,000 to contribute toward necessary

---

9 Counsel for John Doe IV has advised the government that restitution payments already received from other defendants have not reached even half of this amount of restitution needed for John Doe IV's future care.

periodic updates.  The government therefore urges the Court to impose restitution of $26,000[10] for Andy.[11]

The Supreme Court addressed the question of restitution for victims of this form of child exploitation where the criminal defendant did not produce the images, but possessed or distributed them.  *Paroline v. United States*, 572 U.S. 434 (2014).  The Court stated that "a court applying § 2259 should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses."  Id. at 458.  The Tenth Circuit has examined the process of determining restitution under these facts and noted that the Court in *Paroline* "acknowledged that setting a proper restitution award under this standard will involve both 'discretion and estimation,' id. at 462, and noted that a 'precise mathematical inquiry' would be ill-suited for the time being, id. at 459. Rather, a district court 'must assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses.' Id. at 459."  *United States v. Dunn*, 777 F.3d 1171, 1180 (10th Cir. 2015).  Although the Supreme Court identified some factors that may be relevant in reaching such an estimation, they themselves are not precise.  See also *United States v. Galan*, 804 F.3d 1287, 1289-90 (9th Cir. 2015) (defendant not responsible for losses attributable to original abuser; estimation of losses attributable to defendant who distributed images will be a mix of "discretion and estimation" and "precision is neither expected nor required.");  *United States v. Dileo*, 58 F.Supp. 3d 239, 249 (E.D. NY 2014) (noting that

---

10 Because the government believes that the restitution request concerning the preparation of the report should be reduced, the figure recommended here differs from the figure referred to in the Presentence Report.  PSR ¶¶ 26, 85.

11  Counsel for Andy has advised the government that restitution payments already received from other defendants have not reached even 25% of restitution needed for Andy's future care and lost income.

courts applying *Paroline* to a different victim, Vicky, resulted in awards in the $2000 to $4000 range in possession/distribution cases).

The Third Circuit, in a non-precedential decision, set out considerations for the district court in determining restitution:

> In *Paroline*, the Supreme Court stated that determining the proper amount of restitution "involves the use of discretion and sound judgment." *Id.* at 459, 134 S.Ct. 1710. The Supreme Court also articulated factors that a district court may follow when setting the amount of restitution. *Id.* at 459–60, 134 S.Ct. 1710. The factors include:
>
>> the number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes contributing to the victim's general losses; any available and reasonably reliable estimate of the broader number of offenders involved (most of whom will, of course, never be caught or convicted); whether the defendant reproduced or distributed images of the victim; whether the defendant had any connection to the initial production of the images; how many images of the victim the defendant possessed; and other facts relevant to the defendant's relative causal role.
>
> *Id.* at 460, 134 S.Ct. 1710. The "factors need not be converted into a rigid formula, especially if doing so would result in *trivial restitution orders*. They should rather serve *as rough guideposts* for determining an amount that fits the offense." *Id.* (emphasis added).

*United States v. Restitullo*, 796 F. App'x 76, 84 (3d Cir. 2019).

Here, the amounts the government recommends -- $15,000 for John Doe IV and $26,000 for Andy – are reasonable estimations of appropriate contributions by Krasley towards restitution for each victim. Krasley is, of course, one of several hundred defendants who have been charged and sentenced with possessing or distributing images of John Doe IV and/or Andy. Further, it is likely that other defendants in the future will be convicted of possession of or trafficking in images of these victims' sexual exploitation. However, the amount of restitution appropriately owed, as determined by the expert assessments detailed in the reports submitted to the Court *in camera,* is large, and even with several hundred defendants ordered to pay restitution, neither

victim has received anything near the restitution needed to remedy these ongoing violations.  The amounts urged are small portions of the whole amount owed, reflecting that Krasley is one of many who have contributed to the damage to John Doe IV and Andy.  At the same time, Krasley bears more responsibility than some because he actively distributed these images, thus completely oblivious to the fact that sending them to more similarly minded individuals would cause further victimization and damage to these victims.  This was spared here in the charged counts only because the recipients were law enforcement officers.  Although Krasley distributed only one or two images of these specific victims, his possession of those images caused further damage and victimization, and his distribution would have extended the damage for even these couple of images but for the law enforcement recipients here.  Finally, the Supreme Court in *Paroline* said that the restitution ordered should not be trivial, *Paroline,* 472 U.S. at 460.  The amounts recommended here provide non-trivial contributions to these victims' losses, are appropriate and reasonable as Krasley's shares under the facts of this case, yet are a small amount of the total restitution due each victim.  The Court should order the restitution recommended -- $15,000 to John Doe IV and $26,000 to Andy.

     D.    <u>Other Aspects of the Sentence</u>

     1.    Supervised Release, Criminal Fine, and Forfeiture

The Court must impose a period of supervised release of at least the mandatory minimum 5 years.  Given Krasley's efforts to hide his use of his network for these offenses, the government recommends at least ten years of supervised release.

The probation officer has indicated (PSR ¶70) that Krasley does not have the ability to pay a fine within the guideline range of $50,000 to $500,000 (PSR ¶82).  However, Given that Krasley receives monthly pension from Victaulic Company ($944) it appears that he can and

should pay some fine.  PSR ¶ 67.  According to bank records obtained by the government,

Victaulic paid Krasley $944 every month during the period for which the government obtained

records (October 2018 through December 2020)(which equals $11,328 per year).  PSR ¶

67.  Given this income, Krasley has the ability to pay some fine, though perhaps not a fine

within the Guideline range.  Because Krasley will also have financial obligations for restitution

and the JVTA special assessment, the government recommends that the Court impose a fine of

$20,000.

There is no forfeiture in this case.

2.       Special Assessments

There are two special assessment statutes applicable to Krasley's sentencing.     Section

3013(a)(2)(A) directs the Court to impose a $100 special assessment for each count of

conviction, here a total of $1400.    This is the usual special assessment applicable to all offenses

and is mandatory.

There is also a second and additional special assessment (JVTA assessment) which is

applicable to Krasley's offenses for Counts 4 through 14.[12]  PSR ¶81.  This is a mandatory

$5,000 special assessment applicable to convictions for certain child exploitation offenses,

including the offenses of conviction here.  18 U.S.C. §3014(a).   Its application is limited to

"non-indigent person[s]."  *Id.;* PSR ¶81.

In 2015, Congress enacted this new special assessment penalty provision and it is

applicable to the specified offenses which are committed between May 29, 2015 and September

30, 2021.   Congress enacted it as part of the Justice for Victims of Trafficking Act of 2015

(JVTA).   Krasley committed his charged offenses in Counts 4 through 14 between December

---

12  Counts 1 through 3 predated the JVTA, which had an effective date of May 29, 2015.

31, 2016 and June 27, 2018, so these counts are within the statute's range. Section 3014

provides that "in addition to the special assessment imposed under section 3013, the court shall

assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under . .

. (3) chapter 110 (relating to sexual exploitation and other abuse of children); . . ." 18 U.S.C.

§3014(a). Section 2252 is within Chapter 110 of Title 18. The statute does not define "non-

indigent person." The Third Circuit has recently held that the statute requires the assessment to

be applied on a per count basis, not on a per case basis. *United States v. Johnman,* 948 F.3d 612,

620 (3d Cir. 2020).

Congress passed the JVTA "as a sweeping effort to provide services for victims of human

trafficking and juvenile sexual abuse." *United States v. Kelley*, 861 F.3d 790, 799 (8th Cir.

2017)(referring to the Senate's unanimous passage of the act and citing 161 Cong. Rec. S2337-

38 (daily ed. Apr 22, 2015)). Through this legislation, Congress established a fund to support

victims' programming under prior acts of Congress. See 18 U.S.C. §3014; *Kelley*, 861 F.3d at

799-800.

Although Krasley now has appointed counsel in this case, this Court should find that

Krasley is non-indigent for purposes of the JVTA special assessment. A finding here that

Krasley is not indigent for purposes of §3014 would be consistent with the Eighth Circuit's

ruling in *Kelley*. There, the defendant had appointed counsel and at the time of sentencing had a

slightly negative net worth. However, he had a college degree and potential future earnings, and

the Court determined that a finding of non-indigence was appropriate. The Eighth Circuit in

Kelley analyzed indigence using the analyses of "similar post-conviction assessments" and not

under the analysis used for appointing counsel for defendants with IFP status. *Kelley*, 861 F.3d

at 801. It analogized to the determination of whether a defendant could pay a fine, and noted

that "[t]he defendant bears the burden of proving both his inability to pay at the time of sentencing and that he is 'not likely to become able to pay a fine upon his release from his term of imprisonment.'" Id.   It found that for JVTA special assessments, district courts should take into account future earnings, and that for §3014, courts should undergo "an analysis of both a defendant's current financial situation and his ability to pay in the future" in determining his "non-indigent" status. Id. citing *United States v. Strange*, 2017 WL 2199005 (9th Cir. 2017)(analyzing defendant's ability to work).   *Kelley* held that the district court's finding of the defendant's "ability to earn money in the future precluded a finding of indigence for purposes of §3014." *Accord, United States v. Janatsch*, 722 Fed.Appx. 806, 811 (10th Cir. 2018)("nothing in the statute [§3014] precludes an examination of future ability to pay as part of a holistic assessment of the indigency determination.")

Here, Krasley is currently receiving at least $944 per month in pension payments from Victaulic Company.  PSR ¶ 67.  It appears that that payment will continue even while Krasley is incarcerated.  This pension will yield $11,328 per year ($944 x 12).[13]  Krasley earned an associate's degree in electrical technology and heating ventilation & air conditioning (HVAC) from Lehigh Carbon Community College, with a grade point average of 3.16.  PSR ¶ 65. Although not employed at the time of his arrest, with this background Krasley may be available for employment upon release.  His monthly pension, plus his potential future employment, should permit Krasley to pay the $5,000 JVTA assessment on each applicable count.  Eleven counts are subject to this assessment for a total JVTA assessment of $55,000.   The Court should

---

13 Bank records also indicate that Krasley was receiving $1954 per month in 2019 through at least November of 2019 in Social Security Disability payments.  PSR ¶ 67.  The government understands that that those should stop because Krasley is in custody.

find that Krasley is not indigent for purposes of the JVTA assessment and impose the JVTA special assessment of $55,000.

## <u>Conclusion</u>

For the reasons stated above, the United States recommends that the Court impose a custody sentence within the Guideline sentencing range of 262-327 months.  The government recommends that the Court impose restitution of $15,000 (John Doe IV) and $26,000 (Andy) to the two victims in this case.  The government also requests that the Court impose a fine of $20,000.  The government further recommends a period of supervised release of at least ten years, with a mandatory minimum of 5 years, and the Court should impose the $1400 special assessment and JVTA special assessment of a total of $55,000.

<div style="margin-left: 40%;">

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney


__/s/ Albert S. Glenn_____
ALBERT S. GLENN
Assistant United States Attorney

</div>

Dated:   February 8, 2021

Appendix A

# ATTACHMENT A

# Transcript Excerpt

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL CASE |
| | : | |
| Plaintiff(s) | : | Case No.5:18-cr-00545-EGS-1 |
| | : | |
| v. | : | Easton, Pennsylvania |
| | : | October 30, 2019 |
| JOHN JOSEPH KRASLEY, | : | Time 10:50 a.m. to 11:26 a.m. |
| | : | |
| Defendant(s) | : | |

. . . . . . . . . . . . . . .

TRANSCRIPT OF JOHN JOSEPH KRASLEY TESTIMONY
BEFORE THE HONORABLE EDWARD G. SMITH
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff(s):      Albert S. Glenn
                           U.S. Department of Justice
                           615 Chestnut Street, Suite 1250
                           Philadelphia, PA 19106-4476


For Defendant Name:        Robert Patrick Link
                           Link Law, LLC
                           100 S. Broad St., Suite 1910
                           Philadelphia, PA 19110


Court Recorder:            Jennifer Fitzko
                           Clerk's Office
                           U.S. District Court


Transcription Service:     Precise Transcripts
                           45 N. Broad Street
                           Ridgewood, NJ 07450


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

1    and I never really paid attention to it up until now but

2    sometimes it would almost be like a sneakiness that he, like,

3    walk up on you when you weren't expecting it but I never

4    really paid attention to it.

5    Q   Would you see where he came from?

6    A   No.

7    Q   All those times.  Okay.  You've heard all the testimony.

8    You've been through this for a number of years now.

9    A   Twelve years, over 12 years.

10   Q   Have you ever, at any point in your life, used a computer

11   to upload or download child pornography at any point?

12   A   No, I have not.  I never sent or received child

13   pornography from any of my computers or over my internet.

14   Q   Sitting here today, can you tell --

15   A   I wish - I wish I knew who did because I wouldn't be

16   sitting here today.

17   Q   That was - that was my next question.  Can you tell --

18   A   I wouldn't be sitting here if I knew.

19   Q   You can't tell the jury who did it?

20   A   No, absolutely not.  I wish I knew.

21             MR. LINK:  I have no other questions, Your Honor.

22             THE COURT:  Thank you very much, Mr. Link.

23   Assistant United States Attorney Glenn, you may cross-examine

24   the witness.

25             COUNSEL ALBERT S. GLENN:  Thank you, Your Honor.

1   longer working because naturally my brother was sick and at

2   this time now they had to shut his business down and Andy

3   picked up work for me and helped me and showed me how to lay

4   tiles and once he showed me I was able to lay the tiles with

5   him.

6   Q   So, you did various tasks on the construction of your

7   home yourself, is that right?

8   A   Yes.

9   Q   Thank you.  Now, your house has a main floor, of course,

10  main living area?

11  A   Yes.

12  Q   And, it has a basement?

13  A   Yes.

14  Q   Has a finished basement in fact, correct?

15  A   Yes.

16  Q   And, it's divided into a number of rooms, is that right?

17  A   Yes.

18  Q   It has an attic, doesn't it?

19  A   Yes.

20  Q   And, you store things in the basement, correct?

21  A   Yes.

22  Q   There are a number of boxes and other things stored down

23  in the basement?

24  A   Yes.

25  Q   And, you store things in the attic, correct?

1   A   Yes, sir.

2   Q   A fair amount of stuff stored in the attic, right?

3   A   Mostly all junk that we don't use.

4   Q   Okay, but a lot of junk, right?

5   A   Right.

6   Q   A lot of stuff.

7   A   Get it out of sight and out of mind.

8   Q   It's accumulated for a while, correct?

9   A   Yes, sir.

10   Q   And, you have a garage, correct?

11   A   Yes, sir.

12   Q   And, you can store some things in the garage as well, is

13   that right?

14   A   Yes.

15   Q   Okay.  How old are you today, Mr. Krasley?

16   A   I'm 51.

17   Q   Now, when you moved in in 2000, you were married to

18   Kimberly Krasley?

19   A   Yes.

20   Q   And, Kimberly Krasley moved out in January of 2017, is

21   that right?

22   A   Yes.

23   Q   And, from the time you moved in until January of 2017, it

24   was just you and your wife living in the house, right?

25   A   That is correct.

CERTIFICATE

I, Stephanie Garcia, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter.

December 3, 2019

## <u>CERTIFICATE OF SERVICE</u>

I certify that I caused a copy of

## <u>UNITED STATES' SENTENCING MEMORANDUM</u>

to be served on the below date by ECF and by email on the following:

Mark Wilson, Esquire
Federal Defenders
601 Walnut Street, Suite 540
Philadelphia, PA 19106-4476

Richard Kasarda
United States Probation Officer
U.S. Courthouse and Federal Building
504 W. Hamilton St., Suite 1401
Allentown, PA 18101

<div align="right">

_____*/s/ Albert S. Glenn*_____
ALBERT S. GLENN
Assistant United States Attorney

</div>

Dated:       February 8, 2021