UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL CASE |
| | : | |
| Plaintiff(s) | : | Case No.  5:18-cr-00545-EGS-1 |
| | : | |
| v. | : | Easton, Pennsylvania |
| | : | October 30, 2019 |
| JOHN JOSEPH KRASLEY, | : | Time 9:20 a.m. to 4:37 p.m. |
| | : | |
| Defendant(s) | : | |

. . . . . . . . . . . . . . .

TRANSCRIPT OF CRIMINAL JURY TRIAL (DAY 4)
BEFORE THE HONORABLE EDWARD G. SMITH
UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Government:        Albert S. Glenn, AUSA
                          Federal Community Defender
                          Office - EDPA
                          601 walnut Street, Ste. 540W
                          The Curtis Center
                          Philadelphia, PA 19106

For John Joseph Krasley:   Robert Patrick Link, Esq.
                          Link Law, LLC
                          100 S. Broad Street, Ste. 1910
                          Philadelphia, PA 19110

For John Joseph Krasley:   Arthur Donato, Jr., Esq.
                          216 West Front Street, 2nd Floor
                          Media, PA 19063

Court Recorder:            Jennifer J. Fitzko
                          Clerk's Office
                          U.S. District Court

Transcription Service:     Precise Transcripts
                          45 N. Broad Street
                          Ridgewood, NJ 07450

Proceedings recorded by electronic sound recording; transcript
produced by transcription service.

INDEX

|                                          | D  | C  | RD | RC | FRD | FRC |
|------------------------------------------|----|----|----|----|-----|-----|
| **WITNESSES FOR DEFENDANT:**             |    |    |    |    |     |     |
| Kyle McArdle                             |    |    |    |    |     |     |
| By Mr. Robert Patrick Link               | 5  |    | 40 |    |     |     |
| By Mr. Albert S. Glenn                   |    | 24 |    | 41 |     |     |
| Stephanie Krasley                        |    |    |    |    |     |     |
| By Mr. Arthur Donato, Jr.                | 45 |    |    |    |     |     |
| Kathleen Krasley                         |    |    |    |    |     |     |
| By Mr. Arthur Donato, Jr.                | 47 |    |    |    |     |     |
| By Mr. Albert S. Glenn                   |    | 49 |    |    |     |     |
| Brandon Schuster                         |    |    |    |    |     |     |
| By Mr. Arthur Donato, Jr.                | 50 |    |    | 51 |     |     |
| By Mr. Albert S. Glenn                   |    | 51 |    |    |     |     |
| Kaitlyn Grather                          |    |    |    |    |     |     |
| By Mr. Arthur Donato, Jr.                | 53 |    |    |    |     |     |
| By Mr. Albert S. Glenn                   |    | 54 |    |    |     |     |
| Brian Schuster                           |    |    |    |    |     |     |
| By Mr. Arthur Donato, Jr.                | 55 |    |    | 57 |     |     |
| By Mr. Albert S. Glenn                   |    | 56 |    |    |     |     |
| Tracey Gabrielle                         |    |    |    |    |     |     |
| By Mr. Arthur Donato, Jr.                | 59 |    |    |    |     |     |
| Tracey Bennicoff                         |    |    |    |    |     |     |
| By Mr. Arthur Donato, Jr.                | 60 |    |    |    |     |     |
| Samantha Grather                         |    |    |    |    |     |     |
| By Mr. Arthur Donato, Jr.                | 60 |    |    |    |     |     |
| Robert Krasley                           |    |    |    |    |     |     |
| By Mr. Arthur Donato, Jr.                | 61 |    |    |    |     |     |
| Joanne Young                             |    |    |    |    |     |     |
| By Mr. Arthur Donato, Jr.                | 61 |    |    |    |     |     |
| Jeffrey Young                            |    |    |    |    |     |     |

By Mr. Arthur Donato, Jr.      61

Mildred DeLong
 By Mr. Arthur Donato, Jr.      61

Louis DeLong
 By Mr. Arthur Donato, Jr.      62

Margaret Krasley
 By Mr. Arthur Donato, Jr.      62

Clayton Krasley
 By Mr. Arthur Donato, Jr.      63

Defendant: John Joseph Krasley
 By Mr. Robert Patrick Link   66        93        97
 By Mr. Albert S. Glenn              76

Harold R. Haas
 By Mr. Robert Patrick Link   107
 By Mr. Albert S. Glenn              111


EXHIBITS:                              Marked

Government's

112            Transcript of your records from
               Lehigh Carbon Community College    90

4

 1                 (Proceedings started at 9:20 a.m.)

 2                 ESR/CLERK JENNIFER J. FITZKO:  All rise for the

 3    jury.

 4                      (Jury in at 9:20 a.m.)

 5                 JUDGE EDWARD G. SMITH:  Are we on?  You may be

 6    seated, thank you.  The Court is called to order.  All

 7    parties previously present are once again present.  The

 8    jury is present.  Good morning, ladies and gentlemen.

 9                 JURY:  (In unison) Good morning.

10                 THE COURT:  Ladies and gentlemen, yesterday you

11    heard the rest of the Government's case and then the

12    Government rested.  Today the Defendant, that is the

13    defense, will have an opportunity to present any evidence

14    they wish to present.  Mr. Donato, are you prepared to

15    proceed, sir?

16                 COUNSEL ARTHUR DONATO, JR:  We are, Your Honor.

17                 THE COURT:  You --

18                 MR. DONATO:  With your permission, Mr. Link will

19    call our next witness.

20                 THE COURT:  Very well.  Mr. Link, good morning,

21    sir.

22                 COUNSEL ROBERT PATRICK LINK:  Good morning.

23    Defense calls Kyle McArdle.

24                 THE COURT:  Good morning, sir.

25                 WITNESS KYLE MCARDLE:  Good morning.

1          THE COURT:  And if you would please remain

2     standing at the witness stand to be sworn.

3          ESR/CLERK FITZKO:  Please raise your right hand.

4     Do you swear or affirm that the testimony you are about to

5     provide on the issue now before this Court shall be the

6     truth, the whole truth, and nothing but the truth, so help

7     you, God?

8          THE WITNESS:  I do.

9               (The Witness is Sworn)

10         THE COURT:  Thank you very much, sir.  You may be

11    seated.  And sir, would you please state your full name,

12    spelling your last name for the record?

13         THE WITNESS:  Sure, Kyle McArdle, M-C-A-R-D-L-E.

14         THE COURT:  Thank you very much, sir.  Counsel,

15    you may proceed.

16         MR. LINK:  May I -- thank you Your Honor?

17                    DIRECT EXAMINATION

18    BY MR. LINK:

19    Q    Good morning, Mr. McArdle.

20    A    Good morning.

21    Q    Where are you currently employed?

22    A    I am currently employed at Cornerstone Discovery in

23    Philadelphia, Pennsylvania.

24    Q    And what is Cornerstone?

25    A    Cornerstone is a legal consulting firm.  We do a lot of

```
 1    IT and legal work.  We help out with digital forensics
 2    primarily.  We also do courtroom and trial support as well as
 3    graphic design and network security penetration testing.
 4    Q   And what are your roles at Cornerstone?
 5    A   So, I am currently the active director of information
 6    technology at the company as well as a certified digital
 7    forensics examiner.
 8    Q   And what do those roles entail?
 9    A   Sure.  So, digital, digital forensic examiner I'm
10    essentially responsible for collecting, preserving digital
11    evidence in cases such as these.  Typically, computers, cell
12    phones.  We're moving into the cloud a lot now.  We see a lot
13    of information going through Dropbox, Amazon, stuff like
14    that.  So, we essentially are tasked with collecting,
15    preserving, and then investigating these digital, digital
16    devices.
17    Q   And as information technology director what are your
18    roles?
19    A   I am responsible for maintaining the entire network
20    infrastructure at the entire Cornerstone office.  I handle
21    all the servers, the backups, networking infrastructure, as
22    well as manage the end user's computers, devices, and phones.
23    Q   Okay, and then you're also an application developer,
24    correct?
25    A   Yes, so I was actually hired at Cornerstone initially as
```

1    a web developer and programer, and over the time there, I've

2    been there for about seven or eight years, my role has kind

3    of morphed into a little bit more on the IT and digital

4    forensics side and I'm kind of, you know, away from the web

5    development these days.  However, I still do it once in a

6    while.

7    Q    Prior to Cornerstone, where you were you employed?

8    A    Prior to that I was at High Point Solutions for about a

9    year doing web and application development primarily for

10   iPhones, android apps, and before that I was at Lockheed-

11   Martin for several years after college.

12   Q    What did you do at Lockheed?

13   A    So, Lockheed it was - our team was tasked with - we did a

14   lot of development simulations for the Navy, so we worked

15   with primarily the destroyer ships.  We did a lot of

16   essentially calibration and testing for the sailors of all

17   their very complex, you know, radar (indiscernible) when

18   they're out at sea, they have to make sure everything works.

19   Q    Okay.  And you, you mentioned that af- that job was your

20   first job after college, correct?

21   A    Yes, that was my first real job after college.

22   Q    So, so you - I take it you had to undergo some

23   significant training and education to get to the position

24   you're in today, correct?

25   A    Yeah, absolutely.  So, I had a - I got a digital media

1   degree with a focus in programming, web application

2   development at Drexel University.  In 2009 I graduated from

3   there.

4   Q   Okay, and did you ever receive any sort of certificates

5   in a, a certified digital forensic examiner?

6   A   Yeah, I'm currently certified.  I have the ACE

7   certificate which is the access data certified examiner.

8   It's essentially, you know, a written test, part written,

9   part multiple choice and then part actual physical

10  investigation.  And, you know, you go through that.  It's a

11  day-long test and it ensures that you know everything, keep

12  up with best practices and you have to renew that every two

13  years to make sure you're on top of your game with all the

14  new stuff, all the new phones, et cetera.

15  Q   Okay.  So, do, do you undergo continued training in --

16  A   Yes.

17  Q   -- the areas in which you're employed?

18  A   Absolutely.  So, we go to - I go to conferences all the

19  time.  We do webinars.  You know, it's hard to get out of the

20  office to go do week-long trainings here and there but, you

21  know, we do it when we can.  Just this past summer I was down

22  in Myrtle Beach for about five days at a security conference

23  presented by law enforcement, actually.  It was primarily -

24  primary presenters there.  And it's essentially, you know, a

25  just a re-up and a primer on all the new technologies coming

1    out.  You know, every year there's a new iPhone.  Every year

2    you have to learn how to investigate the new iPhone.  So,

3    essentially --

4    Q   And --

5    A   -- you have to keep up with that.

6    Q   Have you testified in court as an expert in the area of

7    digital forensics and information technology?

8    A   Yes, in Pennsylvania State Court.

9    Q   Okay.

10           MR. LINK: Your Honor, I'd offer the witness as an

11   expert in the area of digital forensics and information

12   technology.

13           THE COURT:  Assistant United States Attorney Glenn,

14   do you have any questions on qualifications?

15           MR. GLENN:  I do not, Your Honor.  Thank you.

16           THE COURT:  And is there an objection to the witness

17   being accepted as an expert in digital, digital forensics

18   and, Mr. Link, what was that final, digital forensics --

19           MR. LINK: Information Technology.

20           THE COURT:  And information technology?

21           MR. GLENN:  No objection, Your Honor.

22           THE COURT:  Without objection, the witness is

23   accepted as an expert in digital forensics and information

24   technology.  You may proceed, sir.

25           MR. LINK:  Thank you.

1   Q   And Mr. McArdle, during the course of your employment at

2   Cornerstone were you contacted by Mr. Donato, myself to

3   become involved in Mr. Krasley's case?

4   A   Yes, we were.

5   Q   Okay.  And essentially you were told that Mr. Krasley

6   maintained that he was not accessing the internet and you

7   were tasked with researching various possibilities as to how

8   someone could access an internet network and whether in fact

9   that could've happened or did happen, correct?

10  A   Yes, that is correct.

11  Q   Alright.  Could you explain to the members of the jury

12  some different ways in which an individual if they could

13  receive a wireless signal from a different residence?  How,

14  how would one be able to access that network to essentially

15  get on the internet and masquerade as the person who was the

16  owner of the network?

17  A   Absolutely.  Sure.  The easiest way to get on somebody's

18  network is to ask them for the password.  When you go to a

19  friend's house, you know, typically, if they're good friends,

20  they'll give you the Wi-Fi password.  You can go on, stream,

21  do whatever.  You never need that password again.  Every time

22  you go to your friend's house your phone automatically

23  connects, your computer or whatever it is, and you're on

24  their Wi-Fi.  That's the simplest way.  That's how most

25  people do it in the real world.  Some other malicious ways if

1   you are trying to do it in that method, there are a few

2   different ways that you can kind of gain unauthorized

3   quote/unquote access to a network.  There are a few different

4   kind of attack vectors we would call them in the network

5   security industry.  Basically, you only need to be in range

6   of this Wi-Fi signal for a matter of a couple seconds and you

7   can essentially just press enter on this very easy program

8   you can download from the internet and it essentially is all

9   completely automated.  And it will run through in five

10  seconds, capture this encrypted handshake packet essentially

11  is what it's looking for.  And like I said, this is all

12  automated.  There's no user interaction.  You just hit go.

13  Once this is captured - so you have to be in physical range

14  of this Wi-Fi signal to grab this.  Once you have this packet

15  you no longer need to be there.  You can go home.  You can go

16  across the country.  You can do whatever you want, and then

17  you can essentially take all the time you need in the world

18  to try and get this password from this packet you have.  And

19  there are a couple different ways to do that.  If it's a very

20  weak password, the easiest way is to just run it through a

21  dictionary list of the top common passwords.  These lists are

22  leaked all the time if you ever get an e-mail that your

23  password has been compromised from LinkedIn or Adobe.  Those

24  passwords are all out on the internet if you know where to

25  find them.  And there are security researchers such as myself

1    and other people in our industry as well as malicious actors

2    who compile these lists and then they will either sell the on

3    the dark web or offer them up to private companies for a

4    price.  You know where to look, you know, you can get them

5    for a couple bucks, a couple dollars, bitcoin, whatever it is

6    on the internet.  And you essentially just run this file

7    you've now captured again through the same program or similar

8    program.  You hit enter and essentially it just tries every

9    single password in those leaked lists.  And if the password

10   is found, there you go.  It will pop up and say, you know,

11   this password is the correct password that was encrypted in

12   this packet and now you have that password in a plain text.

13   Plain text you know exactly what it is.  You can walk up to

14   this Wi-Fi range, type it in your phone, your computer, and

15   you are now essentially connected to that network.

16   Q    Okay.  Now, before you utilize any of that type of

17   software or, or if you have physical access to the password

18   itself and you're to enter the password, you, you mentioned

19   that you need the wireless signal, correct?

20   A    Correct.

21   Q    Alright.  And during the course of, of, of your research

22   into this case you had occasions to review all the discovery

23   that the Government provided to the defense, correct?

24   A    Yes, that's correct.

25   Q    And did you do so?

1   A    Yes.

2   Q    Okay.  We heard that you were in court yesterday when the

3   government's expert testified, correct?

4   A    Correct.

5   Q    Alright.  And you heard some testimony about the, the

6   signal being visible at other houses and various obstructions

7   or obstacles that, that could have impeded the, the signal,

8   correct?

9   A    Correct.

10  Q    Did you, in your review of the discovery, notice anything

11  about the router that may make any obstacles I guess less of

12  a, a detriment or less of a threat to not being able to

13  capture the wireless signal?

14  A    Yes, I did.  Absolutely.

15  Q    Okay.  What did you notice about the router in this case?

16  A    So, interference is a very big deal in the wireless

17  industry.  It's a huge issue for cell phones.  It's a bigger

18  issue for Wi-Fi.  So, in recent years they have come up with

19  a new form of wireless technology and it's basically called

20  MIMO, which is multiple input, multiple output.   And if you

21  own any I think iPhone 6 imple- and up have implemented it,

22  basically any Wi-Fi device in the last five years essentially

23  has this MIMO technology.  And this technology specifically

24  developed in order to accommodate for these interferences.  I

25  believe they testified about, you know, signals bouncing off

1    of walls and trees and windows and all these obstructions.

2    So, what MIMO essentially does is it makes use of that

3    reflective signal.  So, for example, you may not have a great

4    line of sight signal if your, your router's on the first

5    floor and you're up in your bedroom.  You know, you have

6    three on the third floor, say.  You have, you know, two

7    floors in between you.  So, if that signal is not, you know,

8    very strong, the way MIMO works is it's actually looking for

9    the signals that are diminishing and bouncing off of all the

10   walls in your house.  And what it's doing is collecting this

11   kind of noise using, you know, a third or fourth antenna on

12   the router that is specifically designed just for this.  And

13   it's essentially taking all of this static and information

14   that's bouncing around and not going direct and it's

15   recombining it in the router and essentially it's actually

16   increasing your throughput.  So, it's actually faster and

17   much better than if you were to have a router that was just

18   simply operating with a one antenna line of sight.

19   Q   Okay.  So, in considering the, the, the make and model of

20   the router itself and the fact that it's MIMO capable or it's

21   a MIMO router, did you also consider - and you reviewed maps

22   that the Government provided, correct?

23   A   Correct.

24   Q   As well, and, and you examined the terrain and the

25   elevation as well as any trees that are in, in the area,

1    correct?

2    A   Correct, yes.

3    Q   Alright.  And, and he briefly discussed - the

4    Government's witness indicated that the trees would, would be

5    an obstacle to the wireless network sort of breaching that

6    treeline into another residence.  What would your opinion be

7    with respect to that, the testimony?

8    A   So, in this particular case I have not been onsite, so I

9    have not been able to monitor his exact Wi-Fi signal.

10   However, in my past experience, while trees may be an issue,

11   it is nowhere as big of an issue as anyone living in a city

12   with buildings, walls, streets, and dozens of other wireless

13   access points around.  I personally live in downtown

14   Philadelphia and I can attest that there are at least 50 or

15   60 networks that you open on your phone and you're seeing all

16   of these networks and you're having all these buildings all

17   over and there is no issue getting through that and that is

18   primarily what MIMO is for, to help you kind of get around

19   these obstacles that are there.

20           MR. LINK:  Okay.  Your Honor, I'd ask that the

21   witness be shown Government's Exhibit 70.  I believe Ms.

22   Evans would be able pull that up.  I'm sorry, 100 the map.

23           THE COURT:  So, Government's Exhibit 100?

24           MR. LINK:  Yes.

25   Q   Are you familiar with Government's Exhibit 100?

1    A   Yes.

2    Q   Okay, and you listened to the testimony yesterday

3    regarding specific locations that could receive a signal,

4    correct?

5    A   Yes, I did.

6    Q   And I guess you'd agree with the Government's witness

7    that the two, two of those residence would in fact receive

8    signals from Mr. Krasley's wireless network?

9    A   Yes, yes.

10   Q   Then there was some testimony regarding - if I may

11   approach --

12           THE COURT:  Certainly, sir.

13   Q   -- this house down here and their - that residence could

14   receive a wireless signal based on everything that you know,

15   the make and model of the router, various obstructions and

16   interference, and the distance.  And you're aware of all

17   those factors, correct?

18   A   I am, yes, correct.

19   Q   And what, what is your opinion as to whether the house

20   that we just noted on Government's Exhibit 100 could receive

21   a signal from Mr. Krasley's residence?

22   A   Sure.  There are a number of factors as was brought up

23   before with trees, buildings, you know, all this stuff in

24   between.  That said, there are plenty of ways to receive the

25   signal from that distance.  There is no reason that should be

1   limited to that.  You can very easily go on Amazon and simply

2   buy a better antenna.  A USB antenna that plugs into your

3   laptop and you will be able to receive a vast amount of, of

4   Wi-Fi signal from a much greater range.

5   Q   That was gonna lead into my next question.  So, if you're

6   able to pick up a signal, what type of things can you do from

7   inside of another residence to enhance that signal to make it

8   just a viable as if you were in the residence where the

9   router is in fact located?

10  A   Yeah, absolutely.  So, you can - you know, most cell

11  phones - the way essentially mostly of these wireless devices

12  work these days is, if you have a laptop with Wi-Fi, the Wi-

13  Fi antenna is typically going around the screen.  So, if you

14  have, you know - typically the chip is somewhere here and you

15  have a Wi-Fi antenna that would go around this way.  They

16  don't necessarily do that on phones as much anymore.  They

17  used to.  It's more just a little chip.  So, the bigger

18  antenna generally the better reception you're going to have.

19  So, as a general rule of thumb, you know, the bigger the

20  antenna the better reception you'll have.  So, if you are

21  having an issue picking up a signal, you can simply go on

22  Amazon and buy a bigger antenna.  For something like 30

23  bucks, 40 bucks on Amazon you can just buy a antenna

24  specifically designed to be a directional antenna.  You can

25  point it at something and pick up a signal from, you know,

1   half mile away, a mile away no problem.

2   Q   Now, as part of your involvement in this case you were

3   looking for evidence of, of the fact of, of hacking of Mr.

4   Krasley's Wi-Fi, correct?

5   A   Yes.

6   Q   And in your experience and in your training with the

7   mechanisms that you just discussed for how one's network

8   could be passed - hacked whether it was receiving the

9   password orally or taking it, looking at it, writing it down,

10  or using any of the software that you discussed, would you

11  expect to see evidence in anything that the Government's

12  provided that that in fact occurred?

13  A   No.  Nothing that I have looked at in discovery would

14  have any indication that someone was on their wireless

15  network.

16  Q   So, wh - I guess the better question is if someone

17  utilized those methods, would there be evidence that you

18  could observe to say, yes, the wireless internet was hacked?

19  A   No.  There would be no logs on say a computer or even a

20  router.  There are no logs.  That will - that's basically

21  monitoring what devices you have.  This functionality is

22  starting to become available.  However, in this case, it was

23  not a feature.  I, I am aware that Comcast is now offering

24  this, however, PenTeleData was not at this time.

25  Q   Okay.  So, Comcast now may send an alert to your phone to

1  say --

2  A   Yes.

3  Q   -- there's a new device connecting to your internet.

4  A   Exactly.  If you pay for the xFi service you now have

5  controls.  Everything will pop up on your phone and it'll say

6  like, you know, Amanda's iPad connected to your new network

7  and then you can kind of go in and do all that.  But that is

8  just now becoming, you know, kind of the norm from these big

9  companies.

10 Q   And in your experience at Cornerstone, have you become

11 involved or have you been involved in cases where in fact

12 someone's network is hacked?

13 A   Yeah.  So, we do this all the time, you know, especially

14 an - on a network security side.  The first thing we do if

15 we're hired for a job like this is we'll go in and perform

16 these attacks on a corporation's Wi-Fi network.  You'd be

17 surp- you'd be shocked at how may corporate Wi-Fi networks

18 have a password that's four digits, five digits, or, you

19 know, the name of the company with just full, unfettered

20 access.  So, yes, absolutely.  We have - we run these attacks

21 every day, well, not every day, but we do these attacks all

22 the time.  Yes.

23 Q   Okay.  There's been some testimony that individuals have

24 gone out to Mr. Krasley's residence and have walked around

25 the backyard say with an iPhone to test the range of wireless

1   signal.  In your experience, would that - is, is that a

2   reliable method for testing the strength of a wireless

3   signal?

4   A    Absolutely not.

5   Q    Why not?

6   A    So, when you're trying to deploy a wireless network,

7   typically you know in a corporate environment - I know this

8   is not a corporate environment but the same principles apply,

9   you would want to know exactly where your interference is

10  coming from.  So, the typical way to measure that is you

11  would basically what's called a site survey.  So, you would

12  walk around and you can absolutely use an iPhone if you want

13  to do this with a specialized software.  However, your site

14  survey is only gonna be as good as that antenna in an iPhone.

15  So, if you have a laptop that's really not that realistic to

16  assume everybody's using this exact iPhone.  So, what you

17  would do is essentially, you know, hook up whether it is an

18  iPhone or the specialized, you know, equipment with some

19  antennas or a laptop, and you would basically just walk

20  around this area.  You would walk around this entire area of

21  the map and it's tracking the GPS location of where you are

22  and it's tracking, you know, not only Mr. Krasley's Wi-Fi but

23  all the other Wi-Fi you can see in the area.  And you

24  essentially, you know, do a walk-around this and it

25  automatically generates basically a site survey and it'll

1    give you a nice little heat map essentially of where your

2    dead zones are, where you have great Wi-Fi propagation, you

3    know.  If there is a tree blocking the internet, you know,

4    you can - you would move the router over a couple inches or

5    something along those lines.  So, that's typically how you

6    would measure, measure Wi-Fi signal strength and, you know,

7    distance and Wi-Fi propagation.

8    Q    Okay.  So, the, the device itself that's being used to

9    measure the Wi-Fi signal would it be better devices than say

10   an iPhone?

11   A    Absolutely, yes.

12   Q    Can you describe why?

13   A    Yeah, so in a corporate environment we would use

14   basically an enterprise access point is essentially what

15   you're using.  And it's, you know, the same kind of wireless

16   access point you see at home or at work or whatever.  But

17   it's basically, you know - it covers a much wider bandwidth

18   and much wider range so you're not only just seeing, you

19   know, Wi-Fi channel in the 2.5 GHz range, but you also want

20   to know what's happening on the 5 GHz range which is the

21   other area that Wi- Wi-Fi operates.  If you're using an

22   iPhone that's not gonna be nearly as well and it's definitely

23   not gonna give you, you know, granular details such as what

24   channel we're on, you know, what exact frequency it's working

25   with, or anything like that.

1   Q    And are there laptops or desktop computers that are

2   better equipped to pick up wireless signals than iPhones?

3   A    Absolutely.  Yes.

4   Q    Okay.  Is there any way to say how many?

5   A    I, I would not be able to say how many.

6   Q    Okay.

7   A    In my - in my experience, I've found that laptops usually

8   have a better - a much better range than an iPhone or an

9   android.

10  Q    Okay.  And with respect to all of your testimony and all

11  opinions that you offered, are all your opinions offered to

12  within a reasonable degree of scientific certainty?

13  A    Yes.

14  Q    Thank you.

15          MR. LINK:  I have no other questions, Your Honor.

16          THE COURT:  Thank you very much, Mr. Link.

17  Assistant United States Attorney Glenn, you may cross examine

18  the witness, sir.

19          MR. GLENN:  I will, Your Honor.  May we approach the

20  bench?

21          THE COURT:  Certainly, counsel.  Please approach.

22          (Sidebar discussion occurred at 9:42:24)

23          THE COURT:  Were we going to take a recess?

24          MR. GLENN:  Yes.  Very brief.

25          THE COURT:  Sure.  We're gonna take --

1           MR. GLENN:  I need to take a brief recess so that I

2     can consult with our experts.

3           THE COURT:  Absolutely, I'd forgotten that.

4     Anything else that you wanted to address?

5           MR. GLENN:  I have no other issues.

6           THE COURT:  Very well, we'll take a 10 minute

7     recess.

8           (Sidebar discussion concluded at 9:42:44)

9           THE COURT:  Ladies and gentlemen, I know we just

10    brought you into the courtroom but the coffee's still hot out

11    there, hopefully, so we're going to take a 10-minute recess

12    and when we bring you back into the courtroom, Assistant

13    United States Attorney Glenn will have an opportunity to

14    cross examine the witness.  I'm going to again remind you

15    that you should keep an open mind about this case until all

16    the evidence is in on both sides, so you should refrain from

17    discussing it with each other or with anyone else including

18    members of your family or allow anyone to talk to you about

19    it.  Do not form any opinions about this case until you

20    retire to the jury room after my charge.  We'll stand in

21    recess for 10 minutes.

22          ESR/CLERK FITZKO:  All rise.

23          (Recess at 9:43 a.m., until 9:59 a.m.)

24          ESR/CLERK FITZKO:  All rise for the jury.

25          (Jury in at 9:59 a.m.)

1          THE COURT:  You may be seated.  Thank you.  The

2     Court is called to order.  All parties previously present are

3     once again present.  The jury is present.  The witness is on

4     the witness stand.  Assistant United States Attorney Glenn,

5     you may cross examine the witness, sir.

6          MR. GLENN:  Thank you, Your Honor.

7                         CROSS EXAMINATION

8     BY MR. GLENN:

9     Q    Good morning, Mr. McArdle.

10    A    Good morning.

11    Q    In your direct examination you talked about one method to

12    decrypt the password in order to get into a router involved

13    intercepting a packet at the time with a handshake of an

14    internet connection, correct?

15    A    Correct.

16    Q    Now, in order to do that decryption let's first start by

17    saying you got the packet.  In order to do that you have to

18    have some special program to, to do that decryption, correct?

19    A    There are number of commercially available programs that

20    do that, but yes, correct.

21    Q    And, and those are usually in Linux, isn't that right?

22    A    That is correct, however, most of them will run on MAC or

23    Windows.

24    Q    But you have to know something about Linux in order to be

25    able to use those, correct?

1    A    You have to know something about the command line.

2    Typically, these will not have a graphic user interface.

3    Q    Right.  So, it's not graphic user interface, it's command

4    lines for Linux, correct?

5    A    Correct.

6    Q    And you have to know that this handshake exists in order

7    to do this, right?

8    A    Well, yes.  Correct.

9    Q    And you have to know that there is such a thing to, to

10   take that packet from the handshake and find this decryption

11   program and then know how to apply it to that packet,

12   correct?

13   A    Correct.

14   Q    Okay.  Now, with respect to the, the packet, the packet

15   here that has the handshake is the critical part of this

16   operation, right?

17   A    Correct.

18   Q    And that packet, that packet only, only comes into being

19   at the moment that the connection is made between someone

20   over here and, and, and the router.  Is that right?

21   A    That is absolutely correct.

22   Q    And that can only be made by someone who can make the

23   connection to the router, correct?

24   A    That is not necessarily correct, no.

25   Q    So, if, if you're just out there and, and try to get on

1  but can't get on there's no packet?

2  A   So, in order to get around that, how you would do it is

3  you would do what's called a de-authentication, and

4  essentially, you're using that same wireless card that you're

5  using to capture the packet and you're basically broadcasting

6  what's called a de-authentication packet.  And what that does

7  is force every wireless device on your network to disconnect

8  and then they will automatically reconnect and that will give

9  you the opportunity to capture this packet whenever you

10  choose to.

11  Q   Alright.  But you yourself can't connect unless you have

12  a password, right?

13  A   To the - to the network, correct.  Yes, correct.

14  Q   And if you don't connect to the network, you're not

15  getting that handshake, right?

16  A   No, that's, that's incorrect.  That's not how it works.

17  The whole purpose of sniffing this packet is essentially what

18  it is called, you are not on this network yet.  You are

19  simply listening to all of the wireless information around

20  you.  So, when you type your username or when you type a

21  password and connect to a network, you're essentially telling

22  your wireless card this is my network.  Please only

23  communicate with this.  If you are listening with what's

24  called passive mode or monitor mode that is listening to all

25  of the Wi-Fi packets in the entire air, anything that it can

1    see.  So, you do not need to know specifically or what the

2    password is at this point.  And that is kind of the

3    methodology behind this.  You don't know you're not on this

4    network how this works so you want to essentially capture

5    this packet.  So, what you're gonna do is de-authenticate

6    every single phone, computer, laptop on this computer.  That

7    forces all of them to reconnect automatically and that gives

8    you the opportunity to listen to these packets in the air

9    going back and forth.  Once you capture that, then you have

10   the packet.

11   Q    Mr. McArdle, I don't think you understood my question.

12   My question was more simple.  If you don't have the password

13   and you try to connect to that network, you don't get the

14   handshake yourself, do you?

15   A    No.

16   Q    And so, you can't get that handshake packet from your own

17   attempt to connect to the network, right?

18   A    Not from your own, no.

19   Q    Okay.  So, you have to then be fortunate enough to find a

20   packet when some other connection is being made.  Is that

21   correct?

22   A    Yes.  And that's when you would de-authenticate.

23   Q    And if there's no other network, no other device at that

24   moment being connected to the network, then there is no

25   device to re-certify, right?

1    A    That is correct.

2    Q    So, you have to be able to find the time when there -

3    when there is another device connected, and you have to be

4    able to capture that one moment, that one packet when that

5    one moment when that one packet goes by with a handshake in

6    order to have this thing that you can then go to your Linux

7    program.  Is that correct?

8    A    That is correct, yes.

9    Q    Okay.  Thank you.  Now, Mr. McArdle, you said you didn't

10   visit the Krasley residence, did you?

11   A    No, I did not.

12   Q    You didn't go onsite?

13   A    No.

14   Q    So, you didn't have - you didn't go to actually view his

15   property, did you?

16   A    I did not.  No.

17   Q    You didn't look to see if it was up on a hill or down in

18   the valley, did you?

19   A    I just reviewed the map that the Government produced.

20   Q    Alright.  And, in fact, it's very hilly out there.  Isn't

21   that right?

22   A    I believe so, yes.

23   Q    You entered in the report that you refer to the rural

24   flatland where his house is located.  That wasn't correct,

25   was it?

1   A   Well, I believe his house is actually located on a

2   flatland.  Around him there may be hills but his house is on

3   the flatland.

4   Q   Well, we've seen on the map that one of these houses you

5   say could connect is way down a hill.  We've heard that

6   evidence.  Is that right?

7   A   I believe so, yes.

8   Q   Alright.  So, to say his house is on rural - I guess you

9   build a house on a flat piece of land.  Is that what you

10  meant?

11  A   Yes.

12  Q   That his house is on a flat --

13  A   Mm-hm.

14  Q   So, the confines of this house are flat?

15  A   Sure, yeah.

16  Q   Alright.  When you measured - when you looked at the

17  distance between his house and the house that Mr. Link

18  pointed to, the Haas house, you were looking at the distance

19  as the crow flies on the Google map, right?

20  A   Not necessarily, you can view the hill terrain on Google

21  maps.

22  Q   Well, you didn't go out there, did you?

23  A   I did not go out there, no.

24  Q   And if the house is on a hill and below the elevation of

25  Mr. Krasley's house, the distance is going to be different

1    than the point-to-point map that you pick up on Google,

2    right?

3    A    Absolutely, yes.

4    Q    Because you've gotta go over and then you've gotta go

5    down, right?

6    A    Sure.

7    Q    So, there's like the hypotenuse of the triangle which is

8    always longer than that side, right?

9    A    Mm-hm.

10   Q    So, there's gonna be longer distance than you might just

11   see on the map just by looking at it as the crow flies,

12   correct?

13   A    Yes.

14   Q    Okay.  Now, you've talked about perhaps some of these

15   methods to perhaps intersect - intercept the password and

16   deduce the password, but even if you have a password, you

17   still have to have a signal strong enough to, to connect to

18   the network and download and upload files.  Is that right?

19   A    Yes.

20   Q    Okay.  And you would agree, wouldn't you, that a signal -

21   a signal from a router will decrease the farther away you get

22   from the router?

23   A    Yes.

24   Q    And isn't it a matter of physics that that will decrease

25   as 1 over r squared?

1    A    Yes.

2    Q    So, if you're at 10 feet you get a certain signal

3    strength from the router, right?

4    A    Mm-hm.

5    Q    You go to 20 feet that's gonna be not half the distance,

6    the strength, it's gonna be 25 percent of the strength,

7    right?

8    A    Sure.  It's --

9    Q    It's down by 1 over r squared, inverse square law.  If

10   you go from 20 feet to 40 feet it doesn't go by half again,

11   again, it goes down by a quarter to 1/16th of the strength at

12   that 10-foot mark, right?

13   A    Sure, yeah.

14   Q    And it's gonna continue to decrease at that rate as you

15   go out farther from the source, correct?

16   A    Mm-hm, correct.

17   Q    Now, signal strength will also be affected by

18   obstructions.  Isn't that true?

19   A    Yes, that is true.

20   Q    And so, going through the wall of a house will diminish

21   the signal strength, correct?

22   A    Yes.

23   Q    And if there's insulation in the house that's going to

24   further dimmish the signal strength, right?

25   A    Sure, yes.

1   Q   To go through a, a line of trees with leaves on them,

2   that will dimmish the signal strength, won't it?

3   A   Yes.

4   Q   And then at the other end it has to go through another

5   wall of the house, that will diminish the signal strength,

6   correct?

7   A   Yes.

8   Q   Now, you would agree, wouldn't you, that the speed of

9   data transmission will affect how quickly you can upload or

10  download a file?

11  A   Yes.

12  Q   And if you have a file like a word file it may upload or

13  download quickly with moderate strength?

14  A   Yes, sure, if it's small.

15  Q   But if you have a picture that may take longer, correct?

16  A   If is it a larger file size, it may, yes.

17  Q   And pictures would normally have larger file size than

18  Word documents, wouldn't they?

19  A   I wouldn't be able to say that for sure.

20  Q   You've never looked at a picture file size versus Word

21  file size?

22  A   I mean, that report is probably 7 megs right there and --

23  Q   What's that?

24  A   That report that you're holding is probably 7 megabytes

25  on a flash drive or -

1  Q   That's a big report, right?

2  A   Yeah.

3  Q   Okay.  And video files are much, much larger, aren't

4  they?

5  A   Yes, they are.

6  Q   And it would take a, a lot stronger signal strength to

7  actually upload or download a video, correct?

8  A   That's not necessarily true.  It may take longer, but it

9  wouldn't require any more strength.  If you're transmitting

10  data the data is still transmitting it's just the speed

11  you're really gaining here by getting signal strength.

12  Q   Well, alright.  If maybe - it could take a very long time

13  to download a video --

14  A   It could.

15  Q   -- as, as your signal strength decreases, correct?

16  A   Yes, it would be slower, so absolutely.

17  Q   Now, would you agree that if, if you saw that a video

18  file was playing accurately in real time, that is there were

19  no interruptions and it was playing accurately that, that the

20  receiver is fairly close to the router?

21  A   There would be a number of factors, I would not

22  necessarily say that is true.  You can stream media without

23  being that close too the thing, again it's really your signal

24  strength that matters, not necessarily how close or far you

25  are.  That's kind of an arbitrary term.  It's really how

 1    powerful that actual signal is.

 2    Q   But as you go further from the router, the signal

 3    strength decreases by 1 over r squared, correct?

 4    A   Yes.  That is true.

 5    Q   So, the farther away you are, the less likely you are to

 6    be able to view a video in real time, stream a video,

 7    correct?

 8    A   Yes.

 9    Q   Okay.  And sometimes as you get farther away, the signal

10    might disconnect and then reconnect.  Is that right?

11    A   That could happen, sure.

12    Q   And other things can affect that like the weather,

13    correct?

14    A   Yeah, I mean minimal, but yes, it can.

15    Q   Okay.  Now, you said you brute force a, a, a password,

16    but you're aware that the password on the router that was in

17    Mr. Krasley's home at the time of the search was 10

18    characters lower case, correct?

19    A   That is correct.

20    Q   And it was not a dictionary word, right?

21    A   That is correct.

22    Q   So, you could not use a dictionary in order to, to find -

23    successfully find that password, correct?

24    A   So, so when I'm using the word dictionary, I'm not

25    strictly speaking English words.  A dictionary is kind of a

1    catch-all for as I said these leaked passwords.  So, if that

2    password was somebody's password and it was leaked, it could

3    absolutely be in a password dictionary, not an English word

4    dictionary.

5    Q   If it were not, it would take a very long time to find

6    that password by brute force, wouldn't it?

7    A   Yes, the 10 lower-case characters would.

8    Q   Okay.  Because the number of options are 26 raised to the

9    10th power, correct?

10   A   Yes.  However, this router had a WPS pin, so you would

11   really only need a brute force at eight digits as opposed to

12   the 10 characters.

13   Q   If you use that particular technique?

14   A   Yes.

15   Q   Okay.  If you were trying to brute force the password it

16   would be 10 to the 26th, wouldn't it?

17   A   For the - yes, for the characters, yeah.

18   Q   Which would be 141 trillion different combinations,

19   correct?

20   A   Sure.  If that's what the math is, sorry I don't - I

21   don't know off the top of my head.

22   Q   Now, Mr. McArdle, did you physically inspect the router

23   that was in Mr. Krasley's house at the time of the search?

24   A   I did not.

25   Q   You would've had that opportunity, wouldn't you?

1    A    I don't believe we were given the opportunity to review
2    the router.
3    Q    Well, you could've asked for permission to go to Mr.
4    Krasley's house and look at the router, couldn't you?
5    A    Sure.  I assume so, yes.
6    Q    You worked for Mr. Krasley on this case, right?
7    A    Yes.
8    Q    You're being paid by Mr. Krasley for your work on this
9    case, aren't you?
10   A    Yes.
11   Q    And you could've asked to go look at the router, couldn't
12   you?
13   A    Yes.
14   Q    The agents did not seize the router, you know that?
15   A    I, I was not aware of that, no.
16   Q    Well, if you had wanted to examine the router and the
17   agents had seized it, you could've asked them to look at it,
18   couldn't you?
19   A    Sure.
20   Q    You asked them for other things, didn't you?
21   A    I believe so, yes.
22   Q    You asked them for images of the computers, correct?
23   A    Yes.
24   Q    You asked them for copies of some of the devices.  Is
25   that right?

1    A    Which --

2    Q    Both thumb drives and some things.

3    A    Yeah, I believe that - yes, there were a number of

4    devices in discovery.  Yes.

5    Q    You asked for a lot of things, right?

6    A    We, we asked for the discovery of most of the material,

7    yes.

8    Q    Yeah, well not just discovery in paper but also images

9    that the forensic examiner had made, right?

10   A    Yeah, absolutely.  Yes.

11   Q    And they gave you every single one that you asked for,

12   didn't they?

13   A    I believe so.  Yes.  I would have to check our.

14   Q    And you didn't ask for to, to look at a router, did you?

15   A    I do not believe so. no.

16   Q    And you didn't go look at the router in Mr. Krasley's

17   house, did you?

18   A    No.

19   Q    Now, you spoke about in your work in corporate intrusion

20   work that you sometimes will go and do a, a heat map or

21   survey of the strength of a router signal from closer to

22   farther away, correct?

23   A    Yes.  Absolutely.

24   Q    You didn't do that here, did you?

25   A    I did not.  No.

1    Q   You could have done that here, couldn't you?

2    A   If the rou - if we had access to the router it could've

3    been done.  Yes.

4    Q   And you could've had access, correct?

5    A   I believe so.

6    Q   But you didn't do that here, did you?

7    A   I did not.

8    Q   Now, you know that from the discovery then that his

9    router was installed in Mr. Krasley's home on August 18,

10   2018, correct?

11   A   I believe.  I'm, I'm not sure of the date exactly off the

12   top of my head.  But sure --

13   Q   Well, [crosstalk]

14   A   -- that sound accurate.  Yes.

15   Q   Alright.  And you, you at least are aware of the charges

16   in the case?

17   A   Yes.

18   Q   And you know that August 18th is after all of the charges

19   had been completed, correct?

20   A   I believe that is true.

21   Q   Alright.  So, the router in Mr. Krasley's home which

22   you've discussed is not the router that was used in any the

23   charged counts in the indictment, correct?

24   A   I believe that is correct.

25   Q   Now, you're aware that the agents also saw that there

1   were some other routers in, in Mr. Krasley's home, right?

2   A   Yes, I believe so.

3   Q   Some that were not connected but appeared be old routers,

4   right?

5   A   Yes.

6   Q   Did you look at those?

7   A   No.

8   Q   Did you ask to look at those?

9   A   I did not.

10  Q   Did you - did you identify the MAC addresses of those

11  routers to check with the PenTeleData records to see if they

12  might've been used during the charge counts?

13  A   I did not, no.

14  Q   So, you don't know what routers were used during the

15  charge counts, do you?

16  A   I'm not sure.  No.

17  Q   You don't know if those routers had WPS or not, do you?

18  A   No.

19           MR. GLENN:  No further questions for this witness,

20  Your Honor.  Thank you.

21           THE COURT:  Thank you, Mr. Glenn.  Mr Link, you may

22  redirect the witness.

23           MR. LINK:  Briefly.  Thank you, Your Honor.

24           THE COURT:  Certainly, sir

25                      REDIRECT EXAMINATION

1  BY MR. LINK:

2  Q   Mr. McArdle, in your opinion that the Haas house could've

3  received the Krasley signal, did you account for the facts

4  that Krasley's house was elevated and the Haas house was down

5  a hill?

6  A   Yes, I did.

7  Q   And you were aware of that by looking at Google terrain?

8  A   Yes.

9  Q   Okay.  Did you also account for all of the obstructions

10  that were noted by Mr. Glenn on cross examination?

11  A   Yes, I did.

12  Q   Did you also account for the obstacles such as the walls

13  of the Krasley house and the trees that were depicted in

14  Government's Exhibit 100?

15  A   Yes.

16  Q   Okay.  Now, you were asked whether or not you actually

17  physically took the router and examined it.  Do you feel that

18  in your analysis and any opinions that you offered that you

19  needed to do that when you knew the make and model of the

20  router itself and you saw pictures of it?

21  A   Yeah, absolutely not.  There was no reason to actually

22  look at the physical router.

23  Q   Okay.  And you, you heard the date of arrest of Mr.

24  Krasley and you're aware of that, correct?

25  A   Yes.

1    Q   And it's fair to say you weren't hired for several months

2    after that, correct?

3    A   That is correct.

4    Q   And at the time that you were hired there was no internet

5    connection at Krasley's house?

6    A   I believe that is true, yes.

7             MR. LINK: I have no other questions, Your Honor.

8             THE COURT:  Thank you very much, sir.  Mr. Glenn, do

9    you have any recross?

10            MR. GLENN:  Yes, Your Honor.  Thank you.

11            THE COURT:  Certainly.

12                       RECROSS EXAMINATION

13   BY MR. GLENN:

14   Q   Mr. McArdle, even if a router can't connect to an

15   internet it can be turned on and its signal strength can be

16   examined.  Is that right?

17   A   You would be able to - the signal strength, yes, the data

18   transfer rate, absolutely not without the internet.

19   Q   Thank you.

20            MR. LINK:  No further questions, Your Honor

21            THE COURT:  Thank you.  Mr. Link, anything further?

22            MR. LINK:  No, Your Honor.

23            THE COURT:  Sir, thank you very much.  You may step

24   down.  Mr. Donato, you may call your next witness, sir.

25            MR. DONATO:  Sir, may we approach?

1            THE COURT: Certainly.  Counsel, please approach.

2            (Sidebar discussion occurred at 10:17 a.m.)

3            THE COURT:  Mr. Donato?

4            MR. DONATO:  I am now gonna call reputation

5    witnesses.  I've informed Mr. Glenn.  It occurred to me that

6    I never informed the Court as to how I was gonna actually do

7    it.  So, I'm gonna call five with the Court's permission.

8    They are gonna be asked to give their names, addresses.  Do

9    they know Mr. Krasley?  How do they know him?  How do they

10   know him?  Do they know others who know him?  Among those

11   others, do you they know who also know him?  What is his

12   reputation for being a truthful, honest, and law-abiding

13   person?  I then intend to say have you had an opportunity to

14   form an opinion as to those traits as to Mr. Krasley?  If

15   they say yes which I expect they will, I'm gonna say what is

16   your opinion as to whether he is honest, truthful, and law

17   abiding?  And they're gonna say whatever they say.  I wanted

18   to check that because I know the rules are very structured

19   and I - and so, I, I don't want to run afoul of -

20            THE COURT:  That sounds - the first one sounds like

21   a reputation question.  The second one sounds like an opinion

22   question.

23            MR. DONATO:  Yes, sir.

24            THE COURT:  What is the position of the United

25   States?

1          MR. GLENN:  I don't have any objection to that

2    procedure, Your Honor.

3          THE COURT:  So, you're gonna call five up and then

4    you're gonna ask those questions?  We're not gonna do the

5    other people stand up?

6          MR. DONATO:  And, and I then would want the other

7    people to stand up.  I would ask the court have the clerks

8    swear them in.  They will give their names and addresses and

9    I would just ask them generally you were present in the

10   courtroom when the five witnesses testified.  If you were

11   called to testify would you testify consistently with what

12   the jury's heard those five witnesses say?

13         MR. GLENN:  I've don't it that was

14         THE COURT:  It's a very unusual procedure.

15         MR. GLENN:  Yeah, but I, I don't, I don't think I

16   really object.  I think probably just a substitute for having

17   these or the others come up and say the same thing on the

18   witness stand.  I don't know that I would have any

19   significant cross examination.  If something changes during

20   the presentation of the five I might then want to talk about

21   it.  But at the moment I don't really see an issue.

22         THE COURT:  And you've had other judges permit that,

23   that type of procedure?

24         MR. DONATO:  I, I have.  I actually in, in front of

25   Judge Giles.  This was long ago back in 2001 I called six and

1  had 115 people.

2          THE COURT:  Okay.  If it's at the request of the

3  defense and without objection from the Government, you may

4  proceed.

5          MR. DONATO:  But I'm open if the Court wishes me to

6  do it a different way.  I just didn't want to do it without

7  running it by the Court first.

8          THE COURT:  If you - if you want to do it that way,

9  like I said, time is not an issue for me, and I don't mind

10  you calling them all up to the stand if you would prefer this

11  from a strategic or technical reason to do it that way, I -

12  and the Government doesn't oppose it, I think we can make it

13  work.

14          MR. DONATO:  Thank you, sir.

15          THE COURT:  Certainly, sir.

16          (Sidebar discussion concluded at 10:20 a.m.)

17          MR. DONATO:  May I proceed, Your Honor?

18          THE COURT:  You may, sir.

19          MR. DONATO:  Defense calls Stephanie Krasley.  And

20  Your, Your Honor, may I make a request that at least for this

21  portion since some people are gonna be standing in the well

22  of the Court, could I move that screen out of the way so the

23  jury will be able to see the other witnesses?

24          THE COURT:  Absolutely.  And what I was gonna do

25  with respect to the other witnesses I was gonna have them at

1   least come into the well of the Court.

2           MR. DONATO:  In here?

3           THE COURT:  Yes.

4           MR. DONATO:  Okay.  Thank you, sir.

5           THE COURT:  Certainly.  So, that we can clearly get

6   their - swear them, get their names, who they are, and

7   whatever information you wanted to get out from them.

8           MR. DONATO:  Yes, sir.

9           ESR/CLERK FITZKO:  Please raise your right hand.  Do

10  you swear or affirm that the testimony you're about to

11  provide on the issue now before this Court shall be the

12  truth, the whole truth, and nothing but the truth, so help

13  you God?

14          WITNESS STEPHANIE KRASLEY:  I do.

15                  (The Witness is Sworn)

16          THE COURT:  Thank you very much, ma'am.  And then

17  please be seated.  And, ma'am, would you please state your

18  full name spelling your last name for the record?

19          THE WITNESS:  Stephanie Krasley, K-R-A-S-L-E-Y.

20          THE COURT:  Thank you very much.  Counsel, you may

21  proceed.

22          MR. DONATO:  Thank you, Your Honor.

23                  DIRECT EXAMINATION

24  BY MR. DONATO:

25  Q   Good morning.

1    A   Good morning.

2    Q   Do you know John Krasley?

3    A   Yes, I do.

4    Q   How do you know him?

5    A   John is my uncle, so I'm his niece.

6    Q   How - and how long have you known him?

7    A   All my life, 45 years.

8    Q   Do you know other people who know him?

9    A   Yes, I do.

10   Q   Among those people who you know who also know him, what's

11   his reputation in that community of people for being honest,

12   truthful, and law abiding?

13   A   Yes.  Everybody that I know has the same type of opinion

14   that we do.

15   Q   Okay.  Now, have you had the opportunity to form your own

16   opinion as to whether John is honest, truthful, and law

17   abiding?

18   A   Yes, I have.

19   Q   And, and what opinion do you have of that?

20   A   I believe he's honest, truthful, and law abiding.

21   Q   Thank you.

22          THE COURT:  Your Honor, I have no further questions.

23   Thank you, sir.  Mr. Glenn, do you have any cross

24   examination?

25          MR. GLENN:  No, Your Honor.

1          THE COURT:  Very well.  Ma'am, you may step down.

2          MR. DONATO:  We would call up the next call,

3   Kathleen Krasley.

4          THE COURT:  Good morning, ma'am.

5          WITNESS KATHLEEN KRASLEY:  Good morning, Your Honor.

6          THE COURT:  And if you would please remain standing

7   and raise your right hand to be sworn.

8          ESR/CLERK FITZKO:  Do you swear - excuse me - do you

9   swear or affirm that the testimony you're about to provide on

10  the issue now before this Court shall be the truth, the whole

11  truth, and nothing but the truth so help you God?

12         THE WITNESS:  I do.

13                   (The Witness is Sworn)

14         THE COURT:  Thank you very much, ma'am.  And please

15  be seated.  And ma'am, would you please state your full name

16  spelling your last name for the record?

17         THE WITNESS:  Yes.  My name is Kathleen Krasley, K-

18  R-A-S-L-E-Y.

19         THE COURT:  Thank you very much.  Mr. Donato, you

20  may proceed.

21         MR. DONATO:  Thank you, Your Honor.

22                   DIRECT EXAMINATION

23  BY MR. DONATO:

24  Q   Good morning.

25  A   Good morning.

1  Q   Do you know John Krasley?

2  A   I do.

3  Q   How do you know him?

4  A   I know him because I met him in 1973.

5  Q   And do you know other people who know him?

6  A   Yes, I do.

7  Q   Among those people who you know who also know him, what's

8  his reputation in that community of people for being an

9  honest, truthful, and law-abiding person.

10 A   I believe he is honest, truthful, and lawful.

11 Q   That's your opinion.

12 A   They, they also believe that too, the friends that he was

13 associated with.

14 Q   Okay.  And should I assume from your answer that you've

15 also formed your own personal opinion --

16 A   Yes, I have.

17 Q   -- that he is honest, truthful and law abiding?

18 A   Yes, I agree with that statement.

19 Q   Thank you.  No further questions.

20          THE COURT:  Mr. Glenn, do you have cross-

21 examination.

22          MR. GLENN:  Yes, Your Honor.

23          THE COURT:  You may proceed, sir.

24                    CROSS EXAMINATION

25 BY MR. GLENN:

1    A   Ms. Krasley, are you related to the defendant?

2    Q   I am his sister-in-law.

3    A   Thank you.

4           MR. GLENN:  No further questions, Your Honor.

5           THE COURT:  Thank you very much.  Mr. Donato,

6    anything further of this witness?

7           MR. DONATO:  Nothing further.

8           THE COURT:  Ma'am, thank -

9           THE WITNESS:  I'm sorry for banging --

10          THE COURT:  That's fine.  Thank you very much.  You

11   may step down.

12          THE WITNESS:  You're welcome.  Thank you.

13          MR. DONATO:  I would next call Brandon Schuster.

14          THE COURT:  Good morning, sir.

15          WITNESS BRANDON SCHUSTER:  Good morning.

16          THE COURT:  If you would raise your right hand to be

17   sworn.

18          ESR/CLERK FITZKO:  Do you swear or affirm that the

19   testimony you're about to provide on the issue now before

20   this Court shall be the truth, the whole truth, and nothing

21   but the truth so help you God?

22          THE WITNESS:  I do.

23                  (The Witness is Sworn)

24          THE COURT:  Thank you very much, sir.  And, sir, you

25   may be seated.  And sir, would you please state your full

 1    name spelling your last name for the record?

 2            THE WITNESS:   Brandon D. Schuster.   Last name is S-

 3    C-H-U-S-T-E-R.

 4            THE COURT:   Thank you very much.   Counsel, you may

 5    proceed.

 6            MR. DONATO:     Thank you, sir.

 7                        DIRECT EXAMINATION

 8    BY MR. DONATO:

 9    Q    Good morning, Mr. Schuster.

10    A    Good morning.

11    Q    Do you know John Krasley?

12    A    Yes, I do.

13    Q    How do you know him?

14    A    He's a friend.

15    Q    How long have you known him?

16    A    I've known him my whole entire life.

17    Q    And how old are you?

18    A    Twenty-eight.

19    Q    Do you know other people who also know him?

20    A    I do.

21    Q    Among those people who you know who also know him, what

22    is his reputation in that community of people for being an

23    honest, truthful, and law-abiding person?

24    A    He is a honest, truthful, and law abiding person.

25    Q    And is that his reputation in that community of people?

Brandon Schuster - Direct/Cross/Redirect          51

1   Do others that you know who also know him feel that way about

2   him?

3   A   Yes.

4   Q   And that's your personal opinion as well?

5   A   Yes.

6   Q   Thank you.  No further questions.

7            THE COURT:  Mr. Glenn, do you have any cross

8   examination.

9            MR. GLENN:  Briefly.

10            THE COURT:  Certainly.

11                        CROSS EXAMINATION

12   BY MR GLENN:

13   Q   Mr. Schuster, are you Tim Lagler's (ph) nephew?

14   A   Yes.

15   Q   And Mr. Langler is a best friend of Mr. Krasley?

16   A   Yes.

17   Q   No further questions, Your Honor.

18            THE COURT:  Thank you very much.  Mr. Donato,

19   anything further?

20            MR. DONATO:  If I may.

21            THE COURT:  Certainly, sir.

22                      REDIRECT EXAMINATION

23   BY MR. DONATO:

24   Q   Are you here to testifying as to the reputation in your

25   personal opinion of Mr. Krasley as being an honest, truthful,

1   and law-abiding person because you're Tim Langley's nephew or

2   because that's actually what you know about his reputation

3   and that's actually your opinion of him?

4   A   It's because of what I actually know of him and that is

5   his actual reputation.

6   Q   Thank you.

7             MR. LINK:  No further questions, Your Honor.

8             THE COURT:  Mr. Glenn, anything further?

9             MR. GLENN:  Nothing further.  Thank you.

10            THE COURT:  Thank you very much, sir.  You may step

11   down.

12            MR. DONATO:  Kaitlyn Grather.

13            THE COURT:  Good morning.

14            WITNESS KAITLYN GRATHER:  Good morning.

15            THE COURT:  And if you would please raise your right

16   hand to be sworn.

17            ESR/CLERK FITZKO:  Do you swear or affirm that the

18   testimony you're about to provide on the issue now before

19   this Court shall be the truth, the whole truth, and nothing

20   but the truth so help you God?

21            THE WITNESS:  I do.

22                 (The Witness Is Sworn)

23            THE COURT:  Thank you very much, ma'am.  And you may

24   be seated.  And, ma'am, would you please state your full name

25   spelling your last name for the record?

1          THE WITNESS:  Kaitlyn Grather, G-R-A-T-H-E-R.

2          THE COURT:  Thank you very much, ma'am.  Counsel,

3     you may proceed.

4          MR. DONATO:  Thank you, Your Honor.

5                        DIRECT EXAMINATION

6     BY MR. DONATO:

7     Q   I'm sorry for mispronouncing your name.

8     A   That's okay.

9     Q   Do you know John Krasley?

10    A   Yes.

11    Q   How do you know him?

12    A   I am his goddaughter, goddaughter.  I know him all my

13    life since I was - since I'm 18.

14    Q   How old are you now?

15    A   I'm 18.

16    Q   Okay.  Do you know other people who know him?

17    A   Yes.

18    Q   Among those people who you know who also know him, what's

19    his reputation in that community of people for being an

20    honest, truthful, and law-abiding person?

21    A   Yes.  I heard great things about him when I'm ever around

22    him, family parties and everything I heard great things about

23    him.

24    Q   Okay.  Now, have you had an opportunity to form your own

25    personal opinion?

Kaitlyn Grather - Direct/Kaitlyn Grather - Cross    54

1   A   Yes.

2   Q   As to whether or not he is honest, truthful, and law

3   abiding?

4   A   Yes.

5   Q   And what is that opinion?

6   A   I believe he is, and I believe everybody around him

7   believes that too.

8   Q   Thank you.  No further questions.

9           THE COURT:  Thank you, Mr. Donato.  Mr. Glenn, you

10  may cross examine the witness.

11          MR. GLENN:  One question, Your Honor.

12                       CROSS EXAMINATION

13  BY MR. GLENN:

14  Q   Ms. Grather, is John Grather, Junior your brother?

15  A   Yes.

16  Q   Thank you.  No further questions, Your Honor.

17          THE COURT:  Thank you very much, sir.  And Mr.

18  Donato, anything further with this witness?

19          MR. DONATO:  Nothing further of this witness, Your

20  Honor.

21          THE COURT:  Thank you very much, ma'am.  You may

22  step down.

23          MR. DONATO:  We would - next call Brian Schuster.

24          THE COURT:  Good morning, sir.

25          WITNESS BRIAN SCHUSTER:  Good morning.

1          THE COURT:  And, sir, if you would please raise your

2    right hand to be sworn.

3          ESR/CLERK FITZKO:  Do you swear or affirm that the

4    testimony you're about to provide on the issue now before

5    this Court shall be the truth, the whole truth, and nothing

6    but the truth so help you God?

7          THE WITNESS:  I do.

8                    (The Witness Is Sworn)

9          THE COURT:  Thank you very much, sir.  Sir, please

10   be seated.  And sir, would you please state your full name

11   spelling your last name for the record?

12         THE WITNESS:  Brian Schuster, S-C-H-U-S-T-E-R.

13         THE COURT:  Thank you very much.  Counsel, you may

14   proceed.

15         MR. DONATO:  Thank you, Your Honor

16                    DIRECT EXAMINATION

17   BY MR. DONATO:

18   Q   Good morning.

19   A   Good morning.

20   Q   Do you know John Krasley?

21   A   Yes.

22   Q   How do you know him?

23   A   He is a - he's a family friend and he used to babysit me

24   a lot when I was younger.

25   Q   Okay, how old are you now?

1   A   Seventeen.

2   Q   Do you know other people who know him?

3   A   Yes, I know a lot of people.

4   Q   Among those people who you know who also know him, what's

5   his reputation in that community of people for being honest,

6   truthful, and law abiding?

7   A   Every person I've ever met that knows him has always

8   considered him to be very honest, very truthful and law

9   abiding.

10  Q   Okay.  And you've had an opportunity yourself to form a

11  personal opinion as to those character traits?

12  A   Yes, I have.

13  Q   And how do you find him?

14  A   I find him to be very truthful, very honest, and very law

15  abiding.

16  Q   Thank you.  No further questions.

17          THE COURT:  Thank you very much.  Mr. Glenn, you may

18  cross examine the witness.

19                      CROSS EXAMINATION

20  BY MR. GLENN:

21  Q   Mr. Schuster, are you related to Tim Lagler?

22  A   Yes.

23  Q   And what's the relation?

24  A   He's my uncle.

25  Q   I'm sorry.

Brian Schuster - Cross/Brian Schuster - Redirect    57

1  A   He's my uncle.

2          MR. GLENN:  Thank you.  No further questions, Your

3  Honor.

4          THE COURT:  Thank you, sir.  Mr. Donato, anything

5  further with this witness?

6                    REDIRECT EXAMINATION

7  BY MR. DONATO:

8  Q   You were present in court when Brandon testified?

9  A   Yes.

10  Q   What relation is he to you?

11  A   My brother.

12  Q   Okay.  Are you here testifying today because you're Tim

13  Lag - Tim Lagler's nephew or are you here testifying today

14  and telling the jury about this reputation of this man and

15  your opinion of him because that's how you truly feel and

16  that is what you truly know about his reputation?

17  A   I may tell with 100-percent truth that I know about him

18  and what I think of him, but I really do think that he is a

19  law abiding, truthful, and honest person.

20          MR. DONATO:  Thank you.  Nothing further.

21          THE COURT:  Thank you very much, sir.  Mr. Glenn,

22  any further questions?

23          MR. GLENN:  No, Your Honor.  Thank you.

24          THE COURT:  Sir, you may step down.  Thank you very

25  much.

1          MR. DONATO:  Your Honor, at this point, with

2    permission of the court and the permission of the Government

3    I would summon the remainder of the character and reputation

4    witnesses to the well of the court to be sworn.

5          THE COURT:  Very well.  You may proceed sir.  And

6    ladies and gentlemen, what we are going to do now at the

7    request of the defense and without objection of the

8    government, we're going to bring additional character

9    witnesses forward, but they would be in the well of the

10   court.  They'll be sworn.  They'll state their names.  It's

11   more to make sure you understand they are here and that they

12   have similar opinions regarding both the reputation and

13   opinion of Mr. Krasley as being honest, truthful, and law

14   abiding.

15         MR. DONATO:  I would ask those of you who were gonna

16   be character witnesses to rise and come to the well of the

17   courtroom.  Your Honor, perhaps it would be best if I started

18   them here to just have them --

19         THE COURT:  Certainly.  Good morning, to all of you.

20   And if all of you would please raise your right hand to be

21   sworn.

22         ESR/CLERK FITZKO:  Do you swear or affirm that the

23   testimony you're about to provide on the issue now before

24   this Court shall be the truth, the whole truth, and nothing

25   but the truth so help you God?

1          THE WITNESSES:  (In unison) I do.

2                    (The Witnesses Is Sworn)

3          THE COURT:  Thank you very much.  And Mr. Donato, if

4    you would question each one as to their name and the spelling

5    of their last name.

6          MR. DONATO:  Yes, let's start here.

7                    DIRECT EXAMINATION

8    BY MR. DONATO:

9    Q   Would you give the court in a loud voice your name and

10   spelling of your last name?

11   A   Tracey Gabrielle, G-A-B-R-I-E-L-L-E.

12          THE COURT:  Thank you.

13   A   Tracey Bennicoff, B-E-N-N-I-C-O-F-F.

14   A   Samantha Grather, G-R-A-T-H-E-R.

15   A   Robert Krasley, K-R-A-S-L-E-Y.

16   A   Joanne (ph) Young, Y-O-U-N-G.

17   A   Jeffrey Young, Y-O-U-N-G.

18   A   Mildred DeLong, D-E-L-O-N-G.

19   A   Louis (ph) DeLong, capital D-E- capital L-O-N-G.

20   A   Margaret Krasley, K-R-A-S-L-E-Y.

21   A   Clayton Krasley, K-R-A-S-L-E-Y.

22   TRACEY GABRIELLE:

23   Q   If I may start with you, do you know John Krasley?

24   A   Yes.

25   Q   How do you know him?

1   A   We're lifetime friends.  I've known him since we were in

2   the eighth grade.

3   Q   You were present in court when the five w-witnesses

4   testified this morning?

5   A   Yes.

6   Q   You heard their testimony?

7   A   Yes.

8   Q   If you were called to testify, would you testify

9   consistently with what they've said on the witness stand?

10  A   Absolutely.

11  TRACEY BENNICOFF:

12  Q   Do you know John Krasley?

13  A   Yes, I do.

14  Q   How do you know him?

15  A   Same school.

16  Q   Okay.  You were present in court when the five witnesses

17  testified this morning?

18  A   Yes.

19  Q   If you were called to testify on the witness stand, would

20  you testimony be consistent with what you heard them say?

21  A   Yes.

22  SAMANTHA GRATHER:

23  Q   (Indiscernible)

24  A   He's my sister's godfather, and I was here and present

25  today when the others were testifying, and I believe 100

1   percent (indiscernible).

2   Q   So you - your testimony would be consistent with what you

3   heard the witnesses say this morning?

4   A   Yes.

5   ROBERT KRASLEY:

6   Q   Sir?

7   A   Uh, John's brother.

8   Q   And you were present in court?  You heard them testify.

9   If you were called to testify your testimony would be

10  consistent with what you heard on the witness stand?

11  A   Yes.

12  JOANNE YOUNG:

13  A   Joanne Young, I am his neighbor and friend for almost 13

14  years.  Um, and, yes, I agree with everything that they have

15  said up there.

16  Q   Thank you.

17  JEFFREY YOUNG:

18  A   I'm his neighbor also, uh, for 12 years, and, uh, I agree

19  with everything that was - that was said up in the witness

20  stand while also.

21  Q   So, your testimony would be consistent with that that you

22  heard?

23  A   Yes, absolutely.

24  MILDRED DELONG:

25  Q   Ma'am?

1  A   Mildred DeLong and I am - I agree with everything that

2  was said.

3  Q   And how do you know Mr. Krasley?

4  A   Well, he's a good friend of mine, and even a neighbor.

5  Q   Okay.  And so, your testimony if you were called would be

6  consistent with what you heard from the other witnesses?

7  A   Absolutely.

8  LOUIS DELONG:

9  Q   Ma'am?

10 A   I'm Louis DeLong.

11 Q   And how do you know?

12 A   A friend.

13 Q   And how long have you known him?

14 A   Oh, for eight years.

15 Q   And you heard the witnesses testify this morning?

16 A   Yes.

17 Q   And if you were called to the witness stand would your

18 testimony be consistent with what you heard on the witness

19 stand today?

20 A   Absolutely, yes.

21 MARGARET KRASLEY:

22 Q   Ma'am.

23 A   Margaret Krasely, I'm his mother.

24 Q   You were present in court, Mrs. Krasley, this morning

25 when the witnesses testified, and, and you heard their

1    testimony?

2    A    Yes.

3    Q    If you were called to the witness stand would your

4    testimony be consistent with what you heard them, them say?

5    A    Yes, definitely.  Definitely.

6    CLAYTON KRASLEY:

7    Q    Sir?

8    A    Clayton Krasley.

9    Q    And how do you know John?

10   A    I'm his father.

11   Q    Okay.  You were present in court today when these

12   witnesses testified?

13   A    Yes.

14   Q    And if you were to testify would your testimony be

15   consistent with the jury's already heard those witness say?

16   A    Yes.

17            MR. DONATO:  Thank you Your Honor.

18            THE COURT:  Assistant United States Attorney Glenn,

19   do you have any questions for any of these character

20   witnesses?

21            MR. GLENN: I do not, thank you, Your Honor.

22            THE COURT:  Very well.  Thank you all very much.

23   You may return to the gallery.

24            THE COURT:  And the record will reflect the 10

25   character witnesses that were just questioned have returned

1    to the gallery.  Mr. Donato, you may call your next witness,
2    sir.
3              MR. DONATO:  Thank you.  With the court's
4    permission, we would now call Mr. Krasley to the witness
5    stand.  Mr. Link will handle that.
6              THE COURT:  Very well, sir.  You know, this might be
7    an appropriate time.  I know we just had a recess.  Why don't
8    we take a, a brief recess because I think we're well ahead of
9    schedule, ladies and gentlemen.  I'm gonna again caution you,
10   you should keep an open mind about this case until all the
11   evidence is in on both sides, so you should refrain from
12   discussing with each other or with anyone else including
13   members of your family or allow anyone to talk to you about
14   it.  Do not form any opinions about this case until you
15   retire to the juror room after my charge.  We'll stand in
16   recess for 10 minutes.
17             ESR/CLERK FITZKO:  All rise.
18                          (Recess at 10:37 a.m.)
19                          (Jury out at 10:37 a.m.)
20             THE COURT:  You may be seated.  The record will
21   reflect the jury is no longer present.  Counsel, was I
22   correct that we are ahead of schedule or had we pretty much
23   anticipated that this would be a short day of testimony?
24             MR. DONATO:  We anticipated it, Your Honor.  I just
25   had a request from Mr. Krasley during the break.  May he - I

1    didn't know whether the Court wanted to talk to him but he

2    needs to use the restroom.

3           THE COURT:  Okay.  Why don't we take care of that,

4    bring up?  But the reason I took a recess, well, one, it did

5    seem like an appropriate time because this looked like a -

6    perhaps our last witness other than any rebuttal witnesses

7    that might be called.  And is this the last defense witness?

8           MR. DONATO:  Yes, sir.

9           THE COURT:  And also, I'm not sure whether the

10   marshals wanted a - me to take a break for their planning

11   purposes when the Defendant is actually taking the stand, so

12   I thought it might be appropriate to give them whatever

13   opportunity they might need to position themselves

14   accordingly.  Alright.  Well, we'll have Mr. Krasley be able

15   to use the, the restroom and we'll resume as soon as we have

16   him back in the courtroom.

17          ESR/CLERK FITZKO:  All rise.

18          THE COURT:  As you were.  That's fine.  Thank you.

19                  (Recess ended at 10:49 a.m.)

20                   (Jury in at 10:49 a.m.)

21          ESR/CLERK FITZKO:  All rise for the jury

22    (Defendant John Joseph Krasley Testimony is under separate

23      order: 5:18-cr-00545-EGS-1_USA v. John Krasley_Krasley

24                   Testimony (Day 4 Trial))

25           (Sidebar discussion occurred at 11:26 a.m.)

1          THE COURT:  It is about 11:30.  Does the defense

2    have any further evidence to present?

3          MR. DONATO:  No, I don't believe so.

4          THE COURT:  Does the Government intend to call any

5    rebuttal witnesses?

6          MR. GLENN:  We are expecting one rebuttal witness

7    he's on his way.

8          THE COURT:  Okay, how long do you expect that to

9    take?

10          MR. GLENN:  Until he arrives or gives testimony?

11          THE COURT:  No, no.  Until he arrives.

12          MR. GLENN:  I would guess 10 to 15 minutes.

13          THE COURT:  Okay.  So, we'll stand in recess until

14   he arrives.  And we have to stand in recess anyways for the

15   marshals to retun Mr. Krasley to his seat.  Assuming there's

16   no surrebuttal we will be done soon.  Now the question is do

17   you still want to close the charge tomorrow, have a charge

18   conference today, and close the charge tomorrow?

19          MR. DONATO:  I would prefer to do it today if we

20   can.

21          THE COURT:  I think we can.

22          MR. GLENN:  That would be good, we just need a

23   couple of extra minutes to print out what I was putting in

24   the computer last night.

25          MR. DONATO:  I'm gonna need probably half an hour

1    just to organi- I have it but I want to tweak it a little

2    bit.

3            THE COURT:  Okay.  How would I find that?  It's

4    (indiscernible) charge conference and you have another chance

5    to give the jurors, jurors a recess.  What time would you

6    expect the one - the Government's gonna call one witness in

7    rebuttal.  Then we'll break for lunch.  I don't want to break

8    for lunch until the charge conference.  I don't think it's

9    gonna take long and decide when you would be ready to give

10   your closing arguments and have the jury come back.  I think

11   that'll be (indiscernible) or we can make sure you have the

12   time you need and still get the closing arguments done, get

13   the charge done, and have the jury out (indiscernible).

14           MR. DONATO:  Yes, sir.

15           THE COURT:  Alright.  So, we're gonna stand in

16   recess till your witness gets here.

17           MR. GLENN:  Thank you, Your Honor.

18           (Sidebar discussion concluded at 11:28 a.m.)

19           THE COURT:  Ladies and gentlemen, it appears that we

20   may be able to complete this case today but we need you to

21   bear with us with respect to how we proceed from this point

22   forward until you're gonna hear the closing arguments, et

23   cetera.  The Government has one rebuttal witness who is

24   actually en route, so we're gonna stay in recess until that

25   rebuttal witness gets here which we don't expect to be very

1    long.  And that is because the defense is about to close its

2    case.  Then the Government has an opportunity to present any

3    rebuttal evidence.  And we understand there is one witness.

4    After that, the defense has an opportunity to present

5    surrebuttal but I don't expect any.  Then I need a brief

6    period of time with the counsel to address certain legal

7    issues, and so, we have to decide exactly when we're gonna

8    send you out to lunch.  And right now, it's gonna be after

9    that rebuttal witness.  And I think this all will work fine

10   if you bear with us.  So, right now we're gonna stand in

11   recess for just a short period of time.  That's gonna be

12   determined by when that witness arrives and we expect that to

13   be 10 minutes or so, 15 minutes.  I'm gonna again caution you

14   that you should keep an open mind about this case until all

15   the evidence is in on both sides, so you should refrain from

16   discussing with each other or with anyone else including

17   members of your family or allow anyone to talk to you about

18   it.  Do not form any opinions about this case until you

19   retire to the jury room after my charge.  We'll stand in

20   recess for 10 to 15 minutes.

21              ESR/CLERK FITZKO:   All rise.

22                     (Jury out at 11:29 a.m.)

23              THE COURT:  And you may be seated.  The record will

24   reflect the jury is no longer present.  So, counsel, here is

25   what I expect to happen.  When the Government's - oh, you,

1    you can remain seated, that's fine.  When the Government's

2    rebuttal witness arrives, we'll bring the jury back into the

3    courtroom.  Mr. Donato, I'll give you the opportunity to rest

4    since you haven't had that opportunity unless you have any

5    more evidence.  But you don't believe you have any more

6    evidence to present?

7           MR. DONATO:  We don't have any more witnesses.  I do

8    want to move into evidence the exhibits that we've marked

9    and, and, and, shown.

10           THE COURT:  And would you like to do that in front

11   of the jury?

12           MR. DONATO:  I would.

13           THE COURT:  Very well.  And then we'll allow you to

14   rest once those have been admitted.  And I assume, Assistant

15   United States Attorney Glenn, I don't believe you have any

16   objection to those exhibits, but just so that during this

17   recess the two of you can consult.

18           MR. GLENN:  That's correct, Your Honor.

19           THE COURT:  Then we will allow the Government to

20   call its rebuttal witness.  At that point we should be at an

21   appropriate time to break for lunch.  We'll break for lunch.

22   I'll give the jury a little bit of a longer lunch.  We'll do

23   a charge conference, then I'll let you get some lunch and

24   prepare your closing arguments.  And when the jury comes back

25   from lunch, we'll have completed the charge conference,

1    you'll be ready to give your closing arguments, and then

2    we'll proceed with the - with the arguments.  Does that sound

3    like that will work?

4             MR. GLENN:  Yes, Your Honor.

5             THE COURT:  Now, Assistant United States Attorney

6    Glenn, how long do you believe you need for your primary

7    argument?

8             MR. GLENN: I would think about 30 minutes, Your

9    Honor.

10            THE COURT:  Do you want more?

11            MR. GLENN:  Well, I --

12            THE COURT:  I was thinking more like 45 minutes plus

13    15 minutes of rebuttal.

14            MR. GLENN:  Yeah.  I may not need 45.  Thirty to 35

15    I think would probably work, but I haven't actually timed it.

16            THE COURT:  Because what I was gonna say to Mr.

17    Donato, that would give you an hour for closing.  I don't

18    know how long you need.

19            MR. DONATO:  I don't think I'll need an hour, but.

20            THE COURT:  Okay.

21            MR. DONATO:  When, when I did it last night it was

22    35 minutes.  When I do it tonight it'll be - it'll be more

23    than that.

24            THE COURT:  Okay.  It sounds like I won't need to

25    look at a clock other than that the, the rebuttal must be

1   limited to 15 minutes.  But as far as the primary arguments,

2   it sounds like the two of you are gonna be pretty close in

3   any case.

4           MR. DONATO:  Yes, sir.

5           THE COURT:  And if then something changes about

6   that, we'll have to address it.  But I want it to be fair to

7   both sides.  But - and 15 minutes is enough for your

8   rebuttal?

9           MR. GLENN:  That will be ample, yes, that's fine.

10          THE COURT:  Okay.  And it sounds like counsel's

11  arguments are going to be very reasonable in time.

12          MR. DONATO:  Sir, we have a statement from the

13  rebuttal witness that the Government produced to us.  I would

14  ask that the Court inquire as to whether or not the rebuttal

15  testimony is incorporated in that statement.

16          THE COURT:  Mr. Glenn?

17          MR. GLENN:  As I stand here now, I don't recall the

18  content of the statement so I can't respond at this point.

19          THE COURT:  When the rebuttal witness does get here,

20  I will certainly give you an opportunity to question that

21  rebuttal witness before the witness is put on the stand in

22  front of the jury.

23          MR. DONATO:  Thank you, sir.

24          THE COURT:  Just make sure this is not a surprise.

25  I mean, it is a rebuttal witness so it doesn't have to be

1    disclosed, but I certainly don't want you to be unfairly

2    surprised as to what, what is --

3         MR. DONATO:  My concern is that if the witness

4    testifies I'm gonna need a continue - or a recess to be able

5    to prepare to cross examine him if I don't know the general

6    nature of his testimony.

7         THE COURT:  Very well.  Certainly, you'll have an

8    opportunity to question him before he takes the stand.  If

9    you need a recess after his direct, we'll take another

10   recess.

11        MR. DONATO:  Yes, sir.  Thank you.

12        THE COURT:  Alright.  We'll stand in recess until

13   the rebuttal witness gets here and Mr. Donato's had an

14   opportunity or Mr. Link together has had an opportunity to

15   talk with him.  And Mr. - Assistant United States Attorney

16   Glenn, you don't have any objection to Mr. Donato and Mr.

17   Link having an opportunity to talk to your rebuttal witness?

18        MR. GLENN:  Talk with the witness?

19        THE COURT:  Before he takes the stand?

20        MR. GLENN:  I guess if he'd like to, it's the

21   Court's witness, not - yes.

22        THE COURT:  If, if you would let Miss Fitzko know

23   when your witness has arrived and when counsel have had their

24   opportunity to talk with him if they - if they wish to.  And

25   then we'll reconvene and go through the, the exhibits from

1  the defense, the defense rest, allow the rebuttal evidence,

2  the Government rest, and then we'll break for lunch.

3          MR. GLENN:  Thank you, sir.

4          THE COURT:  Alright.  We'll stand in recess.

5                    ESR/CLERK FITZKO:  All rise.

6                    (Recess at 11:34 a.m.)

7            (Recording turned back on at 12:42 p.m.)

8          (Started during sidebar discussion 12:42 p.m.)

9          THE COURT:  You do not intend to publish the

10  (indiscernible) report?

11          MR. DONATO:  No.  And I do - and I would not --

12          THE COURT:  Is there any objection with the

13  Government to not published to the jury?

14          MR. GLENN:  I'm sorry?

15          THE COURT:  Is there any objection to it being

16  admitted as his report but not published to the jury?

17          MR. GLENN:  As long as the jury doesn't see it.  I

18  just think the evidence that -- should come from the witness.

19          THE COURT:  And you don't intend to be published?

20          MR. DONATO:  No.  I, I wouldn't intend it to go out

21  to the jur- with the jury even if they requested it.  I just

22  want it in the record.

23          THE COURT:  Very well, I'll admit it with the

24  understanding that it will not be published to the jury.

25          MR. GLENN:  Thank you, Your Honor.

1          (Sidebar discussion concluded at 12:42:55)

2          THE COURT:  And accordingly, defense exhibits 1

3   through 4 are admitted into evidence.

4          MR. DONATO:  And with that, the defense rests.

5                        DEFENSE RESTS

6          THE COURT:  Very well.  Assistant United States

7   Attorney Glenn, does the United States have any further

8   evidence to present in rebuttal?

9          MR. GLENN:  Yes, Your Honor.  Uh, the United States

10  will call one witness in rebuttal, Mr. Harry Haas.

11         THE COURT:  Very well, you may proceed, sir.  Good

12  afternoon, sir.  And sir, if you would please stand up here,

13  remain standing, and raise your right hand to be sworn.

14         ESR/CLERK FITZKO:  Do you swear or affirm that the

15  testimony you're about to provide on the issue now before

16  this court shall be the truth, the whole truth, and nothing

17  but the truth so help you God?

18         WITNESS HAROLD R. HAAS:  I do.

19                   (The Witness is Sworn)

20         THE COURT:  Thank you very much, sir.  And sir, you

21  may be seated.

22         THE WITNESS:  Thank you.

23         THE COURT:  And sir, would you please state your

24  full name spelling your last name for the record?

25         THE WITNESS:  Yes.  My full name is Harold, middle

1   initial is R for Roy, last name is Haas, H-A-A-S.

2          THE COURT:  Thank you very much, sir.  Counsel, you

3   may proceed.

4          MR. GLENN:  Thank you, Your Honor.

5                PLAINTIFF'S EVIDENCE IN REBUTTAL

6   BY MR. GLENN:

7   Q   Mr. Haas, do you know the Defendant here, John Krasley?

8   A   Yes, I do.

9   Q   How do you know him?

10  A   He's my neighbor.

11  Q   How long has he been your neighbor?

12  A   About 25 years I believe.

13  Q   Alright.  Did you ever have - have you visited Mr.

14  Krasley's home?

15  A   Yes.

16  Q   Did you ever have a key to his house?

17  A   Yes.

18  Q   How did that come about?

19  A   I think they went on a - him and his wife went on a

20  cruise one time and we had a key because he has a huge fish

21  tank in there and stuff and in case something would happen

22  that we'd access to allow people to get in there depending

23  what the situation might be.

24  Q   Did you ever use that key to enter his house?

25  A   I don't think so.  Maybe one time, but I don't think so.

1   Q   Did you ever have the past key to his garage door?

2   A   Yeah, I had the garage - it was a code, the code at one

3   time.  Yes.

4   Q   Did you ever use that to enter his garage?

5   A   I tried to use it one time when I wanted to loan a wrench

6   off of him, a torque wrench and I kind of didn't remember the

7   code and I had called John on the phone and John gave me the

8   information to get in and told me where the wrench was, so I

9   had access there.  And that was in the garage area.

10  Q   Now, at your house, your house is - where is your house

11  relative to Mr. Krasley's house?

12  A   Maybe a quarter block down the road.

13  Q   And by quarter block that's sort of a rural block, it's

14  not like city block?

15  A   Yes, yeah.

16  Q   Thank you.  Did you have a router at your house in the

17  last few years?

18  A   Yes.

19  Q   Did you change your router at some time in the last few

20  years?

21  A   Yes.

22  Q   Approximately when did you make that change?

23  A   Approximately two years ago, give or take.

24  Q   And why did you make the change?

25  A   The first router I had only was doing about 12 megs and I

1    couldn't log on from my back porch and stuff, so I went with

2    a high-end router that puts out a lot more area where I could

3    be outside on the front porch or the back porch and be able

4    to log in.

5    Q    Okay.  Now, in using your computer, have you ever seen

6    Mr. Krasley's Wi-Fi network on your computer screen?

7    A    No.

8    Q    Have you ever logged on to Mr. Krasley's Wi-Fi network?

9    A    No.

10   Q    Have you ever had an external antenna to receive Wi-Fi?

11   A    No.

12   Q    Are you currently employed?

13   A    Pardon?

14   Q    Are you currently employed?

15   A    No, I retired April the 1st of this year.

16   Q    2019?

17   A    Pardon?

18   Q    2019?

19   A    Yes.

20   Q    What was your employment before you retired on April 1,

21   2019?

22   A    I worked for Service Electric Cable TV and

23   Telecommunications.

24   Q    What was your position with them?

25   A    Management.

1  Q   Okay.  What were your work hours during say 2013 to 2018?

2  A   When you're in management in the telecommunications

3  business you're like 24/7 actually, but the normal hours was

4  40 a week.  But you had to stay, you know, with my iPhone and

5  stuff in case there was an emergency or, we have a lot of

6  fiber tied in and police departments and et cetera, so if

7  something goes down you gotta be alert and get it taken care

8  of.

9  Q   And what did you say your normal hours were?

10  A   40 hours a week.

11  Q   Okay.  Five days regular, Monday through Friday?

12  A   Yeah.  Monday through Friday.

13  Q   And for those hours would you be away from your home?

14  A   Yes.

15  Q   Thank you.

16        MR. GLENN:  No further questions, Your Honor.

17        THE COURT:  Thank you, Mr. Glenn.  Mr. Donato, you

18  may cross examine the witness.

19        MR. DONATO:  Thank you Your Honor.

20                    CROSS EXAMINATION

21  BY MR. DONATO:

22  Q   Good afternoon, Mr. Haas.

23  A   Good morning.

24  Q   You spoke with agents in this case on January 11th of

25  this year.  Do you remember that?

1    A    Not the exact date, but I do remember that I spoke with

2    them.  They were at the house.

3    Q    Okay.  And you're retired from the telecommunications

4    business April 1, 2019?

5    A    Yes.

6    Q    And that was Service Electric?

7    A    And Telecommunications, Inc.

8    Q    And is that the parent company of PenTeleData?

9    A    Yes.  We're, we're partners with PenTeleData.

10   Q    Okay.  You've been friendly with John Krasley over the

11   years?

12   A    Yes.  Absolutely.

13   Q    You've - any, any time you told John Krasley you needed

14   help with something he came and helped you?

15   A    Absolutely.  I couldn't ask for a better neighbor, tell

16   you the truth.

17   Q    You've been - you've spent time in the Krasley residence

18   for picnics and other social events?

19   A    Yes.

20   Q    You occasionally went out to dinner with the Krasleys,

21   you and your wife, Rose?

22   A    I gotta think.  I couldn't say yes or no, but I think,

23   yeah, we went to Texas Roadhouse one time.

24   Q    Okay.  At some point you helped the Krasley's split a

25   cable line in their house?

1    A   With cable in the house, yes.

2    Q   Now, on March 28, 2019, someone working with us to help

3    us, an investigator came and talked to you.

4    A   Yes.  Female.

5    Q   And, and she met with both you and Rose.  Is that right?

6    A   Yes.

7    Q   And you told her that - I think what you mentioned here a

8    moment ago that John Krasley was your best neighbor.

9    A   Yeah.  He was.

10   Q   She says that you provided numerous examples of John

11   being very quick to lend a hand even when the task is time-

12   consuming and requires physical exertion.  Did she get that

13   right?

14   A   Yes.

15   Q   Can you give the jury an example of that?

16   A   Yeah.  I, I have a 26-acre gentleman's farm and when I

17   bought it and built a house and et cetera, I seeded the front

18   lawn which is a slope and it kept washing out, so I got a

19   tractor trailer loaded with sod and I was laying it on a

20   Saturday morning and John come down and I had mentioned to

21   him I think the day before.  John came down to help me and a

22   thunderstorm came up and we were throwing sod on the lawn and

23   we got soaked.

24   Q   Did it take all day?

25   A   Yeah.  It was pretty much all day.

1    Q   He has taken care - John has taken care of your dogs and

2    birds --

3    A   Yes.

4    Q   -- when you needed that - him to take care of that?

5    Thank you, sir.  I have no further questions.  Thank you, Mr.

6    Haas.

7              THE COURT:  Thank you very much, Mr. Donato.  Mr.

8    Glenn, any redirect?

9              MR. GLENN:  Nothing further, Your Honor.  Thank you.

10             THE COURT:  Very well, sir.  Thank you very much.

11   You may step down.

12             THE WITNESS: Sorry I got called at the spur of the

13   moment.

14             THE COURT:  Not at all, sir.  We appreciate your -

15   you attending.  And Mr. Glenn, does the Government have any

16   further evidence to present in this matter?

17             MR. GLENN:  No, Your Honor.  The Government rests.

18                      PLAINTIFF RESTS

19             THE COURT:  Mr. Donato, does the defense have any

20   surrebuttal?

21             MR. DONATO:  No surrebuttal.

22             THE COURT:  Very well.  Ladies and gentleman, you

23   have now heard all the evidence which is gonna be presented

24   in this matter.  The next step will be for counsel to give

25   you their closing arguments.  We're gonna stand in recess for

1    one hour for lunch, actually for one hour and 15 minutes

2    because I have just a few minutes I need to, to address legal

3    issues with counsel.  And I do apologize because it might

4    have been much more efficient if we had let you go to lunch

5    before rather than have you waiting in the jury deliberation

6    room.  But we're gonna stand in recess for one hour and 15

7    minutes, so at 10 minutes after two we will reconvene and you

8    will hear the closing arguments of counsel followed by the

9    charge of the Court, and then you will retire to begin your

10   deliberations.  Now, even though you have heard all the

11   evidence, you have not heard the closing arguments or the

12   charge of the Court, so I will again urge you to continue to

13   not discuss this matter among yourselves or with anyone else.

14   Continue to wear your juror badges in an obvious place on

15   your clothing while you're in the courthouse.  Continue to

16   not read any newspaper articles or listen to any media

17   communications, and continue to keep an open mind about this

18   case until you have heard those closing arguments and the

19   charge of the court and until you get to the - to the jury

20   deliberation room.  Do not form any opinions about this case

21   until you, in fact, retire to deliberate.  We'll stand in

22   recess until 10 minutes after two for lunch.

23            ESR/CLERK FITZKO:  All rise.

24                 (Jury out at 12:53 p.m.)

25            THE COURT:  You may be seated.  The record will

1      reflect the jury is no longer present.  Counsel, did you want

2      to do the charge conference right now or would you rather get

3      something to eat first and then do the charge conference?  I

4      don't expect it to be long one way or the other.

5              MR. GLENN:  Uh, we could - we could get it out of

6      the way if it's --

7              THE COURT:  Sure.

8              MR. GLENN:  -- short, Your Honor.

9              MR. DONATO:  That's fine.

10             THE COURT:  Very well.  It didn't appear as though

11     there were many contested issues, but something I do want to

12     bring up with you.  My policy generally with respect to

13     exhibits is I don't send anything out with the jury in the

14     first instance unless counsel believe that the jury should

15     have something from the very beginning of their

16     deliberations.  And then what I do is I instruct the jurors

17     that if they do want to see any of the evidence that we then

18     send that evidence out to them once they've requested it.

19     Now, I believe, Mr. Glenn, you may have had a particular

20     exhibit that you were concerned that the jury did have in the

21     jury deliberation room.  Is that correct?  There was a

22     summary?

23             MR. GLENN:  Oh, the - well, I think, yes, it would

24     be helpful for them for their organiza- organizing their

25     thoughts if they had the redacted Exhibit 16 which shows the

1    counts and the, the dates and the times and that, that sort

2    of thing, yes.

3        THE COURT:  Because part of the problem here is if,

4    if we do it that way we would not send the indictment out

5    with the jury.

6        MR. GLENN:  Well, I'm happy to have the indictment

7    sent as well.  I think that's helpful to them also.

8        THE COURT:  Mr. Donato, what are your thoughts on

9    sending just the indictment out?

10       MR. DONATO:  You know, Your Honor, in this case and

11   the nature of the defense, I don't have any objection to

12   sending the indictment out and I don't object to sending that

13   summary either.

14       THE COURT:  Very well.  Then - and are both counsel

15   agreeable that that's all that will go out in the first

16   instance and then we will advise the jury that if they want

17   to see any of the other evidence that's been presented in

18   this case to just let us know in writing?  I'll take it up

19   with counsel and determine whether what they're requesting is

20   appropriate to out with them and get it out to them.

21       MR. DONATO:  Yes, sir.

22       MR. GLENN:  Yes, that's fine although I guess I

23   would ask other than the couple of items we said would not be

24   viewed by the jury, why we would not send any exhibit out

25   other than child pornography if they requested it?

1          THE COURT:  Oh, if they request it, I'm sure we will

2     send it out.

3          MR. GLENN:  Okay.  Alright.

4          THE COURT:  I'm sure we will.

5          MR. GLENN:  Alright.  I wouldn't expect them to want

6     to look at any images, but normally we'd bring them back into

7     court and we'd be able to show them here.

8          THE COURT:  Right.  I, I don't expect it to be a

9     problem in this particular case because looking at any of the

10    particular evidence, it wasn't a long trial.  The evidence

11    should be fresh in their minds.  And as you said, Mr. Donato,

12    the de- the defense here is very particular and very

13    specific.  So - and there are stipulations, so with respect

14    to that, I don't expect there to be a lot of issues with

15    evidence.

16         MR. DONATO:  Yes sir.

17         THE COURT:  Okay.  Now, with respect to the proposed

18    instructions, my understanding, Mr. Donato, is the defense

19    has no objection to the defense's - excuse me, to the

20    Government's requested instructions, and joins in those

21    requests with some limited exceptions, correct?

22         MR. DONATO:  That's my understanding.  Yes, sir.

23         THE COURT:  Okay.  And as we go through this, I just

24    want to confirm that everybody agrees the experts in this

25    case, the, the Government had Special Agent Munjone and

1    Special Agent Evans, and then Special Agent Darin Murphy as

2    the experts.  The Defense had Kyle McArdle and that was the

3    only defense expert, correct?

4            MR. DONATO:  Yes, sir.

5            THE COURT:  Okay.  And those were the three

6    Government experts.  With respect to the stipulation, I know

7    that everyone believed they were stipulations of fact.  The

8    one in fact seems more appropriate to be considered a

9    stipulation of testimony according, and I think with respect

10   to that stipulation I should advise the jury on what a

11   stipulation of testimony is, standard of instruction 2.02.

12   Do both counsel agree?

13           MR. GLENN:  Yes, Your Honor.

14           MR. DONATO:  Yes, sir.

15           THE COURT:  And with respect to the stipulations of

16   fact, especially if these are not going out with the jury,

17   the - some of the stipulations take care of elements of the

18   offense and I'm wondering should the stipulations go out with

19   the jury?  The reason I ask that is interstate commerce.  We

20   know that's stipulated as the internet, et cetera, and it's

21   part of the stipulation concerning real children that the

22   visual depictions where each transported using the internet

23   which is a means and facility of interstate and foreign

24   commerce.  I don't know if the jury would have realized the

25   significance of the stipulation at the time they're given.

1    Now, I can read the stipulations as part of my instructions

2    if you would prefer that, or we can just send the

3    stipulations, the stipulations of fact out with the jury.  I

4    wouldn't send the stipulation of testimony out but the

5    stipulation of fact.  Mr. Donato, what are your thoughts?

6         MR. DONATO:  My, my preference would be that the

7    court read the stipulations of fact to the jury and not send

8    them out unless they're requested.

9         THE COURT:    Assistant United States Attorney

10   Glenn?

11        MR. GLENN:  My preference would be the opposite,

12   Your Honor, that the court send the stipulations out with the

13   jury so they can have them as they consider the, their

14   verdicts.

15        THE COURT:  Okay.  In the first instance I'll defer

16   to the defense on this and I'll read them explaining the

17   significance of them to the jury as a stipulation of fact.

18   The unique thing about our stipulation of fact instruction is

19   it always provides that ending that says you don't have to

20   accept it even though it's stipulated.  But I'll read the

21   stipulation concerning real children.  I'll read the

22   stipulation regarding internet access.  What about the

23   stipulation regarding PenTeleData records?

24        MR. GLENN:  I don't think it would be meaningful to

25   read that because it just has a lot of IP addresses, but it,

1    it sets out --

2              THE COURT:  Right.

3              MR. GLENN:  -- the IP addresses that were assigned

4    to Mr. Krasley on certain dates.  That, that might be

5    something they --

6              THE COURT:  Alright.  Mr. Donato, recognizing that I

7    won't send out these stipulations, do you have any objection

8    to the stipulation concerning the PenTeleData record of IP

9    addresses go out to the jury?

10             MR. DONATO:  I - may I just take a look at it?

11             THE COURT:  Absolutely, sir.

12             MR. GLENN:  Oh, 29 B or C.  I know it has the chart.

13             MR. DONATO:  Here it is.  We don't have any

14   objection to this going to out.

15             THE COURT:  Would you - do you have copies to give

16   to counsel?

17             ESR/CLERK FITZKO:  Here's three.  Here's the

18   (indiscernible) for counsel.

19             THE COURT:  Okay.  Could you, so I get one?

20             ESR/CLERK FITZKO:  Yes, yeah.

21             THE COURT:  And you have a stapler there?

22             ESR/CLERK FITZKO:  Yes.

23             THE COURT:  If you could just get her a copy of the

24   charge.  And Mr. Donato, have you made a decision yet?

25             MR. DONATO:  Yes.  I, I agree that can go out to the

1    jury.

2          THE COURT:  Very well.  So, we will send the

3    indictment out.  We will send the - that summary and what was

4    that marked, Assistant United States Attorney Glenn?  The?

5          MR. GLENN:  Oh, it's Exhibit 16 as redacted, the

6    summary, the summary of counts.

7          THE COURT:  So, the Exhibit 16 and then what was the

8    stipulation concerning the PenDele- TeleData?

9          MR. DONATO:  Twenty- 29, C I believe.

10          MR. GLENN:  Twenty-nine C, Your Honor.

11          THE COURT:  Okay.  So, 29 C will go out, 16 will go

12    out, and the indictment will go out in the first instance.

13    And I will read the stipulation regarding real children and

14    the stipulation concerning internet access.  And those are

15    the only stipulations other than the stipulation of testimony

16    which I'll just simply remind them of when I explain what a

17    stipulation of testimony is.

18          MR. DONATO:  Yes, sir.

19          THE COURT:  Very well.  Okay.  And it's agreed that

20    Government's request number 10 which was put in there

21    alternative in the event the Defendant did not testify will

22    not be given.  With respect to the character evidence --

23          MR. DONATO:  I'm sorry, Your Honor.

24          THE COURT:  Oh sure, sir.

25          MR. DONATO:  Did you say Government's request number

1  10?

2          THE COURT:  Yes.  It's defendant's choice not to

3  testify or present evidence.  That's to be given in the event

4  the defendant does not testify.  He did testify here, so

5  instead of 10 we'll be giving 11.

6          MR. DONATO:  Yes, sir.

7          THE COURT:  And Assistant United States Attorney

8  Glenn, do you agree?

9          MR. GLENN:  Yes, Your Honor.

10          THE COURT:  Defendant's character evidence, this was

11  the issue that came up regarding what instruction I would

12  give in this case, and I've reviewed the cases that you've

13  both cited to.  Would either of you like to be heard further

14  on the issue of what the instruction should be?

15          MR. DONATO:  Sir, I think we already did this at the

16  pretrial conference and certainly the Court remembers what I,

17  --

18          THE COURT:  Yes, absolutely.

19          MR. DONATO:  -- my position.  So, I don't need to

20  argue that any further.

21          MR. GLENN:  Yeah, that's correct, Your Honor. I

22  believe we set forth the subsequent case and then we would

23  urge the - what we, we would put forth what we put in our

24  pleading in our objection.

25          THE COURT:  Well, I was very pleased with how the

1    defense tailored the instruction, because I'll tell you

2    what's wrong with this standard instruction.  Yes, we do have

3    some case law that supports that, and if you read the ins-

4    the comments to the instruction they suggest that the court

5    is not bound to give the standing alone can cause a, a

6    reasonable doubt.  But that's not how Mr. Donato's

7    instruction is phrased, his proposed instruction.  And my

8    problem with the standard instruction when I read it against

9    Mr. Donato's instruction is it doesn't tell the jury what --

10   why they're hearing character evidence.  It presumes they

11   know.  All it says it you should consider this character

12   evidence together with and in the same way as all other

13   evidence in deciding whether the Government has proved the

14   charges.  That gives them no indication at all as to how

15   they're supposed to use this whereas Mr. Donato's proposed

16   instruction does not talk about standing alone.  What it does

17   say is the reason why we give - have character evidence.  I,

18   I think it's extremely well written in that regard, and let

19   me pull it out real quick.  Instead of saying character

20   evidence standing alone can, can create a reasonable doubt,

21   it says, evidence here - it gives the reason why you put this

22   evidence in.  Evidence of a defendant's reputation

23   inconsistent with those traits of character ordinarily

24   involved in the commission of the crime charged may give rise

25   to a reasonable doubt since the jury may think it improbable

1    that a person of good character in respect to those traits
2    would commit such a crime.  It's exactly why you put good
3    character evidence in.  It's - and I think the jury needs to
4    understand why, why did they hear that good character
5    evidence?  Because we know somebody of good character is less
6    likely to commit an offense, so when they hear that good
7    character evidence that good character evidence can be
8    weighed such that it could create a reasonable doubt without
9    saying evidence of good character standing alone may create a
10   reasonable doubt.  So, I am inclined to rule in favor, Mr.
11   Donato, but I wanted to give, Assistant United States
12   Attorney Glenn, you another opportunity to object to that,
13   I've already objected powerfully because you've cited to a
14   case in the Third Circuit that specifically says I'd give a
15   standard instruction that's within my discretion.
16          MR. GLENN:  Well, yeah, it is within your
17   discretion, certainly.  Your Honor, we appreciate the - your
18   concern about giving the jury a reason.  Our concern is that
19   as phrased it comes very, very close to being a standing
20   alone instruction.  If it could be crafted to reflect the
21   reasoning that you're identifying, but at the same time,
22   informing the jury that it should take that into account
23   along with the all the other evidence as it reaches its
24   verdict.  We think that will improve it because that --
25          THE COURT:  Well, I was going to include the

1   standard instruction along with this, so it would - in fact,

2   I think the way we'll do it is, let me give to you exactly so

3   you'll know, all say, you have heard reputation and opinion

4   evidence about whether the defendant has a character trait

5   for what we had there.  Then give evidence of the defendant's

6   reputation inconsistent with those traits of character

7   ordinarily involved in the commission of the crime charged

8   may give rise to a reasonable doubt since the jury may think

9   it improbable that a person of good character in respect to

10  those traits would commit such a crime.  You should consider

11  this character evidence together with and in the same way as

12  all the other evidence in the case in deciding whether the

13  Government has proved the charges beyond a reasonable doubt.

14          MR. GLENN:  Yeah, that's helpful Your Honor.

15          THE COURT:  And that's agreeable to the defense as

16  well?

17          MR. DONATO:  Yes, I think that is agreeable.

18          THE COURT:  Okay.  Government's request number 13,

19  specific investigation techniques not required, and I think

20  we refer to this as the - well, it used to be that show, the

21  crime scene show, CSI.  The CSI instruction.  Why didn't they

22  run all these fancy whatever?  The only problem is I don't

23  know what specific investigative techniques were not used

24  here.  There could be an argument that it's some machine that

25  tests how far the, the radio waves go.  I'm not sure what

1   that machine was called.  Maybe that.  But I was wondering if
2   maybe the two of you just wanted me to read the second and
3   third paragraph of that instruction.  The first paragraph is
4   during the trial you heard testimony of the witnesses and
5   argument by counsel that the Government did not use specific
6   investigative techniques such as, and then that's where we've
7   gotta fill in the blank.  You may consider facts in deciding
8   whether the Government has met its burden of proof because as
9   I told you, you should look at all the evidence or lack of
10  evidence in deciding whether the defendant is guilty.
11  However, there is no legal requirement that the Government
12  use any of these specific investigative techniques or all
13  possible techniques to prove its case.  There is no
14  requirement to - and then it would be use this, whatever that
15  machine was.  That's the paragraph I have the most the
16  trouble crafting 'cause I don't know what that machine is and
17  I'm not sure whether it really is something the defense or
18  the Government would want in.  The other parts of the
19  instruction, paragraph 2, many people watch television shows
20  or movies about police work or lawyers with the criminal
21  justice system and sometimes people are affected by what they
22  - by that when they serve as jurors.  Television shows and
23  movies can create false expectations about real life.  For
24  example, how the trial is going to proceed or what the
25  evidence might look like.  You must decide this case on the

1    evidence in front of you and the law as I give it to you.  Do

2    not decide this case even in part based on something you saw

3    on television or in a movie.  It is improper and unfair.

4    Your concern, as I have said, is to determine whether or not

5    the evidence submitted in this trial proves the defendant's

6    guilt beyond a reasonable doubt.  Now, normally this

7    instruction has to do with they didn't get fingerprints, they

8    didn't do DNA analysis, they didn't get any recordings, et

9    cetera.  So, those are the examples that are given.  I don't

10   know whether counsel want this instruction, whether you, what

11   you want in it, or you don't want these instructions at all

12   or you just want the second part of the instruction.

13          MR. GLENN:  There was I think one question maybe in

14   cross examination to Special Agent Murphy on whether he did

15   do a sort of site map signal strength from Mr. Krasley's

16   router.  And of course, he had no access to the router.  You

17   know, if Mr. Donato's - if Mr. Donato is gonna argue that to

18   the jury, we'd like the instructions.  If it's not going to

19   be argued I don't know if it's necessary 'cause that was not

20   a big part of the case.

21          THE COURT:  We do know that if you believe the

22   experts you're not supposed to use your cell phone to try to

23   just walk out and tell how good the signal is.  I think

24   that's what both the ex- the experts said.

25          MR. GLENN:  Well, I think the experts said there

1   were, there were better devices.

2          THE COURT:  Right.

3          MR. GLENN:  I mean they didn't say the cell phone is

4   completely useless --

5          THE COURT:  Right.

6          MR. GLENN:  -- but they said --

7          THE COURT:  It goes to weight.  It goes to the

8   weight of it, the test.  Mr. Donato?

9          MR. DONATO:  That's not an absent law enforcement

10  technique though, the, the fact that a cell phone isn't the

11  best way to do it.  Is not I think what that's about.  I had

12  a chapter, several chapters of cross examination because I

13  know jury - jurors are susceptible to it, about fingerprints

14  and lifting DNA off the computers.  And I didn't use it

15  because I didn't - because I thought it was petty frankly.

16  But I also thought we don't need to confuse this case with

17  that instruction about fingerprints and lifting DNA off

18  computers.  So, I, I think that the, the paragraph in that

19  instruction that says essentially real life is not like T.V.

20  is important to tell the jury but that's all I think needs to

21  be told on this issue.

22         THE COURT:  Assistant United States Attorney Glenn?

23         MR. GLENN:  I think that's probably fine, Your

24  Honor.

25         THE COURT:  'Cause I could see not even giving this

1    instruction.  I have no problem giving that second paragraph

2    because I don't know that the - a specific investigative

3    technique includes using something to measure the internet.

4    I just don't know, I mean, I could make the argument it does.

5    I could make the argument it doesn't.  So, you're both

6    agreeable to just giving the, the CSI instruction without

7    getting into anything specific?

8              MR. GLENN:  That's fine with me.

9              MR. DONATO:  Yes.

10              THE COURT:  We've agreed that the indictment is

11    going to go out along with those two exhibits, we'll make

12    sure you look at those, what's gonna go out to the jury

13    before it goes out with the jury.  I thought the, the

14    instructions on the offenses were all good.  And want a

15    motive explained instruction?  'Cause motive in child

16    pornography cases is kind of a - it is absolutely true the

17    motive is not an element of the offense.  This gets a little

18    confusing, the jury's gonna wonder why personal advancement

19    and financial gain, for example, are motives for much of

20    human conduct.  However, these motives may prompt one person

21    to intentionally do something, peripherally acceptable while

22    promoting another - like prompting another person to

23    intentionally do an act that is a crime.  It's to get across

24    the fact that intent and motive are different concepts, but

25    in a child pornography case, motive doesn't seem to be an

1    issue.

2         MR. GLENN:  I think that's probably correct, Your

3    Honor.  We have objection to deleting that instruction.

4         THE COURT:  And does the defense have any objection

5    to deleting the motive explained instruction?

6         MR. DONATO:  No, I don't have an objection.

7         THE COURT:  I really do think that would just

8    confuse the jurors in a case like this.  And the defense,

9    that's - as far as the Government's requested instructions,

10   that's all I have.  And there's one defense request

11   instruction that the Government has suggested be modified a

12   little bit to more tie in with the instruction on the

13   presumption of innocence, so just follow as I have instructed

14   you.  Mr. Krasley is presumed innocent unless and until the

15   Government has presented evidence that overcomes that

16   presumption by convincing you that the defendant is guilty of

17   the offense charge beyond a reasonable doubt.  And Mr.

18   Krasley has no obligation to prove anything.  However, if his

19   defense raises a reasonable doubt in your mind, then you must

20   find him guilty.  Did the --

21        MR. DONATO:  You must find him not guilty.

22        THE COURT:  If the defense raises a reasonable doubt

23   on - in your mind then you must find him not guilty.  And by

24   all means, if I misstate that during the instructions point

25   that out.  Do you have any objection to the, the modification

1    requested by the Government to your instruction on the

2    defense?

3         MR. GLENN:  Alright.  This is -

4         MR. DONATO:  Your Honor, I don't know that the Court

5    read this entire instruction.  when I saw the Government's

6    objection and suggestion I didn't - I didn't - I wasn't upset

7    by it.  But it begins with Mr. Krasley's defenses --

8         THE COURT:  Oh, yes.  I didn't read all that.  I

9    didn't read the beginning of it.

10        MR. DONATO:  Oh, okay.

11        THE COURT:  Correct.  It's exactly - what I'm

12   reading from is exactly what was in the Government's

13   response.

14        MR. DONATO:  Okay.  May I have a moment?

15        THE COURT:  Oh, absolutely, sir.

16        MR. DONATO:  You, you saw this, right?  Doubt this

17   changes in all of it but what I was more interested in is Mr.

18   Krasley defenses (indiscernible).  Thank you sir, we can live

19   with that.

20        THE COURT:  Alright.  And I will give that

21   instruction as soon as I am done reading the elements of the

22   four offenses.  Then I will give the theory of the defense

23   instruction and then go from there.  We'll remove the motive

24   explain instruction and that will take us into the final

25   instructions.  And I have had copies of the proposed verdict

1    slip handed out to both of you.  Why don't you take time over

2    lunch to look at those, see if that's gonna be an acceptable

3    verdict form?  Are there any other - oh, and then one other

4    thing we did with the charge - talk about.  And this is

5    really first directed to Mr. Donato.  Do you want any further

6    instructions on the, the chat room and the, the file names or

7    do you not want to bring attention to it?  We've already

8    given them instruction at the time of it.  What I would do is

9    just give the standard instruction, the standard instruction

10   to them that that's only to be considered for purposes of

11   determining location and for no other purpose.  I would

12   suggest we give it but I'm gonna defer to the defense on

13   this.  If you believe that it would, would merely lead to

14   drawing the jury's attention to that evidence as opposed to

15   cautioning them how to use that evidence, so I'm gonna defer

16   to you on that.

17        MR. DONATO:  My inclination is to request that the

18   court give as a final instruction.

19        THE COURT:  Okay.  And that, that's my inclination

20   as well and I guess I'm sure that Assistant United States

21   Attorney agrees?

22        MR. GLENN:  Yes, Your Honor.  No objection.

23        THE COURT:  Very well.  Are there any other requests

24   of instructions from the Government?

25        MR. GLENN:  No, Your Honor.

1            THE COURT:  Any other requests of instructions from

2       the defense?

3            MR. DONATO:  No, sir.

4            THE COURT:  Very well.  Anything else?  I'll let you

5       look at the proposed verdict slip over lunch.  Anything else

6       before we stand in recess until 10 after two?

7            MR. GLENN:  I was just gonna say, so when we resume

8       at 10 after two we'll just move into closing arguments?

9            THE COURT:  Is that enough time for the two of you

10      to get some lunch and --

11           MR. GLENN:  Maybe 2:20.

12           THE COURT:  Sure.

13           MR. DONATO:  Can we have around 2:30?

14           THE COURT:  Sure, 2:30 it is.  Alright, I wish I'd

15      told the jury that now so they could be more relaxed at

16      lunch, that's fine.  Although I wish I had told the jury that

17      now so they can be more relaxed at lunch.  That's fine.

18           MR. GLENN:  Yeah.

19           THE COURT:  At 2:30 we will bring the jury back in

20      and we'll do the closing arguments followed by the charge.

21           MR. GLENN:  Okay.

22           MR. DONATO:  Sir, the only other - I don't know

23      whether it's a request or just a thought that I have.  If

24      closing arguments and the charge go to 4:30 or 5:00, my

25      understanding was even if that happened the Court would want

1    the jury to remain in deliberations this evening?

2              THE COURT:  Correct.

3              MR. DONATO:  Then the only other request that I

4    would make is that when they go out to deliberate the Court

5    inform them that they are not required to make a decision

6    tonight and at any time when they want to go home they can go

7    home.

8              THE COURT:  And I would normally tell them that as

9    well.  Do you wish to be heard, Assistant United States

10   Attorney Glenn?

11             MR. GLENN:  No objection.

12             THE COURT:  Alright.  I - as a general rule I leave

13   it up to them whether they stay or go and how long they stay,

14   although there are times if they stay too long and they're

15   not close to reaching a verdict I'm not gonna hold everybody

16   here late into the evening and send them home.  'Cause

17   sometimes a good night's sleep can start things off much

18   better.

19             MR. DONATO:  Yes.

20             THE COURT:  Alright.  If anything comes up over the

21   lunch hour let me know before we bring the jury in at 2:30.

22             MR. GLENN:  Thank you, Your Honor.

23             MR. DONATO:  Thanks.

24             ESR/CLERK FITZKO:  All rise.

25                  (Recess at 1:20 p.m., until 2:34 p.m.)

1          ESR/CLERK FITZKO:  All rise for the jury.

2                    (Jury in at 2:34 p.m.)

3          THE COURT:  You may be seated, thank you.  The Court

4     is called to order.  All parties previously present are once

5     again present.  The jury is present.  Ladies, and gentlemen

6     of the jury, now that you have heard all of the evidence

7     which is to be presented in this case, the next step is for

8     counsel to give you their closing arguments.  Even though

9     those arguments do not constitute evidence, you should

10    consider them very carefully.  In their arguments, counsel

11    will call to your attention the evidence which they consider

12    material and will ask you to draw certain inferences from

13    that evidence.  Please keep in mind, however, that you're not

14    bound by their recollection of the evidence.  It is your

15    recollection of the evidence and your recollection alone

16    which must guide your deliberations.  If there is a

17    discrepancy between the attorney's recollection and your

18    recollection then you are bound by your own recollection, nor

19    are you limited in your consideration of the evidence to that

20    which is mentioned by counsel.  You must consider all of the

21    evidence which you consider material to the issues involved

22    to the extent that the inferences which counsel asks you to

23    draw are supported by the evidence and appeal to your reason

24    and judgement, you may consider them in your deliberations.

25    Counsel may also call to your attern- attention certain

1    principles of law in their arguments.  Please remember,

2    however, that you are not bound by any principals of law

3    mentioned by counsel.  You must apply the law in which you

4    are instructed by me and only that law to the facts as you

5    find them.  Under the federal rules of criminal procedure,

6    the Assistant United States Attorney makes his closing

7    argument first followed by the closing argument of the lawyer

8    for the defense.  Then the Assistant District Attorney will

9    have a brief rebuttal argument.  Then I will instruct you in

10   the law which you will apply to the facts as you find them.

11   Assistant United States Attorney Glenn, are you prepared to

12   close to the jury, sir?

13            MR. GLENN:  Yes, Your Honor.

14            THE COURT:  You may proceed, sir.

15            MR. GLENN:  Thank you, Your Honor.  May I please the

16   Court?

17            THE COURT:  Sure.

18            MR. GLENN:  Counsel, ladies and gentlemen, first I

19   want to thank each of you for your careful attention to the

20   evidence in the case.  You've heard a lot of witnesses and a

21   lot of evidence over the last two and a half days, and I've

22   noted that each of you has been careful and very attentive to

23   listen to everything that was presented to you.  We thank you

24   for that.  I'd like to reiterate a couple of close - remarks

25   that the judge made because I think they're important.

1   First, I will be reviewing some of the evidence with you that
2   you heard but I won't be able to speak to you about
3   everything that you heard.  You, of course, can consider
4   everything that was presented in your deliberations and you
5   should do that.  Secondly, if I say something different from
6   how you recollect it, then of course, your recollection will
7   control your deliberations.  I am going to divide my closing
8   argument here into three parts.  First, I want to show you
9   how the evidence has proven each of the 14 counts of the
10  indictment.  I don't think this is really in dispute in this
11  trial but we'll start with that because you do have to find
12  that.  Second, then I will review the evidence on the
13  question that is key before you, that is how we have proven
14  that Mr. Krasley is the person who committed each of these 14
15  violations.  And finally, I want to talk to you about why
16  some of the other evidence that you've heard or suggestions
17  of other possibilities are, are really more speculative or
18  conjecture, and, and just aren't plausible and that you
19  should reject them as you consider the counts in this case.
20          So, first, how do you prove the violations here?
21  Let me again put my small chart up for you just as a
22  reference.  You recall that we had Exhibit 16 during the
23  course of the trial and --
24          FEMALE JUROR SPEAKER:  It's really hard for use to
25  see it down there.

1          MR. GLENN:  Okay.

2          FEMALE SPEAKER:  Let me know if (indiscernible).

3          MR. GLENN:  I put it up here?  It's farther away

4    though.

5          FEMALE SPEAKER:  Perfect.

6          MR. GLENN:  Alright.  So, you know, how have we

7    proven these, these counts?  You remember that we have six

8    counts of distribution, and for each of those six counts you

9    heard either the person or by stipulation from the undercover

10   law enforcement agent who engaged with a person on GigaTribe

11   who was using the GigaTribe name like anythingnew or

12   somethingnew or lookingtoyouallday or slicktoyou10, and

13   downloaded files that that person was sharing.  That person

14   affirmatively gave their password allowing the agent to enter

15   the - those folders and download those files.  Now, the agent

16   saw many other files over the course of these six there were

17   hundreds of files of images and videos of child exploitation

18   images that were being offered by this person.  So, each of

19   those six counts has been proven to you by how the agents got

20   it and then the images themselves.  And we showed you four

21   images and you saw that they were indeed minors engaged in

22   sexually explicit conduct, and we received the others into

23   evidence.  But there was a stipulation that every one of the

24   exhibits that was introduced whether your saw it or not, did

25   involve minors engaged in sexually explicit conduct and was

1    produced using minors in such conduct.  Now, the other

2    counts, you remember that counts 7 through 12 were counts

3    involving the wiretap, the Title III interception.  Agent

4    Conrad told you that he was able to observe what was being -

5    what was going on, on Mr. Krasley's IP account during this

6    30-day period because of the court-ordered wiretap.  And he

7    was able to see the images.  He was able to see what was

8    being done on that account, and child pornography images of

9    exploitation of young children were being uploaded, were

10   being downloaded, were being viewed.  And those, those images

11   are in evidence and they're stipulated to be child

12   pornography.  So, those, those show the, the receipts, the

13   transportations, and that several of them were accessed with

14   the intent to view child pornography.  And that's the wiretap

15   evidence.  The other counts are count 4 and that was

16   Chatstep.  Chatstep detected child pornography, reported it

17   to law enforcement.  Agent Evans viewed it, confirmed that it

18   was child pornography, and then we have records from Chatstep

19   pointing to the IP address.  And count 13 was a download of

20   links from PutVid.net.  Remember PutVid.net had videos in the

21   cloud.  You could download them, and Agent Conrad went to

22   those links and found that they were indeed child

23   pornography.  So, as you consider the elements of the

24   offenses that the court will instruct you after the arguments

25   are done, you'll hear all the things that you have to find to

1    find that these offenses occurred.  And all of that evidence

2    is there and it's not really disputed.  And there's a

3    stipulation as to the, the key elements of these statutes.

4    So, from the evidence that's been presented we've proven to

5    you that each of the 14 violations did occur.  The question

6    for you is did Mr. Krasley do it?  We've also proved that.

7    We have proven to you through the evidence at trial that it

8    was the Defendant, John Krasley, who committed each of these

9    14 violations.  I'm gonna take this down so it's not

10   distracting at this point having to view all the violations.

11        So, let's review - let's review the evidence that,

12   that shows that it was, in fact, Mr. Krasley and not someone

13   else who did these violations.  First and most importantly,

14   as you heard throughout the trial, is the IP address.  All of

15   the evidence, all of these violations were connected to Mr.

16   Krasley's IP address.  The GigaTribe distributions came from

17   his IP address, internet protocol address.  This is the IP

18   address which PenTeleData, his service provider, assigned to

19   his account at his residence and that's where it went.  All

20   of the receipt counts, the Chatstep count, the PutVid count,

21   they all were either uploaded or downloaded to or from Mr.

22   Krasley's IP address assigned to his residence.  The same is

23   true - well, the IP address was not as important on the

24   wiretap because the wiretap was directly assigned to his

25   internet connection, so everything that was observed and all

1   of the child pornography that was detected in the wiretap was

2   in fact done on Mr. Krasley's IP address.  So, these 14

3   instances of violations of child exploitation statutes, over

4   more than five years, every one of them was to or from Mr.

5   Krasley's IP address at his residence.  That long period of

6   time is important.  It wasn't just one isolated incident when

7   this - his IP address showed up and we saw this.  Fourteen

8   different violations over five and a half years.  Now, it was

9   to his residence.  That's where the IP address connected.  He

10  lived there.  As he told you today, he lived there with only

11  his wife up until January of 2017 and then after January of

12  2017 he lived there alone.  It was just him.  Now, we've also

13  presented evidence that he was there at the date and time of

14  each of these violations.  Agent Hartman presented to you the

15  AT&T data.  The AT&T data, which was obtained by search

16  warrant, was what cell tower was Mr. Krasley's telephone

17  connecting to?  And Agent Hartman picked out the dates and

18  times that were closest to the dates and times of the charge

19  accounts and came fairly close on them.  And every time,

20  every single time, Mr. Krasley's cell phone was connected to

21  a cell tower that was close to his home.  You saw the maps

22  that Agent Hartman had prepared from the data that AT&T had

23  provided.  And you can see that it was the tower just to the

24  northeast or to the southwest and once to the west and a

25  couple times right near his home.  But every time his cell

 1    phone was there.  It's a reasonable inference for you, ladies
 2    and gentlemen, from your common sense and experience, that
 3    people carry their cell phones with them.  In fact, in this
 4    case, when Mr. Krasley was encountered away from his home on
 5    the day of the search, December 7, 1984 - 19 - I'm sorry 19 -
 6    2018 - on December 7th, Mr. Krasley had his cell phone on his
 7    person that day.  Now, one of the questions in this case for
 8    you, ladies and gentlemen, is did the connection to the
 9    wireless router in Mr. Krasley's home when these violations
10    occurred - did that occur - did that come from within his
11    home or from outside his home?  You have several pieces of
12    evidence which you may consider on that question and on that
13    question only.  The agents found - Agent Munjone found a hard
14    drive in Mr. Krasley's house and was seized both in 2013 and
15    2018 which had some IRC chats, we call internet relayed chats
16    on them.  And some of them were chats on channels like Little
17    Boy Sex Channel.  Agent Munjone found those chats.  They were
18    deleted but he could still recover them from that hard drive.
19    Those were found in Mr. Krasley's home.  They were dated in
20    2010, and we suggest to you that makes it more likely that
21    the signal that the internet connections involved in these
22    counts came from within the home.  Similarly, agents seized a
23    Staples thumb drive from the home in 2018.  That thumb drive
24    had file names from two deleted files.  The file's content
25    wasn't there.  The file had been deleted but Agent Munjone

1    could recover the name of the file.  And you saw those two

2    names, and Agent Evans told you those were indicative of

3    child pornography having been the content associated with

4    those files when the content was there based on her

5    experience in viewing many child pornography files.  So,

6    those two files in the thumb drive also sug- which are child

7    pornography related, also suggest that the signals - that the

8    connections to the internet for the charge accounts came from

9    within the home and not outside the home.  That's the only

10   purpose for which you may consider that.  You recall that

11   Agent Conrad testified for you that during the course of the

12   Title III wiretap they observed a connection to mail.ru.

13   Agents Evans told you that mail.ru is a Russian site provides

14   e-mail, provides cloud storage, and that is frequently used

15   by child pornographers.  One reason is it's in Russia.  Law

16   enforcement has trouble getting records from Russia when they

17   investigate people who trade in child pornography so it's

18   preferred by them.  That was signed on - signed onto at Mr. -

19   on Mr. Krasley's internet connection at 6:11 a.m., 6:11 in

20   the morning and then three minutes later from Mr. Krasley's

21   internet connection there was a sign-on to supplyhouse.com,

22   building, building supplies website with Mr. Krasley's e-

23   mail.  And he acknowledged for you today he signs on to

24   supplyhouse.com.  He uses that e-mail to do that.  One more

25   thing.  The mail.ru sign-on was done with a cell phone of the

1    model that matched Mr. Krasley's cell phone that was seized

2    on December 7th.  Further, showing and proving to you that

3    Mr. Krasley was the person who committed these violations.

4    What's the pen register and the GigaTribe data, you recall

5    that, on our calendars with red and white and black?  Pen

6    register - pen register data showed where that internet

7    connection went to.  The pen register data again was

8    intermittent.  Sometimes the order expired, sometimes the,

9    the pen just didn't work.  But from February of 2015 to May

10   of 2018, the pen register data, for when we had the data,

11   they were connected to the GigaTribe you'll recall every day

12   or every other day or every third day.  And I would suggest

13   to you, ladies and gentlemen that it's a reasonable inference

14   and you should make this inference that based on the pen

15   register data and on the GigaTribe data that you also saw -

16   well, first that you saw this pattern, this consistent

17   pattern of connections to GigaTribe every day, every other

18   day, every third day or fourth day sometimes.  And that was

19   true over the course of the data we have for the almost three

20   and a half years of pen register data.  You recall it was

21   also true for the September 2017 data from GigaTribe.  You

22   recall that was also true for the August 1st to December 7th

23   data from GigaTribe.  So, for the little windows that we

24   have, and they're not little, let me take that word back, for

25   the windows we have on the GigaTribe activity from this

1   account it's consistent for every window we're looking at.  I

2   suggest to you that you should make this inference that it

3   was the same for every day from say the beginning of 2015

4   through December 7th of 2018.  And we know that the account

5   used GigaTribe in 2013.  That's count 1 and we include - used

6   GigaTribe in 2014.  That's count 2.  You may even extend that

7   inference further back, that for this whole period of time

8   this person was using GigaTribe every day, every other day,

9   or every third or fourth day.  Now, there are some other

10  facts with respect to the pen register data which help you to

11  know that it was, in fact, Mr. Krasley who was doing this.

12  Can we have exhibit 105 up, please?  And, I'd like you to go

13  to the 2018 calendar, please.  Remember that - well, if you

14  look at all of the pen register data, you will see that there

15  are only three times in all of this pen register data over

16  three and a half years that we have data from, when there are

17  five consecutive days of no GigaTribe activity.  Only five -

18  only three times when this person, Mr. Krasley, was using it

19  - was connecting to GigaTribe that he could refrain from

20  connecting to GigaTribe for five consecutive days.  Well,

21  what is one of those?  Take a look at April 12 to 16, 2018.

22  What do we know about Mr. Krasley on those days?  We know he

23  was on a cruise.  He was on a cruise out of Fort Lauderdale,

24  a cruise that went to the Caribbean.  He wasn't home.  Mr.

25  Krasley's not home, his account doesn't touch GigaTribe.

1       Another time, the second of the three for which there are

2       five consecutive days in which there's no connection to

3       GigaTribe occurred at the end of January, 2018.  January 28th

4       to February 1st, 2018.  What do we know about Mr. Krasley

5       from, from January 28 to February 1, 2018?  We know that his

6       cousin who lives in New Jersey was very ill, critically ill.

7       She was in the hospital in New Jersey and we know that he

8       went to visit her.  And she passed on January 30, 28 - 2018,

9       on January 31, 2018.  And so, that's the reason why Mr.

10      Krasley would not have been connecting to GigaTribe on those

11      days.  Five days of nonconnection, a reason why Mr. Krasley

12      wasn't connecting.  So, ladies and gentlemen, this is direct

13      evidence - well, I'm sorry.  One more thing.  That's the -

14      that is the pen register data.

15            Now, you recall we also got data from GigaTribe.

16      And the data from GigaTribe showed, the, the - we asked them

17      for what names were connected, connected to by his IP

18      addresses and the names that the undercover agency had used.

19      They come back with about 35 names and all - and in the first

20      collection the last 15 log-ons for those 35 names, every

21      single one of those log-ons came from Mr. Krasley's IP

22      address.  Every single one of them, and that 2017 month that

23      we had a window on was consistent with the other activity.

24      Then we asked them again for records and they came back with

25      records that went all the way from August 1, 2018 to July 31,

1    2019, the end of time they were collecting records.  And what

2    did that show?  It showed from August 1 - well, can you put

3    up Exhibit 107, please?  So, when they sent these records it

4    showed that from on August 1st, 20- 2018 until December 6,

5    2018, the same pattern of connections to GigaTribe that we've

6    seen elsewhere.  Every day, every other day, every third of

7    fourth day connections to GigaTribe.  And then, on December

8    7th it stops.  It stops completely, for the rest of December

9    not a single connection to GigaTribe.  And could we see the

10   next screen, please?  And that continues all the way from

11   January, February, March, all the way to the end of the

12   records for this to July.  Not a single log-on to GigaTribe.

13   And what about Mr. Krasley during that period?  There's a

14   stipulation.  He had no access to the internet from any

15   place, at any time, in any way during that period of time.

16   GigaTribe connections stop and Mr. Krasley is not able to

17   make them.  That's another reason why you know that it was

18   him who was making these connections and why you know it was

19   him who committed these violations.

20          So, that is direct evidence.  These - all of this

21   that we've discussed is direct evidence of facts, and from

22   those facts, you may then infer that it was Mr. Krasley, and

23   we submit that that proves that beyond a reasonable doubt.

24   Now, the defense has raised through its cross examination and

25   in its case some areas that you need to address and discuss.

1   The defense correctly has pointed out that many of the
2   affidavits which are submitted in child pornography pro-
3   search warrant applications recite general characteristics of
4   people who trade and collect child pornography.  And that's
5   true.  And they include collecting child pornography, keeping
6   it for a long time, other things like that.  As Agent Evens
7   told you, though, those are generalizations.  They apply to
8   most people.  They apply a lot of the time, but it doesn't
9   mean they apply to everyone.  It doesn't apply every single
10  time.  And so, while most child pornographers do that, it
11  doesn't mean you have to require that in order to convict.
12  Now, you've heard, of course, that when Mr. Krasley's
13  residence was searched by agents in 2018, 2013, 29, 2006 they
14  didn't find child pornography.  But now you've also heard,
15  however, from Agent Munjone that devices which would enable a
16  laptop or a computer to do the things that are charged, to go
17  to GigaTribe, to go to PutVid, to go to Chatstep, devices
18  which would enable that to occur can be very, very small.
19  You saw the image with the quarter on it of how small an SD
20  card is, of how small a microSD card is, and you remember
21  there was a little USB drive that wasn't much bigger than the
22  little part that goes into the computer.  Those are very,
23  very small items.  We suggest that that makes them easy to
24  hide, very easy to secrete something like that, and
25  especially in a house like Mr. Krasley's house.  I mean first

1    you heard he built it himself, he was involved in the design.

2    He was involved in the disc - in the construction.  He knows

3    how it's built inside and out.  He could perhaps have created

4    a, a secret place.  There's no evidence of that, but he built

5    it himself.  He really knows it.  He also told you sort of

6    what's in it.  There's a living floor of course but there's a

7    basement. He told you he's a collector of junk.  He has

8    boxes.  He has junk.  He has other things in the basement.

9    He has an attic.  He has boxes and he has things and stuff

10   in the attic.  He has a garage.  He has boxes and things and

11   stuff in the garage.  You can consider that, and we suggest

12   that that shows that there are plenty of places to hide

13   something as small as an SD card or a microSD card or a very

14   small thumb drive.

15              MR. DONATO:  Objection.

16              THE COURT:  There's an objection.  Counsel, please

17   approach.

18               (Sidebar discussion occurred at 3:00 p.m.)

19              THE COURT:  Mr. Donato?

20              MR. DONATO:  Sir.  This is an issue we already rule

21   on about they must have missed something and now the U.S.

22   Attorney is argument to the jury that there's plenty of

23   places there where they - he could have done this with a

24   device that Agent Munjone talked about and they just didn't

25   find it and, and he could have hidden it anywhere.  There's

1    just absolutely no evidence in the record that he hid

2    anything and that, that is incredibly in my view improper.

3    We've already discussed this.  The Court's already ruled on

4    it on that issue of we missed something.

5           MR. GLENN:  Your Honor, we agreed that Agent Munjone

6    did not give that opinion or even say that.  But the reason

7    that these are in the record is it gives the jury a reason to

8    understand why there might not have been anything found and

9    that's what I said.

10          THE COURT:  The argument that he secreted the flash

11   drive or something else that's on there is a perfectly

12   legitimate argument as to why it was not found.  So, either

13   the Government is not allowed to offer argument about how he

14   could have committed these crimes and they found something in

15   the house would be holding, unfair to the Government.  We get

16   to the part where the theories about how the facts came out

17   as they did which is no, no evidence found.  So they could

18   argue certainly that he could have a logical, a very logical

19   explanation is that wherever he put what is something that

20   could be hidden and it wasn't, so you're certainly free to

21   argue that, but the jury's free to reject as well, but it's

22   an appropriate argument.

23          MR. DONATO:  I think this is just a different

24   version of the same thing the Court ruled on.  That's why

25   Agent Munjone couldn't say we missed something because what,

1    what they're saying is it is Krasley.  We didn't find any

2    evidence, and the reason we didn't find any evidence is

3    because we think we missed something of his and if we found

4    that thing that we missed it would prove it.  But they didn't

5    find anything.

6         THE COURT:  Well, not so much that we missed it,

7    that he effectively hid it.

8         MR. DONATO:  But there isn't any it.  There isn't

9    any proof of an it.  There isn't any proof that - this is a -

10   this is a - this is just a theory that Agent Evans said to

11   the grand jury and that Agent Munjone said in his report.

12   It's just a theory.  We must have missed something.

13        THE COURT:  It's all argument, but it is appropriate

14   argument by the Government, it's also an appropriate for you

15   to day, they're trying to come up with answers to why they

16   found nothing.  So, the objection's overruled.

17        MR. DONATO:  Thank you, sir.

18         (Sidebar discussion concluded at 3:02:50)

19        MR. GLENN:  So, ladies and gentlemen, you recall the

20   size of those devices.  They could have - could have been

21   hidden anywhere in that house and you've heard about how the

22   house was - what was in the house at the time when the agents

23   would have been searching it.  So, given that the fact that

24   the agents did not find child pornography in the home doesn't

25   mean the Defendant did not commit the offense.  You should

1    look to the other evidence which strongly shows that he did.

2         Now, the defendant presented to you several

3    character witnesses in this case.  Five of them testified

4    from the witness stand and a number of them stood before you

5    and affirmed that they agreed with Mr. Krasley's reputation

6    for, for truthfulness and for law abidingness.  And they all

7    affirmed that, friends of his, family of his, but - and

8    apparently he was a good neighbor as well.  He certainly

9    helped out Mr. Haas with the turf and, and things like that.

10   But that not surprising, it's not surprising that someone who

11   trades child pornography would not be broadcasting that to

12   the world.  Trading child pornography is something that you

13   do in secret, it's something you do by yourself.  It's some-

14   it's a secret that you have, a deep, dark secret that people

15   keep.  They don't broadcast this to their friends.

16        Now, there is some - there have been suggestions

17   about other possible ways that someone could have done this

18   and it wasn't Mr. Krasley, and I want to talk about those and

19   why those are more speculation and conjecture and are just

20   not plausible.  So, first, was it somebody else?  Well,

21   first, could somebody have parked outside on the road and

22   then connected to Mr. Krasley's internet account?  We'll get

23   to the question of the password in a minute.  But Agent

24   Hartman told you that for the days that he reviewed the pole

25   camera he didn't see anybody parked out in the road, at least

1   where the pole camera could see.  And remember how often

2   someone would have had to have been there.  They would have

3   had to been there of course for each of the 14 dates that are

4   charged in the - in the indictment.  But remember the

5   GigaTribe records.  I think it's a fair assumption on your

6   part, an inference on your part to decide that whoever

7   committed these offenses here also is the one accessing

8   GigaTribe every time we saw a GigaTribe connection.  Six of

9   the counts themselves were done through GigaTribe.  So, if

10  somebody else parked on the road or somebody sitting in the

11  forest with a computer, they had to be there over the course

12  of four years every day or every other day or every third or

13  fourth day because that's how often those GigaTribe

14  connections are.  And ask yourself that - if that is

15  reasonable or plausible.  This is a rural area, and I would

16  suggest from your common sense and experience that people in

17  rural areas kind of watch out for each other, and if someone

18  had been parking on the road that often or walking around the

19  forest among those houses with that kind of frequency, they

20  would have been confronted by somebody.  But that's just not

21  reasonable, that it didn't happen.  Could it have been Mr.

22  Krasley's wife, Kimberly Krasley?  She lived in the house

23  from - for purposes of our indictment from March of 2013

24  through January of 2017.  Well, take a look at the patterns

25  that you see.  There are charges in the indictment before

1    January of '17.  There are charges after January of '17.  He

2    was trading child pornography before and after.  No real

3    change to the pattern.  Similarly, you can look at the access

4    from GigaTribe, what was going on before January 17 and

5    after.  No real change in the pattern suggesting there's no

6    evidence at all that it was Kimberly Krasley rather than John

7    Krasley who was committing the offenses.  Now, could it have

8    been a neighbor?  Well, first of all, we know that Mr.

9    Krasley's internet router was protected by a password.  The

10   password at the time of the search was a 10-character

11   password, all letters, lower case, and not a word, not

12   something that you could guess.  The number of combinations

13   26 to the 10, 141 trillion combinations, not something that's

14   easily detected.  And it's not a dictionary word where you

15   could apply one of those dictionary programs.  Now, Agent

16   Murphy told you and the defense expert told you about a

17   vulnerability by which some people might be able to, to get

18   into that, but there's a lot to that, and think about how

19   much there is to that in order for someone to make that work.

20   They have to know about the vulnerability.  They have to know

21   it's there.  They have to know what WPS is, and then in order

22   to do it they have to figure out how to do it.  And if they

23   were to get some instructions, they also have to have the

24   technical skill and capability to use Linux.  Agent Murphy

25   told you that the programs which are used for this sometimes

1   are in Linux and Linux is not something that you go and, and

2   buy on your average Dell computer.  Then you have to know how

3   to use Linux, how to install Linux, and then you have to get

4   a special network card and you have to do that.  And if you

5   do all that, the defense expert told you then you have to

6   capture that one little handshake packet.  Well, that little

7   handshake packet you don't get that yourself if you don't

8   have the password.  You have to wait for somebody else to

9   connect and it only pops up at the moment of connection and

10  then it's gone.  So, you have to be able to capture that

11  packet at the moment of connection, take it back with you,

12  and then know how to use all of this technical stuff.  So,

13  and - so, that's not an easy thing to do.  Theoretically

14  possible, maybe, but that's speculation and conjecture here.

15          Now, in addition to that, you recall there's

16  evidence here that the routers changed a number of times.

17  They changed here.  They changed in November of '17.  They

18  changed in August of 2018 which is after the charges.  But

19  Agent Murphy looks through the PenTeleData records and he

20  told you that there were a lot of changes of routers.  And

21  you know from the evidence here that when a router changes

22  the password changes.  So, if somebody had gone through all

23  of that to capture that little handshake packet and maybe

24  could they have gotten in?  Well then the router changes,

25  then they have to do it all over again.  And this happened a

1    number of times.  You'd have to believe that they kept doing

2    that over and over and over again.  I suggest to you that's

3    not reasonable, that that's speculation and it's just not

4    reasonable to believe that that occurred.  In particular, you

5    heard that Mr. Krasley changed his router in early November

6    of 2017.  That was just a few days before the wiretap was

7    installed pursuant to the court order.  Well, that means that

8    whoever was doing this not only did they have to go through

9    all of this again, but they had to do it in that little brief

10   few-day period between the change of the router and the

11   change of the password and the day that the wiretap started.

12   Because by November 24th the wiretap is seeing the, the

13   trading of images of children being sexually abused.  So, it

14   would even have to occur in that very little window.  I

15   suggest to you, ladies and gentlemen, that's just not

16   reasonable to believe that that happened.

17          Now, even if - even if someone could obtain that

18   password, even if someone could find a way to access Mr.

19   Krasley's network in that way, you can't do it from anywhere.

20   The strength of the signal of Mr. Krasley's router is an

21   issue.  You have to be close.  You have to be nearby.

22   Special Agent Murphy told you that the general rule is when

23   you have a router it'll go about 100 yards for a good

24   connection.  And under which circumstances are those 100

25   yards?  It's perfect conditions.  It's clear space.  It's

1   level space.  It's line of sight, and it's nothing in

2   between.  When you start putting things in between, the

3   strength of the signal goes down.  And the distance at which

4   you can get a good connection goes down.  Now, Mr. Krasley's

5   router we know was in his home.  So, other than someone

6   connecting in his home, that signal's going through a wall.

7   It's going through a wall and it's going through the

8   insulation in the wall which would impede the signal, and

9   then it's going out.  And then where is it going?  Well, if

10  you think about - if you're thinking about the possibility

11  that one of the neighbor houses might have been capturing

12  this signal, remember that it has to go through the walls of

13  Mr. Krasley's house, and then it goes through the trees which

14  were surrounding his house, and then it has to go through the

15  walls of the other person's house before it gets to their

16  router.  Now what was the nearest home?  That was Ursula

17  Kocher, whose home was just up on the map.  Could we have

18  Exhibit 100, please?  So, if you look at Mr. Krasley's home,

19  it's the red dot, Ms. Kocher's house is up at about 2 o'clock

20  on the clock and there's a bunch of trees you can see between

21  Mr. Krasley's residence and her home.  Agent Murphy sug-

22  estimated that was 80 yards.  Now that's 80 yards with trees

23  and 80 yards with two walls.  And so, he said in his opinion,

24  that it was very unlikely that you would get a sustained,

25  solid signal at her home.  And was she cracking passwords?

1    You would have to believe that this 70-year-old widow who

2    lived alone was using Linux and these special packet captures

3    and was cracking passwords.  The next closest residence was

4    across the road, Mr. Geiger's residence.  Agent Murphy I

5    think said that that was over 100 yards away, I think 130.  I

6    forget - your recollection will control that.  But again,

7    that's going through Mr. - the walls of Mr. Krasley's house,

8    through the tree line, and then through the walls of that

9    person's house.  And Mr. Geiger, well - the Defendant told

10   you in his testimony Mr. Geiger had never been to Mr.

11   Krasley's house.  He didn't go there, so he wouldn't have

12   been able to look at the router bottom or the page or

13   anything and see the password.  He wasn't there so he would

14   have had to do it through this password cracking the program

15   with Linux and, and packets and handshakes and things like

16   that.  And finally, Mr. Haas' home which is down at maybe 8

17   o'clock on the clock from Mr. Krasley's home, Agent Evans

18   told you that house measured on the Google map was 860 feet

19   away.  But it's actually farther than that because remember

20   that the Google map is - it's level, that is this map doesn't

21   show the, the elevation is much lower to Mr. Haas' house.

22   So, not only does the signal have to go from Mr. Krasley's

23   house to, Mr. Haas' house, it has to down.  And if you

24   remember from the geometry which you have as a hypotenuse

25   going from Mr. Krasley's house down there, so it's not just

1    the 860 feet that can be measured line of - as the crow

2    flies, but also the extra distance because of the downhill.

3    So, it's even farther away than 860 feet.  Nine-hundred feet

4    would be three football fields away.  Three football fields

5    away.  And there's a line of trees in between Mr. Krasley's

6    house and Mr. Hass' house.  And, of course, Mr. Haas has the

7    walls in his house for it to go through.

8         Now, with respect to signal strength, the agents had

9    looked at the signal strength in 2013.  In July of 2013 when

10   they were in Mr. Krasley's home that was just a few months

11   after the March 2013 charged defense for GigaTribe

12   distribution that Mr. Krasley made, the - and, and they had

13   their cell phones out.  Now, it's true the cell phone is not

14   a technical, high-tech antenna that would be available for

15   as, as the defense expert said, for corporate network

16   analysis, but it does give you information.  And you can look

17   on your cell phone and see networks and you can see when they

18   come and you can see when they go.  And they saw Mr.

19   Krasley's network as they were at the house and as they

20   walked off the back deck, they saw it begin to go away.  And

21   when they got to the tree line around his house it wasn't

22   there anymore.  And then maybe if you had a really high,

23   expensive, technical detecting device you'd see more at the

24   tree line.  But the fact is the iPhone is detecting networks.

25   That is its purpose is to try to connect, allow you to

1    connect if you can, and it couldn't, and just as far as the

2    tree line let alone going off his property.  So, that's an

3    indication of the strength of Mr. Krasley's router.  Now,

4    remember that the strength of the signal is very important.

5    We've been talking about can it be detected, but even as, as

6    Agent Murphy told you, even if you can see a signal at

7    another house it doesn't mean you're going to be able to

8    upload or download effectively.  That is, if the signal is

9    just barely there it's going to take forever to upload or

10   download and especially for videos.  Videos are very large

11   files and they take a while to do that.  So, even if they

12   could possibly be detecting the signal out at the widow's

13   house or Mr. Geiger's house, it would be unlikely that, that

14   they could do any sustained file transfer at those - at those

15   locations.  And the other factor, ladies and gentlemen, is as

16   Agent Murphy told you, if Mr. Krasley has a strong router,

17   say he has a fairly strong router, in order to do this the

18   other house also has to have one because it goes back and

19   forth.  If the signal can go from Mr. Krasley's house to the

20   receiving house but their router isn't strong enough to get

21   back, well, it's not gonna work because it's a two-way

22   street.  It has to work both ways.  And you remember what Mr.

23   Haas told you, that he changed his router about two years ago

24   because his old one just wouldn't even give him the signal on

25   his deck, let alone going 900 feet up to Mr. Krasley's house.

1    So, the router at the receiving end is also very important.

2           You'll also see that some of the - some of the

3    charges in the indictment occur on, on days which are

4    weekdays during the - well, some of the charges, the first

5    and third count, occur on weekdays between 8 and 5, and, of

6    course, Ms. Krasley was at work before she moved out.  And

7    even with Mr. Haas himself, who worked 8 to 5 regular hours

8    Monday through Friday so he wouldn't have been home either.

9           One more point about whether someone might have been

10   driving around on, on the road and in, in the woods.  If you

11   think of the, the houses of Mr. Geiger and the widow, Ms.

12   Kocher or Mr. Haas, those are really the only houses with any

13   suggestion that the signals might reached.  Anyone else who

14   had sought to intercept and, and deduce that password

15   would've had to be a person on the road or in the woods

16   because they didn't have a house close enough.  Only those

17   three houses were the ones that were close enough.  And Mr.

18   Geiger never went to Mr. Krasley's house.

19          So, ladies and gentlemen, the clear, solid evidence

20   here points conclusively to John Krasley.  The evidence which

21   is solid and real, that which is clearly verifiable.  All of

22   the direct evidence shows that it was, in fact, John Krasley

23   who was the one who was downloading and uploading and

24   distributing and viewing child pornography.  Proof of - proof

25   beyond a reasonable doubt that will be your burden here, and

1    we fully accept that and agree that that should be the

2    burden.  Proof beyond a reasonable doubt, though, as the

3    Court will instruct you, doesn't mean proof beyond all doubt.

4    Proof beyond a reasonable doubt.  And that a reasonable doubt

5    is not conjecture or speculation and that's what I suggest

6    these are, these other possibilities are, conjecture and

7    speculation.  The Court will instruct you that circumstantial

8    evidence is as valuable as direct evidence.  No, we didn't

9    have someone standing over Mr. Krasley's shoulder while he

10   operated a computer to distribute and view and upload and

11   download child pornography.  But we have all of this

12   verifiable, factual evidence that we presented to you that

13   shows that it was him doing exactly that.  That's an

14   inference from that evidence.  That's the wet raincoat, but

15   that's perfectly fine and legitimate evidence for you to rely

16   on and make the appropriate inferences in order to find the

17   fact that it was Defendant Krasley who committed these

18   offenses.  This is an important case.  It's an important case

19   for the Government, it's an important case for Mr. Krasley.

20   The images involved are images of child abuse.  Each of the

21   individuals involved in these images was a real child.  Both

22   sides have step- have stipulated to that.  The images are

23   recordings of them being sexually victimized, and the viewing

24   of these images and the transmission of these images really

25   victimizes those children.  This is an important case.

Government - Closing Argument/Defense - Closing Argument131

1   Ladies and gentlemen, based on the evidence that we have
2   presented to you and the inferences which you can make from
3   that evidence, I urge you to find Mr. Krasley guilty on each
4   count.  Thank you.
5          THE COURT:  Thank you very much, Assistant United
6   States Attorney Glenn.  Mr. Donato, you may close to the
7   jury, sir.
8          MR. DONATO:  Thank you, Your Honor.  Good afternoon,
9   ladies and gentlemen.  Case doesn't make sense.  It just
10  doesn't make sense.  We never said that one of the neighbors
11  must have done it.  We never said that somebody drove up in a
12  car and did it.  We never suggested that we knew anything
13  about who did it.  What I told you in my opening is it wasn't
14  him.  As the Court explained to you, this is a closing
15  argument.  It's not my purpose to argue with you.  It's my
16  purpose to reason with you, and this is the greatest system
17  of justice that exists on the planet.  But one - every time I
18  do this I wish that the way it worked is you could say to me,
19  hey, what about this?  We tried during the trial to ask the
20  questions that may be on your mind because you can't ask
21  those questions.  And we try to address in our - in our
22  summation and our opening statements the issues that may be
23  on your mind because you can't tell us what they are.  So,
24  I'm gonna do my best to address what I think you should be
25  concerned about.  And the first thing I want to say is that

1   my friend, Mr. Glenn, at one point said that reputation

2   witnesses not unusual because child pornographers don't show

3   what they're doing.  Child pornographers don't show other

4   people that they're doing that.  That is that typical child

5   pornographer that doesn't apply to everybody.  In voir dire

6   and jury selection you all agreed to some principles that are

7   essential for you to be fair in this case, to judge the

8   witnesses' credibility by the same standards.  That means all

9   of the witnesses, the defendant, law enforcement witnesses,

10   the reputation witnesses to give John the same fair trial you

11   would give him if he were charged with some other kind of

12   offense, 'cause these offences are the worst types of crimes

13   that there are.  Somebody who would exploit children has a

14   special place in hell when they die.  You all agreed that you

15   would give him your individual judgment.  You all agreed that

16   you would presume him to be innocent, and you all agreed that

17   if some loved one of yours was sitting in that chair you'd be

18   satisfied with yourself as a fair juror.  And that is no more

19   important in any other case, any kind of case, than it is in

20   this one.  Maybe most child pornographers wouldn't tell other

21   people what they were doing.  This case doesn't make sense

22   because Mr. Krasley was married to Kimberly Krasley in 2006

23   when the state police came and called him a child

24   pornographer and seized all of his devices.  And she was also

25   married to him in 2009 when the FBI came and called him a

1   child pornographer and seized all of his devices.  And she

2   was also married to him in 2013 when Homeland Security came

3   and called him a child pornographer and seized all of his

4   devices.  I think, to use Mr. Glenn's phraseology, it's a

5   fair inference to think that over those five year - over

6   those six, seven years, Mrs. Krasley might have said to Mr.

7   Krasley what's all this about?  What's going on here?  Mrs.

8   Krasley may have said that to friends of hers some of whom

9   testified here as reputation witnesses.  After this trial,

10  after all of us has - have devoted ourselves to this case,

11  you know why those voir dire questions are important and your

12  answer to them was so vital.  And I told you Monday morning

13  that we didn't disagree with what the Government says

14  happened here and you saw that during the trial.  We agree

15  with a lot of what the Government has said.  Filth.  Child

16  pornography went over Mr. Krasley's IP address.  If they

17  indicted the IP address, the IP address would be guilty.  But

18  they don't know who did it and they can't prove it.  Someone

19  did that but it wasn't him.  I told you in my opening and I

20  showed you during the trial that they used warrants,

21  applications, orders, cell site location information, pole

22  cameras, mobile and air surveillance to try and identify him

23  as the one who did it.  They all failed.  Why did they fail?

24  They failed because it wasn't him.  You're probably tired of

25  hearing that there were warrants in 2006, 2009, 2013, and

1    2018 to search and seize all of his devices.  I told you in

2    my opening that I was gonna show you that and I did.  Every

3    one of those warrants and any warrant in a child pornography

4    case uniformly lists the characteristics of a child

5    pornographer, the way they behave.  For the Government to

6    stand here and say, oh, that's not in every case, when the

7    lead agent told you she's never seen a case like this, I

8    suggest you should reject that argument.  Each time they said

9    to the judge who issued the warrant, we need his devices

10   because he's a pornographer.  And they said we know about

11   these people they store child pornography.  It'll be found on

12   his computer.  Storing can be intentional or unintentionally.

13   You remember the testimony.  And it may be - it maybe

14   unintentional.  It'll show he did it because there are

15   footprints and paths that are followed that are detectable by

16   the forensic experts that work for the federal government.

17   That's what they tell the judge who's issuing the warrant

18   because if they can't tell them that the judge is gonna is

19   gonna say I'm not gonna authorize you to go take this

20   person's property.  You gotta persuade me that there's gonna

21   be something on that property that has evidentiary value.

22   Every witness told you, the lead investigator included, child

23   pornography can be stored and maintained for long periods of

24   time on a computer.  Most often, pornographers maintain the

25   files purposefully.  So, if, if he didn't maintain any file

1   purposefully, then by their definition he's not a

2   pornographer 'cause they say most pornographers maintain the

3   files purposefully.  Computer experts can find them if you

4   let us take his property and even if he's deleted it or tried

5   to delete it they'll find it.  They use it for their own

6   sexual gratification.  They're likely to collect other child

7   erotica.  They say now all child pornographers don't have the

8   same characteristics in the afda- in the affidavits for the

9   search warrant.  It's only most of them.  Then they say maybe

10  he really is one and maybe what he did was he used some sort

11  of device to access these websites that was attached to his

12  computer and then he hid it in the junk in his attic.  You

13  heard evidence that there was junk in his attic and garage

14  but you didn't hear any evidence that they hid anything

15  there.  There's absolutely no evidence of that.  That's the

16  Government's way of trying to have it both ways.  Oh, when

17  say that about child pornographies and affidavits and

18  probable both the search warrants, we tell that judge all of

19  them act that way but we're telling you that's not what we

20  mean.  We only mean most of them act that way or some of them

21  act that way.  But just in case you think all of them act

22  that way, then what we're gonna do is make up a story and

23  here's the story.  There's a way to take a little device and

24  every time you log onto one of these websites you go through

25  that device and then what you can do is you can take that

1    device and there won't be anything on your computer and you

2    can hide it in the junk in your attic.  Forget about the fact

3    that you had no evidence that Mr. Krasley did that.  Forget

4    about the fact that Mr. Krasley came on the witness stand and

5    was under oath and he could have been asked about that and

6    wasn't.  Forget about that.  That's just our theory.  They

7    found nothing on his computers.  Four times they searched

8    them.  One time he even got a letter from Customs and Boarder

9    that that search that we just did in 2013, remember the

10   letter that I cross examined Special Agent Evans with, that

11   search that, that - that search we did in 2013, this was the

12   September 5th letter, the reason we kept all your stuff is

13   because we found child pornography on it.  That was a lie.

14   That - those devices had never been analyzed yet, yet they

15   send a letter to a person.  Imagine getting that letter in

16   your mailbox when you came home one day.  They send a letter

17   to a person that says we searched you, we took all your

18   stuff, and the reason we're keeping it is because it contains

19   child pornography.  Months later they give back all of his

20   devices because they contained nothing.  They've got a pole

21   camera that apparently doesn't see his house.  Nobody said

22   whoever hacked his IP address, whoever coopted it was in a

23   building or in another house or in a car.  Nobody said that.

24   But the pole camera doesn't even look at his house.  What it

25   does see is him going back and forth and getting his mail,

1  cutting his lawn, going back and forth from his home.  The

2  cell site location information says that at the time or right

3  around the time that some of these transfers took place, his,

4  his cell phone was located generally in the area that would

5  ping off of that tower.  It doesn't tell you whether he was

6  in the house at a computer.  The pole camera and cell site

7  location information can't tell you exactly where he was,

8  that he was on a computer or exactly what he was doing.

9       And these chat fragments and the Staples thumb drive

10  with the file names on it, let's talk about that for a

11  minute.  You remember that that the chat fragments were

12  located on the device that we seized and returned in 2013.

13  And it was seized again in 2018 and the chat fragments were

14  still there.  Now, if Mr. Krasley was the guy, when he got

15  that device back after the search in 2013 he would know that

16  those chat fragments were there and that device would've been

17  in an incinerator somewhere.  Same with the thumb drive.  If

18  Mr. Krasley was the guy, he would have known that those files

19  names were on that thumb drive because if he was the guy he

20  would've been the one that would had deleted the, the videos

21  that were attached to, and when he got it back he would have

22  hit it with a hammer.  They search in 2006, 2009, 2013 and

23  2018, and all the same stuff is always there.  If he was the

24  guy he wouldn't have that stuff still there.  He would - it

25  wouldn't be the same.  And when I - when Agent Munjone was on

1   the witness - Special Agent Munjone was on the witness stand
2   and I was talking to him about the 2013 warrant with the, the
3   device that had the chat fragments on it and I said you
4   returned that, Agent Munjone, because there was nothing
5   illegal about those chat fragments and because you found
6   nothing else on the computer and you didn't know who created
7   those chats.  You didn't know.  And he said yes.  His, his
8   testimony was it appears someone was chatting using that
9   device.  Someone is not John Krasley.  It's someone.  They
10  don't know who it is.  They know - they know he didn't live
11  alone at that time.  He was living with his wife and I'm not
12  suggesting his wife did anything.  I don't know who did it.
13  I can't prove who did it.  We don't have a burden of proof.
14  But they don't have any idea who was in and out of that house
15  and had access in 2010, 11, 12, 13, 14, 15, and 16 and 17.
16  They don't know.  And you know he cooperated with the
17  December 7, 2018 warrant when they found a safe that was in
18  his bedroom and Agent Evans tells you that she asked him for
19  - to be able to get into it and he said sure.  Does that
20  sound like a criminal to you?  They knew we said he was
21  innocent.  They knew we suspected someone had to have hacked
22  his IP address.  So, they go and interview all of his
23  neighbors.  We didn't say it was the neighbor.  We said we
24  don't know who it is.  They said, well, you know what, Donato
25  may say it's a neighbor so we'll go - we'll go interview the

1    neighbors and all the neighbors say no.  You saw Harry Haas

2    today, he's a neighbor.  They bring him on rebuttal to rebut

3    what I'm not sure, but he ends up saying John is the best

4    neighbor I ever had, or John's the best of my neighbors.

5    Your, your recollection of his testimony will control.  They

6    followed him by motor vehicle, by airplane.  Imagine this.

7    Twelve years this guy has been under investigation.  You

8    would think after 12 years there'd be some person who said,

9    you know, that John Krasley's a little weird, you know.  He

10   ends up going around little kids and playgrounds and bus

11   stops.  You would think there'd be somebody but you heard

12   nobody because it isn't him.  So, they figure we'll follow

13   him and they do.  And he goes to the gym.  They know he goes

14   to a gym.  No evidence from all that surveillance.  And all

15   of the law enforcement agents that testified to you in this

16   trial all said in one way or another, yes, it's true.  There

17   were four search warrants in 12 years.  Yes, the affidavits

18   all said there - there's probable cause we'd find evidence.

19   No, we never found ever.  No, we didn't investigate anybody

20   else really.  We spoke to some people but we never asked to

21   see their devices.  Yes, John's router was in and out of the

22   open - out in the open where everybody could see with the

23   password visible.  We tested the Wi-Fi and the cell phone

24   which we know is not the best way.  They've been

25   investigating this guy so long that's why the Government says

1   to you this is an important case for the Government, because

2   if they come up empty on this case they've spent 12 years

3   trying to prove that this guy's the guy when he's not the

4   guy.  We don't know who invaded his Wi-Fi.  We don't know

5   where they were except at some point whoever it was, was

6   close enough.  We can't prove how it was done but we showed

7   you evidence about how it is done and the frequency with

8   which it is done.  It happens.  We showed you evidence about

9   how it happens.  Kyle McArdle from Cornerstone sat up there.

10  He didn't really disagree much with what the Government's

11  expert.  Nobody said the Government's expert's unqualified.

12  Nobody said Kyle McArdle's unqualified.  Nobody objected to

13  them testifying as experts.  They both said the same thing.

14  Yes, it happens.  Here's how it can happen.  No, we can't say

15  that it happened in this case 'cause it doesn't leave the

16  trace.  Yes, there are commercially available software tools

17  that allow you to get into somebody else's IP address and

18  they are commercially available I think he said on Amazon,

19  other tools and antennas that could let someone do that.  And

20  we didn't prove who did it, but as the Court will tell you,

21  we don't have a burden of proof.  We don't have the burden of

22  proof for a very good reason.  It's not just something given

23  us, it's every defendant in every criminal case as the

24  framers of this constitution knew how unfair it would be to

25  accuse somebody of something and then tell them prove that

1   you didn't do it.  They lived under that kind of system, an
2   inquisitorial system.  It's one of the reasons, not the main,
3   but one of the reasons for the revolution.  They knew it was
4   an impossible task.  We never said it was a neighbor.  We
5   only said it wasn't John.  We never said it was his wife.  We
6   only said it wasn't John.  We never said we knew who it was.
7   We only said it wasn't John.  We can't issue a subpoena to
8   compel somebody to testify.  We don't have that power.
9   That's a power the Government has.  A citizen can't get a
10  search warrant to seize someone else's property to see if
11  they might do it.  That's a power the Government has.  These
12  are some of the reasons the defendant in a criminal case does
13  not have the burden of proof.  They don't have to prove their
14  innocence, and you said in voir dire you would not require
15  him to do so in order to find him not guilty.  We're holding
16  you to that.  It is impossible to prove a negative.  You've
17  all heard that that's what it means.  You can prove that
18  someone did something but that person can't prove they
19  didn't.  But while you're discussing reasonable doubt after
20  you go back in the deliberation room, consider this.  That's
21  what the Government had.  They had a reasonable doubt.  They
22  had a reasonable doubt that it was Krasley.  That's why they
23  searched him four times.  That's why they went and talked to
24  all the neighbors.  Geez, I wonder if it was them, and all
25  the neighbors not surprisingly in, in the presence of two,

1   three or four federal agents who identified themselves,

2   people with badges, said no, no, it wasn't me and I don't

3   know whether it was or not.  I don't want to accuse anybody.

4   They got warrants, pen register, Giga- GigaTribe records,

5   cell site location information, mobile and air surveillance

6   in a desperate attempt to get evidence that it was John and

7   they failed and they failed because it wasn't him.  Why was

8   it that there was no activity on that internet connection for

9   those times that Mr. Glenn talked to you about?  Well, they

10  don't know.  They can't prove it.  What they say to you is

11  we'll guess.  It must've been him.  It must've been because

12  he was visiting his aunt.  He - his aunt's dying.  He was on

13  the witness stand this morning.  Mr. Glenn asked him about

14  his aunt.  John said he went up to see her on the day she

15  died and Mr. Glenn says to you that week when she was sick up

16  there that must be where he was and I want you think that

17  that must mean that's why there was no activity on that site.

18  It could mean just the opposite because Mr. Krasley when he

19  testified didn't say I was up there 24 hours a day for seven

20  days or five days.  So, if there was no activity while he was

21  up there and no activity for that consecutive five days even

22  though he was home, it could mean just the opposite.  So,

23  they say, well, why wasn't there activity?  Well, just guess.

24  But here's the thing, ladies and gentlemen.  This is a man's

25  life.  We don't allow guesses.  That's not a reasonable

1    inference.  There's a difference between a reasonable

2    inference and a guess.  If someone walks in with a raincoat

3    that's soaking wet with an umbrella, you might guess that

4    it's raining.  But if you look out the windows and it's

5    sunny, that would be a wrong guess.  There's some other

6    reason why that person is soaked with water.  They're

7    obligated to prove it to you because they're not allowed to

8    ask you to do a job like this and render a judgment like this

9    with a question in your mind that you're gonna have to live

10   with for the rest of your life.  You're not allowed to guess

11   because you could guess wrong, and if you guess wrong it's

12   got an adverse effect on someone's life.  A man's life should

13   not rest on a guess.  The Government says we don't know who

14   typed those chat fragments.  We don't know.  We don't know

15   who put the titles on the USB drive where the videos used to

16   be, who partially erased the chat fragments, who deleted the

17   videos on the USB.  But they say to you it must have been

18   him.  Just guess that it was him.  It was him who typed the

19   chats, who inserted the titles, who erased them, and who

20   erased the videos.  Just guess.  But guessing isn't allowed

21   'cause you might guess wrong.  A man's life should not rest

22   on a guess.  They tell you we never tested the Wi-Fi from the

23   Krasley residence.  We walked around with a cell phone.  We

24   know that's not the best way to do it.  We don't know how far

25   it extended.  We never asked the local people if we could see

1    their devices.  Hey, can we take a look at your devices to

2    see if there's anything left from GigaTribe on it?  We never

3    did that because just guess it was John.  The law does not

4    permit you to guess.  Your oath does not allow you to guess.

5    Your conscience shouldn't allow you to guess.  You can't live

6    with a verdict that's based on a guess because each of you

7    knows a man's life shouldn't rest on a guess.  This is really

8    what proof beyond a reasonable doubt means.  One logical,

9    understandable, comfortable conclusion.  You have to be

10   comfortable that you made the right decision.  No one has the

11   right to ask you to guess.  Although we have no burden of

12   proof in a criminal case, we, we wanted you to know some

13   things.  We wanted you to know that John was well thought of.

14   This guy who they keep referring to as the defendant here,

15   this person who's been under investigation for 12 years, we

16   wanted you to know how well thought of he is.  Mr. Glenn says

17   well, you know, it was his friends and his family.  Well, who

18   would you call?  Strangers?  Do you know strangers that will

19   come in and attest to your character?  That is who you call.

20   They are the people who know you the best.  They are the

21   people who know you so well that they know foibles about you

22   that other people don't know.  My wife could tell you things

23   about me that no one else knows.  My closest friend could do

24   the same.  That's who we call.  We wanted you to know he was

25   well thought of and that those who know him best think highly

1   of him because he has an excellent reputation for being

2   honest and truthful and abiding by the law.  That doesn't -

3   this case doesn't make sense because that's not a child

4   pornographer.  Child pornographers don't abide by the law.

5   They live lives - they live lives of lies.  They're not

6   truthful or honest.  And these witnesses also said that's my

7   opinion too.  That's my opinion.  A couple of them said I've

8   known him - I'm a young person.  I've known him because he

9   used to babysit for me or he's my godfather.  It's an honor

10  to be named someone's godfather in the Christian faith.  And

11  because that's the person who's gonna be responsible for your

12  child and his or his spiritual future in the event you die

13  during his, during his childhood.  So, he's honest and an

14  honest person is true.  And he's, he's truthful and a

15  truthful person tells the truth.  He told the truth here

16  today.  He took the oath.  He answered every question that

17  Mr. Link asked him.  He answered every question that Mr.

18  Glenn asked him.  Mr. Glenn didn't say, Mr. Krasley, those

19  2010 chat fragments, where did they come from?  Those file

20  names on that Staples thumb drive where did they come from?

21  He didn't ask him.  He didn't show that he lied about

22  anything, exaggerated, was somehow just talking out of self-

23  preservation, and they told you he was law abiding.  A person

24  who has respect for the law does not commit child pornography

25  offenses.  The crimes at issue here are among the worst that

1   anyone can commit and here's why those reputation witnesses

2   were so important.  The Court will instruct you that Mr.

3   Krasley's defense is that it wasn't him, and the Court will

4   also instruct you that the law is, that evidence of Mr.

5   Krasley's reputation that is inconsistent with the character

6   traits of someone who'd be involved in these – the commission

7   of some – of, of these crimes may give rise to a reasonable

8   doubt in your mind because it is improbable that a person of

9   good character would commit such a crime.  I don't want you

10  to think, ladies and gentlemen, that those witnesses came in

11  here for any other reason than they wanted to tell you that

12  John's a law-abiding person.  They wanted you to know that

13  he's a truthful and honest person.  They didn't want you to

14  make a decision about him without knowing that.  They weren't

15  compelled to be here.  They weren't subpoenaed.  They were

16  all volunteers because it's improbable that a person with

17  that kind of reputation who is seen that way in his community

18  would commit an offense.  You saw them, those reputation

19  witnesses.  You saw them.  They were all good people.  They

20  all knew him.  Took a day off from work to come in here.  You

21  know, they didn't have to.  Not one – not one rebuttal

22  witness was called to rebut what they said or to rebut

23  anything that Mr. Krasley said on the witness stand.  Not one

24  rebuttal witness was called.  Harry Haas was called.  We had

25  interviewed Mr. Haas.  And as I said to you earlier, that guy

1    thinks the world of John Krasley.  We didn't even ask him the

2    reputation questions.  He told the agents and he told our

3    investigator that Krasley was his best neighbor.  Helpful,

4    selfless, and dependable.  And you saw him testify.  You saw

5    Mr. Haas testify.  You can judge his credibility.  Yes, we

6    put Mr. Krasley on the witness stand or put better, in law,

7    the decision as to whether or not a criminally accused person

8    is gonna testify is that person's decision alone, not the

9    lawyer's decision.  Mr. Krasley wanted to testify and he got

10   on the witness stand and essentially said ask me anything you

11   want.  That doesn't sound like a criminal or someone with

12   something to hide.  And you know, if he chose not to testify,

13   the Court, at my request, and sometimes the Court on its own

14   motion would instruct you that the defendant's failure to

15   testify cannot be used against him in any way because it is

16   not proper to punish someone for the execution of a

17   fundamental constitutional right, in this case the right to

18   remain silent.  So, he didn't have to testify and the Court

19   would've in all likelihood said that to you, you couldn't

20   hold it against him.  And John knew that but he testified

21   anyway.  He wanted you to see him.  He wanted you to see him

22   say I didn't do it.  He wanted to say to Mr. Glenn, go ahead,

23   ask me whatever you want.  Ask me.  And he categorically

24   denied it.  And the Government didn't ask him about the

25   conduct.  They didn't ask him about the chat fragments, the

1    Staples thumb drive, where he was, how many people were in

2    his house.  Who, who - what he was doing.  They didn't ask

3    him anything because they knew.  They knew he was credible.

4    They knew he was ready to answer those questions.  They knew

5    he was ready to issue a categorical denial.  You saw him,

6    ladies and gentlemen.  What's he supposed to do?  What are

7    you supposed to do when someone says you did something and

8    you know you didn't do it?  What are you supposed to do?

9    What else could he do but what he did?  He doesn't know who

10   committed this crime.  He doesn't know how this happened.  He

11   told you.  I don't have any - I' not accusing anybody.  I

12   don't know who did this.  It just wasn't me.  What else would

13   you do?  I mean, it's, it's everybody's nightmare.  He's done

14   all he can do.  It just doesn't make sense.  Four search

15   warrants in 12 years, nothing found.  A good neighbor who is

16   honest, truthful, and abides by the law, someone named as a

17   godparent, a trusted babysitting, a reliable friend?  Not one

18   person came to court to say he's bad, he's weird, he's odd,

19   he's a pervert.  Nobody.  I saw him on his computer and as

20   soon as he saw me see him he shut the door.  Not - nothing.

21   Nothing like that.  And the lead case agent told you she's

22   never seen a case like this either.  You know why?  'Cause

23   they find child pornography on pornographer's computers and

24   it's easy to convict them.  They don't have to ask you to

25   guess in those kinds of cases.  I could stand here and talk

1    to you all day.  I hope I've addressed some of the things

2    that are on your mind.  The Court will define reasonable

3    doubt for you.  While you're deliberating, if you think that

4    there may be a day in your life where you're gonna lay your

5    head down on a pillow and say I wonder if that guy was guilty

6    or I wonder if was innocent, that's a reasonable doubt.  You

7    gotta do the right thing now because that day when you put

8    your head down on the pillow, it'll be too late unless you do

9    the right thing now.  If it looks like the defendant might be

10   guilty, possibly guilty, it could be him, it's probably him,

11   that's not guilt beyond a reasonable doubt.  Guilt beyond a

12   reasonable doubt is that kind of a doubt where you have no

13   hesitation at all.  You have a clear conscience, a clear

14   mind.  It's comfortable for you to say this defendant is

15   guilty.  I suggest to you, ladies and gentlemen, that because

16   of the ca - the nature of this case, and because this case

17   doesn't make sense, the only fair, reasonable verdict, the

18   only verdict under these circumstances that you would want if

19   some friend or loved one of yours was sitting in that chair,

20   is not guilty.  For about six years, seven years, John

21   Krasley has been in my hands after the execution of the 2013

22   search warrant.  My reluctance to sit down is because I don't

23   want - I'm not sure I can leave him in your hands.  I'm not

24   sure I've said everything I need to say to you to give you

25   the right idea of who he is and why this case does not have

1    proof beyond a reasonable doubt.  But I'm not permitted to do

2    that and you're probably tired of hearing from me anyways, so

3    I'll just say this, in a few minutes he's gonna be in your

4    hands and out of mine.  Treat him right.

5            THE COURT:  Thank you very much, Mr. Donato.

6    Assistant United States Attorney Glenn, your rebuttal

7    argument, sir?

8            MR. GLENN:  Thank you, Your Honor.  I want to be

9    very clear with you, ladies and gentlemen.  We don't want you

10   to guess.  We don't want you to guess.  We want you to do

11   precisely what the Court will instruct you to do, consider

12   the evidence, consider what is before you, consider the

13   elements of the offense, and then consider whether you have a

14   reasonable doubt.  And we submit that on the evidence that we

15   have given you, you won't.  You will not have a reasonable

16   doubt.  You can find him - the defendant guilty beyond a

17   reasonable doubt.  Mr. Donato has said, well, we're not

18   saying it's the neighbor, we're not saying it's this or that,

19   it just wasn't him.  They put on evidence about cracking

20   passwords and signal strength and we've, we've talked about

21   those.  If it's not a neighbor then it's somebody else.  But

22   whoever that somebody else is that they are asking you to

23   conjure up, that person has to be close enough to connect, so

24   that's the person on the road or in the woods every day or

25   every other day or every third day, and that doesn't make

1    sense for five years.  That doesn't make sense.  Looking at

2    the evidence and, and considering these arguments, you're,

3    you're looking at what is speculative and what is real.  Mr.

4    Donato says we don't know who did it.  We don't know if it's

5    a neighbor.  We don't know where.  We don't know how.  It

6    wasn't him.   But that is just saying we don't know, as he

7    can say, and they have no burden, absolutely right.  I would

8    ask you to look at what is real.  What are the real facts

9    that are in the case?  What have been actually proven, and

10   what does that tell you?  I'm not gonna go over everything we

11   talked about before, but just remember that there are key

12   facts here which are essentially undisputed.  It was his

13   internet address.  It went over five years.  He lived there

14   alone or just with his wife, and I'm not saying his wife had

15   anything to do with it.  For the purposes of whether the

16   signal was in or outside the house or the thumb drives and

17   that chat session, and why did didn't he go and get rid of

18   some that stuff?  He thought he deleted it.  Agent Munjone

19   told you that the chat session was deleted and files on the

20   thumb file were deleted if he'd even remembered it by the

21   time the, the search came around.  And he got the evidence

22   back.  There are connections to mail.ru and his supply house

23   address right next to each other within three minutes early

24   in the morning at six in the morning, and you know he was up

25   going to the gym around those hours.  And then, of course,

1    there are the, the GigaTribe records and the pen register

2    records again showing so many, so persistent, consistent

3    connections from that IP address and that says there's gotta

4    be somebody on the road or in the woods or it's him.  It's

5    him from his house.  Him at his computer.  Remember that when

6    Agent Conrad told you about watching some of the child

7    pornography, the child abuse images on the Title III

8    interception, on the wiretap, he said I could watch the

9    movies that he was downloading in real-time.  No

10   interruptions.  Nothing breaking apart.  He could watch them

11   in read-time, large video files.  When things uploaded, Agent

12   Conrad saw they uploaded almost instantaneously.  That

13   suggests a very strong signal as if you were right in the

14   house, right next to your router, right there.  So, ladies

15   and gentlemen, the, the evidence of that it is Mr. Krasley is

16   strong.  It is persuasive.  It is consistent and it is beyond

17   a reasonable doubt.  That is what you know.  That is the

18   evidence that is actually proven.  Those are facts, and those

19   facts should lead you to a conviction here.  Yes, he's

20   different.  He doesn't necessarily reflect the characteristic

21   of every child pornographer, but there, there are some who

22   don't.  Those a generalities.  Those are generalizations.

23   But the defendant should not evade responsibility for what he

24   did here simply because the agents didn't find the child

25   pornography at his house.  The evidence shows that he did it.

1  The fact that they didn't find the child pornography should

2  not give him a pass on the crimes that he committed here.

3  His character witnesses I'm sure were quite sincere in what

4  they said about him and about his reputation and their

5  opinion about him.  But again, child pornography is a very

6  secret thing.  You do it in the dark.  You do it by yourself,

7  and you don't tell people.  It's a secret.  They wouldn't

8  know.  Ladies and gentleman, the evidence that we presented

9  here in fact is, is real evidence, is solid evidence, and is

10 far more than is necessary for you to find Mr. Krasley guilty

11 beyond a reasonable doubt, and we would ask you to do that on

12 all counts.  Thank you.

13     THE COURT:  Thank you, Assistant United States

14 Attorney Glenn.  Counsel, anything further before I charge

15 the jury?  Mr. Glenn?

16     MR. GLENN:  Could we approach the, could we approach

17 the bench.

18     THE COURT:  Certainly.  Counsel, please approach.

19 And before counsel do, ladies and gentlemen, this takes

20 approximately 30 minutes to charge you on them all.  You've

21 already been sitting for over and hour and a half.  Does any

22 juror need a break?  Please raise your hand.  Okay.  We're

23 gonna stand in recess for 10 minutes because you have been

24 sitting a long time and some jurors have raised their hands.

25 Now, you've heard the closing arguments.  You've heard the

1    evidence.  You haven't heard my charge yet, so again, please

2    continue to keep an open mind about this case until you have

3    heard my charge.  So, you should refrain from discussing it

4    with each other or with anyone else including members of your

5    family or allow anyone to talk to you about it.  Do not form

6    any opinions about this case until you retire to the jury

7    room after my charge.  When I am done with my charge, it will

8    be past 4:30, closing in on 5:00.  You will get to decide

9    whether we end for the day.  You go home, get a good night's

10   sleep, come back tomorrow and begin your deliberations or

11   whether you wish to begin your deliberations tonight and at

12   some time break then and go home or whether you want to stay

13   for a lengthy period of time and deliberate tonight.  This is

14   one of the disadvantages to closing and charging in the

15   afternoon.  We don't want you to rush to try to reach a

16   verdict.  We don't want you to be tired as you're

17   deliberating towards reaching a verdict.  So, but I'm gonna

18   give the decision to you in the first instance after I am

19   done charging him and we'll send you back to the jury

20   deliberation room and that's the first item of business other

21   than selecting a foreperson is to decide do we want to go

22   home and come back tomorrow morning at 9 o'clock fresh, or do

23   we want to begin deliberations this evening just so you know

24   what you're gonna be doing?  But for now, we're just gonna

25   stand in recess.  We'll bring you back in 10 minutes and

1    you'll hear the charge of the court.

2              ESR/CLERK FITZKO:  All rise.

3                        (Jury out 4:05 p.m.)

4              THE COURT:  Ms. Fitzko, is the food back there?

5    They can start eating.

6              THE COURT:  You may be seated.  The record will

7    reflect the jury is no longer present.  Counsel, by the way,

8    food has already been delivered to the jury deliberation

9    room.  In the - in the - whether they want to stay or not,

10   food's been delivered just in case.  But somebody wanted to

11   approach.  Assistant --

12             MR. GLENN: I did, Your Honor.

13             THE COURT:  Yes, Mr. Glenn?

14             MR. GLENN:  I didn't want to interrupt Mr. Donato

15   but I, I have one concern about something he said in closing

16   argument and that was that the Government did not present

17   evidence that he was a pervert and he was going to amusements

18   parks or going and watching little kids.  I think had we

19   tried to offer evidence like that we would've had a clear

20   objection that that's character evidence --

21             THE COURT:  Yes.

22             MR. GLENN:  -- and would be impermissible.  So, I'm,

23   I'm - my inclination is to ask the court to instruct the jury

24   that the Government is not permitted to present pure

25   character evidence to prove that the defendant acted

1    consistently with that in, in order to kind of mute that,

2    that argument.

3            THE COURT:  Mr. Donato?

4            MR. DONATO:  Your Honor, I, I believe I can't tell

5    you that I specifically recall every word I said, but I

6    believe that that was in the section of my closing where I

7    was saying about reputation witnesses testifying to his good

8    character and there was no rebuttal to say he was a person of

9    bad character.  That - that's the sense in which I was trying

10   to argue that.  And I don't think I said the Government

11   didn't produce.  I said you didn't hear anybody come in to

12   say that he has bad character.

13           THE COURT:  Right.  And I don't know whether the

14   words you used, pervert, et cetera, I don't know whether they

15   would have rebutted the character traits that were actually

16   introduced which was honesty, truthfulness, and law abiding.

17           MR. DONATO:  Law abiding is - would be one I think.

18           THE COURT:  Perhaps, perhaps.  I guess you could be

19   a pervert doing things that are legal or you could be a

20   pervert doing things that are illegal, but perhaps.  I was a

21   little concerned about that character reference and the

22   suggestion that the Government could - it, it gave the

23   impression that the Government just call in people to say bad

24   things about Mr. Krasley.  And while they can rebut those

25   particular traits, they did not.  But I don't know that it

1    does any - I, I don't know that any instruction now would

2    make any real impact.  What, what type of instruction were

3    you thinking?

4         MR. GLENN:  Well, even better would be that the

5    Government would not be permitted to show evidence of Mr.

6    Krasley engaging in - well, we couldn't do that - engaging in

7    activities of special interest with children.

8         THE COURT:  Because it's a - it's a fine line what

9    you would've been able to get in to rebut, a fine line.  And

10   I'm not sure where that line falls without knowing what the,

11   the prospective evidence may have been to rebut that, that

12   good character evidence.  Certainly, anything if you just

13   focus on the law abiding if you had evidence that he did not

14   abide by the law, even specific instances.

15        MR. GLENN:  Well, but just as Mr. Donato said

16   correctly that possessing the chat logs of chats which

17   discuss exchanging child pornography is not a violation of

18   the law, neither is hanging around schoolyards and watching

19   kids as they come and go or going to an amusement park.  If

20   Mr. Krasley, for example, took children to an amusement park

21   on a regular basis or had them stay over at his house

22   overnight or things like that, maybe that would have been

23   evidence we could introduce to suggest this - the things that

24   Mr. Kra- Mr. Donato is saying we didn't do.  But we didn't

25   because we didn't think that was appropriate character

1   evidence.

2         MR. DONATO:  I don't think there was any evidence.

3   There was evidence of, you know, him being good to children

4   but you obviously didn't (indiscernible).  Your Honor, I

5   think that our position would be that we would object to any

6   mention of it or any instruction primarily because although I

7   appreciate professional courtesy of Mr. Glenn not wanting to

8   interrupt me, I can't do anything about it now in front of

9   this jury.  I can't correct it.  I can't go and say, you

10  know, I misspoke and what I - or I can't go and say here's

11  what I meant, I meant that you saw nobody come in to refute

12  the reputation witnesses that we presented.

13        THE COURT:  Right.  I think we should just let it go

14  because it was --

15        MR. GLENN:  Very well, Your Honor.  Thank you.

16        THE COURT:  Take five minutes or so, relax a bit,

17  and then you can sit and enjoy my closing statement of the

18  law.  You've both had an opportunity to review the verdict

19  slip and have found it acceptable?

20        MR. DONATO:  Verdict slip's okay.

21        MR. GLENN:  It is to the Government, Your Honor.

22        MR. DONATO:  Yes, it's fine.

23        THE COURT:  Very well.  Alright.  And, of course,

24  I'll call you up to see if you have any exceptions to my

25  charge.  Please let me know if I miss anything.  Please let

1    me know if you have something else that you hadn't thought of
2    before or if you think I'm somehow misstating the law.  And
3    I'm hoping that the jury does not want to say late because I
4    do think they're probably tired after a long day of, of
5    testimony and argument and then my charge.
6            MR. GLENN:  Well, they probably want to stay long
7    enough to the food, Your Honor.
8            THE COURT:  Yes.  And we wouldn't want it to go to
9    waste.
10           MR. DONATO:  They're not gonna receive the charge,
11   the final charge until that (indiscernible).
12           THE COURT: Yes, sir.
13           MR. DONATO:  I think I - respectfully, I'd renew my
14   request we make - you make that decision for them.  They,
15   they may be - they heard a lot today.  We've crammed a lot
16   into one day I think including the arguments of counsel, and
17   I - I'm concerned that they may want to stay because --
18           THE COURT:  They don't want to come back tomorrow.
19           MR. DONATO:  They don't want to come back tomorrow.
20           THE COURT:  Exactly.  That's almost always the
21   reason they want to stay.  It's because they don't want to
22   come back tomorrow.
23           MR. DONATO:  And, and that - so, that works the same
24   sort of damage.  And, and it's probably equal to both of us,
25   you know, that they'll come to a hasty verdict just to get

1  out of here.

2          THE COURT:  What are your thoughts, Assistant United

3  States Attorney Glenn?

4          MR. GLENN:  I think they should have the opportunity

5  to begin deliberations.  I mean, if in fact all 12 of them on

6  serious and careful reflection are fairly convinced one way

7  or the other, then they should have the opportunity to do

8  that vote.  If they're not, obviously, they can preliminarily

9  begin and then they could come back tomorrow.

10          MR. LINK:  You already told them --

11          THE COURT:  Let's, let's set somewhat of an early

12  deadline.  We'll let them go back and deliberate.  We'll let

13  them make the decision.  They may decide after they've eaten

14  that they do want to go home for the night.  If they do, then

15  I certainly would not want them trying to deliber- liberate

16  well into the evening after having listened to testimony all

17  day long.  So, let me think - let's see what they say and let

18  them begin and see what they say, and if they want to begin

19  their deliberations just let that - we'll let them.

20          MR. DONATO:  Yes sir.

21          THE COURT:  We just won't let it go on too long into

22  the evening because I think it is best even though I don't

23  want them to have come back tomorrow either, but I think it's

24  in the interest of justice a well-rested jury is probably

25  deliberating a little more rationally than a tired jury.

1           MR. DONATO:  Yes sir.

2           MR. GLENN:  Very good.

3           THE COURT:  Alright.  Thank you.

4           ESR/CLERK FITZKO:  All rise.

5           THE COURT:  As you were.  That's fine.

6                (Recess 4:13 p.m. until 4:30 p.m.)

7           ESR/CLERK FITZKO:  Counsel I think the Judge is

8    gonna come out and speak to you before I bring the jury in.

9    All rise.

10          THE COURT:  You may be seated.  Thank you.

11   Counsel, it's now four - excuse me, all parties previously

12   present are once again present.  The jury is not present.

13   Counsel, it's now 4:30 and I wanted to get your opinion as to

14   whether we should send the jury home now at the time we

15   normally would have ended today and instruct them in the law

16   tomorrow morning and let them begin their deliberations

17   tomorrow.  Assistant United States Attorney Glenn, what are

18   your thoughts?

19          MR. GLENN:  I think that would be reasonable.  We

20   have no objection to that and they would still have all day

21   tomorrow to deliberate.

22          THE COURT:  Mr. Donato, what are your thoughts?

23          MR. DONATO:  I agree, sir.  I, I - there's always a

24   tension between charging and then letting them go and then

25   they, they may forget.  So, while they're fresh I think it's

1   a good idea to have the charge and they begin deliberations

2   and they have all day if they want.

3           THE COURT:  Very well.  They may not like it because

4   they were under the impression that maybe they would get out

5   of here today, but I don't want them to be anxious to get out

6   of here.  I went them to be anxious to make sure they take

7   their time and carefully consider all the evidence --

8           MR. GLENN:  Yes sir.

9           THE COURT:  -- and the law.  Very well.  I'm gonna

10  send the jury home tonight and we'll reconvene at 9 o'clock

11  tomorrow morning for the instructions on the law.

12          MR. DONATO:  Yes, Your Honor.

13          ESR/CLERK FITZKO:  All rise for the jury.

14                      (Jury in at 4:33 p.m.)

15          THE COURT:  You may be seated.  Thank you.  The

16  record will reflect all parties previously present are once

17  again present.  The jury is present.  Ladies and gentlemen,

18  we have changed our plan because we have now reached 4:30 in

19  the afternoon and after consulting with counsel it was

20  determined that it would be best to send you home for the

21  night, bring you back at 9 o'clock tomorrow, tomorrow

22  morning, instruct you on the law, and then allow you to begin

23  your deliberations at that time.  Now, I understand there's

24  food back there.  You're free to eat that.  Take some of it

25  with you.  Take all of it with you.  And I apologize because

1   a lot of time that was waste- I don't want to say wasted

2   today.  It might not have been wasted with counsel and myself

3   but it was wasted - your time was wasted and I do apologize

4   for that.  We had been running very smoothly right up until

5   today and what, what it's done has it's led us to far too

6   late in the afternoon now.  So, you've heard everything that

7   you need to hear except for my charge on the law.  So, the

8   cautionary instructions I've been giving you for the last

9   several days still hold.  Please remember that you're not to

10  discuss the case among yourselves or with anyone else until

11  you've heard the law and we excuse you to begin your

12  deliberations tomorrow.  You are not to conduct any

13  experiments or make any individual investigations of any of

14  the facts of the case.  Please do not make any internet

15  searches related to the case, and do not discuss the case on

16  any social networking sites or blogs.  You are not to read,

17  listen to, or watch any media accounts of the case, and

18  please wear your juror badges in an obvious place on your

19  clothing at all times while you're in the courthouse.   You

20  should keep an open mind about this case until all the

21  evidence is in on both sides until you've heard the closing

22  arguments and the charge of the Court and until you get to

23  the jury deliberation room because it is only at that time

24  that you will know enough about this case and about the low

25  to intelligently and favorably discuss it.  So, you should

1  refrain from discussing it with each other or with anyone

2  else including members of your family or allow anyone to talk

3  to you about it.  Do not form any opinions about this case

4  until you retire to the juror room after my charge.  We'll

5  stand in recess until 9 o'clock tomorrow morning.  Have a

6  good night, and I'm serious about the food.  Eat it here,

7  take it with you.

8              ESR/CLERK FITZKO:  All rise.

9                     (Jury out at 4:35 p.m.)

10             THE COURT:  You may be seated.  Thank you.  The

11  record will reflect the jury's no longer present.  Counsel,

12  there's one other charge I was wondering about that - and

13  it's the inflammatory photograph charge.  It wasn't requested

14  by either side.  It's - I already did try to give them that

15  instruction when the photographs were actually presented to

16  them.  Does either side wish me to give the inflammatory

17  photograph instruction?

18             MR. GLENN:  No, Your Honor.  I don't think that's

19  needed at this point.

20             THE COURT:  Mr. Donato?

21             MR. DONATO:  I, I don't know that that particular

22  instruction is needed.  When the - when the images were

23  introduced the Court did give a short instruction --

24             THE COURT:  Yes.

25             MR. DONATO:  -- but it wasn't the entirely of the

1    inflammatory photographs instruction.

2            THE COURT:  No, it was not to allow to inflame

3    their, their passion such if they couldn't have a reasoned -

4    I won't - can't say exactly what it says, but they couldn't

5    have a reason and rational review of the evidence.

6            MR. DONATO:  I, I would ask that the Court give that

7    instruction again.

8            THE COURT:  It's much easier to give the, the

9    standard instruction only because I'm not quite sure - if

10   you, if you would give me a proposed instruction that you

11   would be comfortable with.  I don't want to take a chance on

12   trying to recreate what I had said at the time that was

13   largely based on the inflammatory photograph instruction.

14           MR. DONATO:  May I, may I respond to this tomorrow

15   morning?

16           THE COURT:  Absolutely.

17           MR. DONATO:  Just take a look at it tonight?

18           THE COURT:  Absolutely.  Anything else before we

19   stand in recess, Assistant United States Attorney Glenn?

20           MR. GLENN:  No, Your Honor.  Thank you.

21           THE COURT:  It is so much easier to say Mister, but

22   you've earned the title of Assistant United States Attorney so

23   I try to use it as much as I can, and Mr. Donato?

24           MR. DONATO:  No, sir.

25           THE COURT:  Very well.  We'll stand in recess until

1   9 o'clock tomorrow morning.

2             MR. DONATO:   Thank you.

3             MR. GLENN:   Thank you, Your Honor.

4             ESR/CLERK FITZKO:   All rise.

5                 (Proceedings ended at 4:37 p.m.)

CERTIFICATE

I, Stephanie Garcia, court approved transcriber, certify that
the foregoing is a correct transcript from the official
electronic sound recording of the proceedings in the above-
entitled matter.

April 30, 2021